**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ROBERT E. PRIMUS, in his official capacity,

*Plaintiff,*

vs.

DONALD J. TRUMP, in his official capacity, *et al.,*

*Defendants*.

Civil Action No. 1:25-cv-03521-DLF

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

I.      Statutory Background ................................................................................................. 3

II.     Procedural Background............................................................................................... 4

III.    Plaintiff's Amended Complaint ................................................................................. 4

LEGAL STANDARD........................................................................................................... 7

ARGUMENT ....................................................................................................................... 7

I.      Plaintiff Fails to Plausibly Allege that His Removal Was Motivated by Race .............. 7

II.     Plaintiff's Claim Is Not Legally Cognizable ................................................................. 17

CONCLUSION..................................................................................................................... 22

**TABLE OF AUTHORITIES**

**CASES**

*Alston v. City of Madison*,
  853 F.3d 901 (7th Cir. 2017) ........................................................................... 9, 10, 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................ 7, 11, 16

*Bellinger v. Bowser*,
  No. 1:17-cv-02124-TJK, 2018 WL 4705808 (D.D.C. Sept. 30, 2018) ........................ 11, 12, 16

*Blackwell v. Strain*,
  496 F. App'x 836 (10th Cir. 2012) ........................................................................ 11

*Bolling v. Sharpe*,
  347 U.S. 497(1954)........................................................................................... 8

*Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
  551 U.S. 701 (2007)........................................................................................... 14

*Gomillion v. Lightfoot*,
  364 U.S. 339 (1960)................................................................................... *passim*

*Gustave-Schmidt v. Chao*,
  226 F. Supp. 2d 191 (D.D.C. 2002) ......................................................................... 7

*Harrington v. DC Winery, LLC*,
  No. 22-689 (TSC), 2023 WL 5561604 (D.D.C. Aug. 29, 2023) .................................. 7

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935)....................................................................................... 1, 17

*In re Navy Chaplaincy*,
  738 F.3d 425 (D.C. Cir. 2013)........................................................................... 10

*In re Sealed Case*,
  121 F.3d 720 (D.C. Cir. 1997)........................................................................... 20

*LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*,
  784 F. Supp. 3d 1 (D.D.C. 2025) ........................................................................ 11

*McCleskey v. Kemp*,
  481 U.S. 279 (1987)........................................................................................... 13

*Myers v. United States*,
  272 U.S. 52 (1926)......................................................................................... 2, 17

ii

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020) .................................................................................................... 17

*Smith v. Clinton*,
  253 F. Supp. 3d 222 (D.C. Cir. 2018) ........................................................................... 7

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.* (SFFA),
  600 U.S. 181 (2023) ............................................................................................... 13, 18

*Trump v. Hawaii*,
  585 U.S. 667 (2018) .................................................................................................... 21

*Trump v. United States*,
  603 U.S. 593 (2024) ......................................................................................... 2, 17, 18

*Trump v. Wilcox*,
  145 S. Ct. 1415 (2025) ................................................................................................ 17

*United States v. Virginia*,
  518 U.S. 515 (1996) ............................................................................................... 19, 20

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ............................................................................................ 2, 8, 16

*Walls v. Sanders*,
  760 F. Supp. 3d 766 (E.D. Ark. 2024) ........................................................................ 13

*Washington v. Davis*,
  426 U.S. 229 (1976) ...................................................................................................... 8

*Yick Wo v, Hopkins*,
  118 U.S. 356 (1886) ............................................................................................. *passim*

**CONSTITUTION**

U.S. Const. art. II ........................................................................................................ *passim*

**STATUTES**

49 U.S.C. § 1301(b)(1) ...................................................................................................... 3

49 U.S.C. § 1301(b)(3) ............................................................................................... 3, 6, 16

49 U.S.C. § 1301(c)(1) ....................................................................................................... 3

49 U.S.C. § 1321(a) ........................................................................................................... 3

49 U.S.C. § 10501 .............................................................................................................. 3

49 U.S.C. § 10704 ........................................................................................................... 3

49 U.S.C. § 10901 ........................................................................................................... 3

49 U.S.C. § 10903 ........................................................................................................... 3

49 U.S.C. § 11323 ........................................................................................................... 3

49 U.S.C. § 11124 ........................................................................................................... 3

49 U.S.C. § 11701 ........................................................................................................... 3

49 U.S.C. § 11702 ........................................................................................................... 3

49 U.S.C. § 13521 ........................................................................................................... 3

49 U.S.C. § 13701 ........................................................................................................... 3

49 U.S.C. § 14303 ........................................................................................................... 3

49 U.S.C. § 15301 ........................................................................................................... 3

49 U.S.C. § 24308 ........................................................................................................... 3

ICC Termination Act of 1995
  Pub. L. 104-88 ............................................................................................................ 3

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 7

**OTHER AUTHORITIES**

The Associated Press, The Gainesville Sun, In Cabinet, Obama goes for
  experience, pragmatism, (Dec. 20, 2008), https://www.gainesville.com/story/news/nation-
  world/2008/12/20/in-cabinet-obama-goes-for-experience-pragmatism/31590871007/. ........... 19

CBS News, A Cabinet That Looks Like America (Jan. 5, 2001),
  https://www.cbsnews.com/news/a-cabinet-that-looks-like-america/. ..................................... 20

Elisabeth Bumiller & Erica L. Green, *Trump Fires Black Officials from an Overwhelmingly
  White Administration*, N.Y. Times (Oct. 8, 2025),
  https://perma.cc/2DBG-3XFH ...................................................................................... 15

Ellen L. Weintraub (@EllenLWeintraub), X (Feb. 6, 2025),
  https://x.com/EllenLWeintraub/status/1887648967300694270. ............................................ 15

Exec. Order No. 14151, Ending Radical And Wasteful Government DEI Programs And
  Preferencing, § 1. ...................................................................................................... 14

Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based
    Opportunity, § 1 .......................................................................................................... 14

Fed. Election Comm'n, Shana M. Broussard,
    https://www.fec.gov/about/leadership-and-structure/shana-m-broussard/. ............................. 12

Federal Reserve,
    https://www.federalreserve.gov/aboutthefed/bios/board/jefferson.htm.................................. 12

The Federalist No. 77, at 459 (Alexander Hamilton) (Clinton Rossiter ed., 1961)...................... 21

Fox News, Obama: Attacks on Cabinet Diversity are Premature (updated Jan. 10, 2017),
    https://www.foxnews.com/politics/obama-attacks-on-cabinet-diversity-are-premature .......... 19

https://myprivateballot.com/wp-content/uploads/2025/01/Abruzzo-Wilcox-Firing
    -Letter.pdf ................................................................................................................. 11

HUD's Secretary, HUD (last visited Jan. 21, 2026),
    https://perma.cc/V3BE-SRCS.................................................................................... 16

Katz Banks Kumin, Lisa Banks and Debra Katz to Represent Former EEOC Chair and
    Commissioner Charlotte A. Burrows (Jan. 28, 2025), https://katzbanks.com/news/burrows/ ... 11

Olivia Trusty Biography, FCC,
    https://perma.cc/728W-HVF7.................................................................................... 16

Oral Argument Tr. 109:11-13, Trump v. Slaughter, No. 25-332 (U.S. Dec. 8, 2025),
    https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/25-332_7lhn.pdf 18

PBS News, Meet Joe Biden's Cabinet Picks (Jan. 20, 2021),
    https://www.pbs.org/newshour/politics/meet-joe-bidens-cabinet-picks.................................. 20

President Donald Trump Fires Fed Governor Lisa Cook (Aug. 25, 2025),
    https://www.documentcloud.org/documents/26074125-cook-letter/ ...................................... 11

Robert Primus Biography, Surface Transportation Board,
    https://perma.cc/AT64-TWWH ....................................................................... 4, 5, 16

The White House (archived), The Clinton Presidency: Building One America,
    Recore of Progress,
    https://clintonwhitehouse5.archives.gov/WH/Accomplishments/eightyears-11.html. ............ 19

William C. Vantuono, Primus Nominated to STB, Railway Age (July 21, 2020),
    https://www.railwayage.com/regulatory/primus-nominated-to-stb/........................................ 16

**INTRODUCTION**

President Trump exercised his constitutional authority to remove Plaintiff Robert Primus, a principal officer of the United States who exercised substantial executive power as a member of the Surface Transportation Board (STB). During his first year of his second term in office, President Trump similarly exercised his constitutional authority to remove a number of Democratic principal officers, of every race, throughout the Executive Branch. Plaintiff filed this action as part of a series of lawsuits by removed principal officers, claiming that their removals violated statutory provisions that protected them from removal, except for cause. Unfortunately for Plaintiff, the tide turned against such claims. The Supreme Court stayed several lower court injunctions reinstating removed principal officers of multimember agencies on the basis that the statutes conferring for-cause removal protection were likely unconstitutional. In one of those cases, *Trump v. Slaughter*, No. 25-332, the Supreme Court granted certiorari to consider whether to overrule Plaintiff's main authority purportedly supporting the constitutionality of such for-cause removal restrictions, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).

With his initial claim in question, Plaintiff shifted gears. He amended his complaint to add a claim that President Trump removed him on the basis of race in violation of the equal protection component of the Fifth Amendment's Due Process Clause. The Court should dismiss his new claim for failure to state a claim, for two reasons.

*First*, he fails to plausibly allege that President Trump removed him on the basis of race. Lacking any direct allegations of discriminatory intent, Plaintiff tries to construct a claim out of an amalgam of circumstantial allegations. He argues that a statistical pattern of removing Black principal officers exists, but the Supreme Court has explained that statistical evidence of disparate outcomes does not make out a claim of intentional discrimination "[a]bsent a pattern as stark as that in *Gomillion*[ *v. Lightfoot*, 364 U.S. 339 (1960)] or *Yick Wo*[ *v. Hopkins*, 118 U.S. 356

1

(1886)]," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), two notorious cases in which cities targeted hundreds of minority residents for adverse treatment, to the total or near-total exclusion of similarly situated white residents. Here, what Plaintiff proffers as statistical evidence comprises himself and a handful of other removed Black principal officers, when the President has also removed many officers of other races (as many other judges in this Court who have confronted challenges to such removals could attest). On the other hand, the President has appointed several prominent Black officials, including a cabinet member. Plaintiff gets no further by making atmospheric allegations with no connection to his removal, such as the fact that the President has generally opposed diversity, equity, and inclusion programs, and that the Department of Labor has issued vintage-inspired posters featuring white men. And although President Trump did not remove the remaining white Democrat member on the STB, that hardly supports an inference of discrimination where differences in that member's professional experience and her shorter term and potential near-term departure from the STB supply obvious alternative explanations for her not having been removed.

*Second*, no court has ever endorsed Plaintiff's novel legal theory that the Fifth Amendment constrains the President's selection of principal officers. "[T]he President's power to remove 'executive officers of the United States whom he has appointed'" is a "conclusive and preclusive" Presidential power that "may not be regulated by Congress or reviewed by the courts." *Trump v. United States*, 603 U.S. 593, 620-21 (2024) (quoting *Myers v. United States*, 272 U.S. 52, 106 (1926)). The logic of Plaintiff's position, that the President's exercise of even plenary Article II authorities is constrained by the equal protection component of the Fifth Amendment, would extend equally to appointments of principal officers as to removals. Yet virtually all recent Presidents have proudly admitted that they considered race and sex when choosing the principal

officers who led their administrations. The Court should not adopt a novel legal theory that would deem such conduct a constitutional violation while placing district court judges in the untenable position of having to peer into the President's mind to divine his intent when he makes his most sensitive and important personnel decisions.

## BACKGROUND

### I.    Statutory Background

The Surface Transportation Board (STB) is a federal agency charged with the economic regulation of various modes of surface transportation, primarily freight rail. 49 U.S.C. § 10501. The agency has jurisdiction over railroad rate, practice, and service issues and rail mergers, line sales, line construction, and line abandonments. *See id.* §§ 10704, 10901, 10903 & 11323. The STB also has jurisdiction over certain matters pertaining to passenger rail, the intercity bus industry, non-energy pipelines, household goods carriers' tariffs, and marine freight shipping between the mainland United States, Hawaii, Alaska, and U.S. territories and possessions. *See, e.g.*, *id.* §§ 13521, 13701, 14303, 15301 & 24308. The agency resolves surface transportation disputes through docketed proceedings, prescribes regulations, and may bring civil actions to enjoin violation of its orders. *E.g.*, *id*. §§ 1321(a), 10704(b), 11702. The Board also has authority to investigate certain freight and passenger rail matters, both upon complaint and on its own initiative. *Id.* §§ 11701, 24308(f). And it may direct the movement of rail traffic during emergencies and must direct that preference or priority be given to certain traffic upon notice by the President during times of war. *Id.* §§ 11123, 11124.

Created on January 1, 1996, by the ICC Termination Act of 1995, Pub. L. No. 104-88, the STB is the jurisdictional successor to the former Interstate Commerce Commission (1887-1995). For the first twenty years of its existence, the STB was "aligned" with the U.S. Department of Transportation for administrative purposes, although it retained a statutory removal provision. *See* 49 U.S.C. § 1301(b)(3). On December 18, 2015, Congress reauthorized the STB as a wholly

"independent" agency and increased its membership from three to five persons. Of the STB's five Board Members, one serves as the Chairman. 49 U.S.C. § 1301(b)(1), (c)(1).

## II.    Procedural Background

Plaintiff filed his initial Complaint raising an ultra vires claim on October 1, 2025, ECF No. 1, and Defendants were properly served on October 28, 2025. On December 4, 2025, as a matter of right, Plaintiff amended his Complaint to include a Fifth Amendment Due Process claim. ECF No. 15. Defendants intended to seek a stay of this case's proceedings pending the Supreme Court's resolution of *Trump v. Slaughter* in the U.S. Supreme Court. Plaintiff indicated he would consent to a stay of his ultra vires claim but not his Fifth Amendment Due Process claim. Recognizing that a similar removal case, *Brown v. Trump*, No. 25-1764 (DLF), was also before this Court with the same counsel, raising the same causes of action and with a motion to stay pending and fully briefed, the parties moved to stay this case until the Court ruled on the stay motion in *Brown* and subsequently move to adopt the Court's ruling there. On December 29, 2025, the Court stayed litigation as to the ultra vires claim in *Brown* but allowed the Fifth Amendment Due Process claim to proceed. The Court also ordered the parties in *Brown* to propose a briefing schedule for the Government's planned motion to dismiss. On January 7, 2025, the parties in this case filed a proposed scheduling order and partial motion to stay which would place this case on the same briefing schedule as *Brown*. Joint Proposed Briefing Schedule for Mot. to Dismiss on Count II of the Am. Compl., ECF No. 17. The Court approved the proposed briefing schedule in its January 8, 2026 Minute Order. Accordingly, Defendants in this case filed this Motion to Dismiss on or before January 28, 2026; Plaintiff shall file his Opposition on or before February 18, 2026; and Defendants shall file any reply on or before March 4, 2026.

## III.    Plaintiff's Amended Complaint

Plaintiff was a Democratic member of the STB who was first appointed by President Trump in 2020. *See* Am. Compl. ¶ 5, ECF No. 15. He was subsequently reappointed by President Biden to serve a term expiring on December 31, 2027. President Biden, during his administration, appointed Plaintiff as chairman of the STB. *Robert Primus Biography*, Surface Transportation

4

Board, https://perma.cc/AT64-TWWH. Before he served on the STB, Plaintiff was a longtime political operative on Capitol Hill. For over twenty years, Plaintiff closely advised more than half-a-dozen Democratic senators and congresspersons. Am. Compl. ¶ 39; *Robert Primus Biography*, Surface Transportation Board, https://perma.cc/AT64-TWWH.

On August 27, 2025, President Trump removed Plaintiff from his position as a member of the STB, via email and without a stated reason. Plaintiff is Black. Am. Compl. ¶ 9. At the time of his removal, the remaining Democrat-appointee who was not removed was white. *Id.* ¶ 10. Plaintiff does not allege that the President or anyone else in the Trump Administration ever said anything mentioning his race.

Plaintiff asserts that his removal "fits within a pattern of Trump Administration removals of high-level Black officials in the federal government, including Senate-confirmed members of independent Commissions." *Id.* ¶ 12. Without specifying the data, he alleges that "available data" shows that "since the beginning of President Trump's second term in office, approximately 75 percent of Black federal officials leading multimember agencies have been removed from office. In contrast, only approximately 27 percent of white federal officials on multimember agencies have been removed." *Id.* ¶ 45. That 75 percent apparently equates to six out of eight. *See id.* ¶ 46 (listing six Black members of multi-member agencies that President Trump has removed). Plaintiff does not allege that President Trump or any member of his administration has referred to the race of any of the other Black members of multi-member agencies who have been removed or attributed their removal to race. Besides Plaintiff, only one of them has filed a lawsuit challenging his or her removal on the basis of alleged racial discrimination, Alvin Brown of the National Transportation Safety Board, who is represented by the same counsel as Plaintiff and whose case is also pending before this Court. *See Brown v. Trump*, No. 25-1764 (DLF).

Although Plaintiff argues that his removal "reflects a broader pattern across the government of President Trump removing high-level Black officials," he cites just two other examples: the Librarian of Congress and the Chairman of the Joint Chiefs of Staff. *See* Am. Compl. ¶ 47.

Plaintiff alleges that President Trump and White House representatives have made statements opposing "diversity, equity, and inclusion" ("DEI") policies in the federal government. *See id.* ¶¶ 48-52. Although Plaintiff asserts that these statements opposing DEI policies "indicat[e] that he and his administration are seeking to remove people of color throughout the federal government," *id.* ¶ 48, nothing in any of the quoted statements refers to removing people of color.

Plaintiff also asserts that "the Executive Branch has also at times made a clear and demonstrable emphasis on hiring white men," *id.* ¶ 54, but the sole factual allegation purportedly supporting this statement is that the Department of Labor issued "workforce posters featuring almost exclusively white men," *id.* Plaintiff argues that "[m]ore generally, Black officials and Black employees across the federal government have been removed from their jobs at disproportionate rates," *id.* ¶ 55, but not one of the articles cited in that paragraph compared the rates at which Black employees have been removed from federal government jobs to the rate at which employees of other races have been removed from federal government jobs. Finally, Plaintiff alleges that "in the Trump Administration's first 200 days, only two percent of all of President Trump's Senate-approved appointees have been Black individuals." *Id.* ¶ 56.

Plaintiff's Amended Complaint names President Trump, the STB, and STB Chairman Patrick Fuchs as Defendants.[1] In Count I, which the Court has stayed, *see* Minute Order (Dec. 28, 2025), Plaintiff claims that his removal was ultra vires in violation of the STB for cause removal provision, 49 U.S.C. § 1301(b)(3). *See* Am. Compl. ¶¶ 57-62.

In Count II, Plaintiff claims that his removal constitutes race discrimination in violation of the equal protection component of the Fifth Amendment Due Process Clause. *See id.* ¶¶ 63-68. He alleges that he was removed and "was treated differently from similarly situated people, the other members of the Board, and particularly the white Democratic member." *Id.* ¶ 65. He alleges that "President Trump has not offered a non-discriminatory reason for his choice to remove Mr.

---

[1] Plaintiff's principal challenge is to his removal from the STB, which the President ordered. Plaintiff also alleges Defendants STB and Patrick Fuchs removed his access to STB systems and offices in compliance with the President's order. Accordingly, the arguments in this motion focus on the President's removal authority and the Fifth Amendment's scope.

Primus," *id.* ¶ 66, and that "[e]ven if the Defendants assert a non-discriminatory reason, any purported non-discriminatory reason is pretextual, and race was at least in part the reason for removing Mr. Primus," *id.* ¶ 67. He asks the Court to declare that his removal was unlawful and issue an injunction and a writ of mandamus against Chairman Fuchs and the STB that would de facto reinstate him in office by directing them to treat him as a member of the STB. *See id.*, Request for Relief.

**LEGAL STANDARD**

"A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint." *Harrington v. DC Winery, LLC*, No. 22-689 (TSC), 2023 WL 5561604, at *2 (D.D.C. Aug. 29, 2023). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although the Court assumes the truth of a plaintiff's factual allegations, "[t]his presumption does not apply, however, to a 'legal conclusion couched as a factual allegation.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "Accordingly, a complaint must offer more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Smith v. Clinton*, 253 F. Supp. 3d 222, 234 (D.C. Cir. 2018) (quoting *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002)).

**ARGUMENT**

## I.    Plaintiff Fails to Plausibly Allege that His Removal Was Motivated by Race

**1.**    Even if the Fifth Amendment constrains the President's authority to remove principal officers on the basis of race,[2] Plaintiff fails to state a Fifth Amendment claim because he fails to allege plausibly that the President removed him because of his race. "[T]he Due Process

---

[2] *But see infra*, Part II.

Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497(1954)). But while the Fifth Amendment, and the Fourteenth Amendment's Equal Protection Clause, address "invidious[]" (that is, purposeful) discrimination, Supreme Court "cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional Solely [sic] because it has a racially disproportionate impact." *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Plaintiff makes no factual allegations that, if credited, would constitute direct evidence of discriminatory intent. The message removing him simply informed him of his removal and said, "[t]hank you for your service." Am. Compl. ¶ 40. And Plaintiff does not allege that the President or anyone in his administration made any other statement mentioning Plaintiff's race or tying his removal to his race.

2.    Thus, Plaintiff's claim rests solely on circumstantial factual allegations of discriminatory intent. Plaintiff relies in part on alleged statistical data purportedly showing a pattern of removal of Black members of multi-member agencies, akin to a disparate impact argument. *See id.* ¶¶ 45-46. But the Supreme Court has set the bar extremely high for when evidence of disparate outcomes, without more, can demonstrate discriminatory intent, and Plaintiff's alleged statistical evidence comes nowhere close to that bar. Whether an action "bears more heavily on one race than another," *Davis*, 426 U.S. at 242, may provide a starting point, but "[a]bsent a pattern as stark as that in *Gomillion*[ *v. Lightfoot*, 364 U.S. 339 (1960)] or *Yick Wo*[ *v. Hopkins*, 118 U.S. 356 (1886)], impact alone is not determinative, and the Court must look to other evidence," *Vill. of Arlington Heights*, 429 U.S. at 266.

In both *Gomillion* and *Yick Wo*, referenced above, there were indisputable patterns of racial discrimination. In *Gomillion*, Tuskegee officials redrew city boundaries to exclude all but four or

8

five Black residents out of 400, without removing a single white resident. 364 U.S. at 341. In *Yick Wo*, the City of San Francisco required the owners of all wooden laundry houses to seek permission to continue operating, and every Chinese owner's petition was denied while every non-Chinese person's petition was approved—with one exception. 118 U.S. at 362. As one court explained, for statistical evidence of disparate outcomes to meet the standard of *Gomillion* and *Yick Wo*, "[t]he statistics must be so stark that they are unexplainable on grounds other than race, leading to the inescapable conclusion, tantamount for all practical purposes to a mathematical demonstration, of discriminatory intent." *Alston v. City of Madison*, 853 F.3d 901, 908 (7th Cir. 2017) (citations omitted).

Here, Plaintiff attempts to suggest a similar statistical pattern: Plaintiff first argues his removal was based on race, not political affiliation, because a white Democratic member of the STB was not removed. Am. Compl. ¶ 43. Plaintiff also contends that 75 percent of Black officers leading independent multi-member boards and commissions[3] during the second Trump Administration have been removed while only 27 percent of the white officers on those same bodies have been removed. *Id.* ¶¶ 45-46.

Plaintiff's statistical argument suffers from numerous flaws. First, these alleged statistics bear no resemblance to the stark facts of *Gomillion* or *Yick Wo*. Unlike in those cases, where the defendants excluded individuals outside the disfavored race from the allegedly discriminatory actions (completely in *Gomillion* and with one exception in *Yick Wo*), here Plaintiff admits that President Trump has removed a substantial percentage of white members of multi-member agencies. *See* Am. Compl. ¶ 47.[4] The alleged 75 percent of Black members of multi-member

---

[3] Plaintiff appears to be referencing five Black individuals, not including himself: Alvin Brown (National Transportation Safety Board), Gwynne Wilcox (National Labor Relations Board), Lisa Cook (Federal Reserve), Charlotte Burrows (Equal Employment Opportunity Commission), Travis LeBlanc (Privacy and Civil Liberties Oversight Board).

[4] Indeed, one need only view the flood of recent litigation (mostly in this District) challenging the President's removal of executive officers, to see that he has removed many officers of all races. *See, e.g.*, *Wilcox v. Trump*, 1:25-cv-334 (D.D.C.) (lawsuit filed by removed Black member of National Labor Relations Board); *Harris v. Bessent*, 1:25-cv-412 (D.D.C.) (lawsuit filed by

9

agencies who were removed is far less stark than the 100 percent of Chinese laundry owners who were disadvantaged in *Yick Wo* or the 99 percent of Black Tuskegee residents in *Gomillion*. These statistics do not "remotely approach" the starkness of *Gomillion* and *Yick Wo* and are insufficient to demonstrate disparate racial outcomes violative of the Fifth Amendment. *In re Navy Chaplaincy*, 738 F.3d 425, 429 (D.C. Cir. 2013). Even a showing that "a substantial majority" of an affected population was Black is insufficient. *Alston*, 853 F.3d at 908.[5]

Second, Plaintiff chooses an invalid basis of comparison. Even though President Trump has removed only *Democratic* members of multi-member commissions, Plaintiff compares the

---

removed white member of Merit Systems Protection Board); *Grundmann v. Trump*, 1:25-cv-425 (D.D.C.) (lawsuit filed by removed Asian-American member of Federal Labor Relations Authority); *LeBlanc v. Trump*, 1:25-cv-542 (D.D.C.) (lawsuit filed by removed Black member and removed white member of Privacy and Civil Liberties Oversight Board; another removed white member did not join lawsuit); *Slaughter v. Trump*, 1:25-cv-909 (D.D.C.) (lawsuit originally filed by one removed white commissioner and one removed Latino commissioner of Federal Trade Commission); *Samuels v. Trump*, 1:25-cv-1069 (D.D.C.) (lawsuit filed by removed white commissioner of Equal Employment Opportunity Commission; a removed Black commissioner did not join lawsuit); *Harper v. Bessent*, 1:25-cv-1294 (D.D.C.) (lawsuit filed by removed white member and removed Asian-American member of National Credit Union Administration Board); *Corp. for Pub. Broad. v. Trump*, 1:25-cv-1305 (D.D.C.) (lawsuit filed by three removed white members of Board of Corporation for Public Broadcasting); *Brown v. Trump*, 1:25-cv-1764 (D.D.C.) (lawsuit filed by removed Black member of National Transportation Safety Board); *Cook v. Trump*, 1:25-cv-2903 (D.D.C.) (lawsuit filed by removed Black member of Board of Governors of the Federal Reserve); *Boyle v. Trump*, 8:25-cv-1628 (D. Md.) (lawsuit filed by two removed white commissioners and one removed Asian-American commissioner of Consumer Product Safety Commission); *Dellinger v. Bessent*, 1:25-cv-385 (D.D.C.) (lawsuit filed by removed white Special Counsel); *Storch v. Hegseth*, 1:25-cv-415 (D.D.C.) (lawsuit filed by eight of seventeen removed Inspectors General; removed officers were white, Black, and Asian-American); *Brehm v. Marocco*, 1:25-cv-660 (D.D.C.) (lawsuit filed by removed white President of United States African Development Foundation); *Aviel v. Gor*, 1:25-cv-778 (D.D.C.) (lawsuit filed by removed white President of Inter-American Foundation); *Perlmutter v. Blanche*, No. 1:25-cv-01659 (D.D.C.) (lawsuit filed by removed white Register of Copyrights).

[5] *See also Alston, 853 F.3d at 908* ("Consider more closely the statistics present in *Gomillion* and *Yick Wo*. There, the statistics showed that minorities were disproportionately affected by the law. But the statistics showed more than disparate impact. They revealed that almost all minorities—every minority in *Yick Wo* and all but five minorities in *Gomillion*—were negatively affected by the law. The statistics also revealed that almost no whites—none in *Gomillion* and only one in *Yick Wo*—were negatively affected by the law. In both cases, it was clear that the statistical disparity at issue was caused by the defendants' actions, which allowed the Court to conclude that statistics alone were enough to prove unconstitutional disparate treatment.").

10

percentages of all Black and white members of multimember agencies removed by President Trump, rather than the salient comparison of the percentage of Black and white *Democratic* members removed. *See* Am. Compl. ¶ 45. However, "[t]o be useful" in making out a claim for intentional discrimination, "a statistical comparison" must compare populations of "similarly situated individuals." *Blackwell v. Strain*, 496 F. App'x 836, 839-40 (10th Cir. 2012). There is thus an "obvious alternative explanation," *Bellinger v. Bowser*, No. 1:17-cv-02124-TJK, 2018 WL 4705808, at *6 (D.D.C. Sept. 30, 2018) (quoting *Iqbal*, 556 U.S. at 682), for why President Trump has removed a greater proportion of Black members of multimember agencies than white members: he has removed only Democrats, and Democrats had greater Black representation on multimember agencies at the time he took office.

Third, Plaintiff's evidence is anecdotal (unlike the hundreds of individuals adversely affected in *Gomillion* and *Yick Wo*), and those anecdotes do not paint a picture of intentional racial discrimination. The 75 percent of Black members removed apparently equates to six out of eight, or Plaintiff and five other individuals. *See* Am. Compl. ¶ 46. Regarding other Black members of multimember agencies, the Court can take judicial notice that:

- Travis LeBlanc, a Black Democratic member of the Privacy and Civil Liberties Oversight Board, was removed alongside two white Democratic members, Edward Felten and Sharon Bradford Franklin. *See LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, 784 F. Supp. 3d 1, 13-14 & n.8 (D.D.C. 2025).

- Charlotte Burrows, a Black Democratic commissioner of the Equal Employment Opportunity Commission, was removed alongside a white Democratic Commissioner, Jocelyn Samuels; an Asian-American Democratic commissioner, Kalpana Kotagal, was not removed. *See* Katz Banks Kumin*, Lisa Banks and Debra Katz to Represent Former EEOC Chair and Commissioner Charlotte A. Burrows (Jan. 28, 2025),*https://katzbanks.com/news/burrows/.

- Gwynne Wilcox, a Black member of the National Labor Relations Board, was removed alongside the white General Counsel, Jennifer Abruzzo. President Trump's message removing them raised specific policy disagreements he had with both Ms. Wilcox and Ms. Abruzzo. *See* https://myprivateballot.com/wp-content/uploads/2025/01/Abruzzo-Wilcox-Firing-Letter.pdf.

- President Trump invoked the Federal Reserve's for-cause removal provision in removing Governor Lisa Cook, based on apparent mortgage fraud. *See* President

11

Donald Trump Fires Fed Governor Lisa Cook (Aug. 25, 2025), https://www.documentcloud.org/documents/26074125-cook-letter/. He did not remove another Black governor, Vice Chair Philip Jefferson, who has not been accused of wrongdoing. *See* Federal Reserve, https://www.federalreserve.gov/aboutthefed/bios/board/jefferson.htm.

- At the Federal Election Commission, President Trump removed a white Democratic member, Ellen Weintraub, but did not remove a Black Democratic member, Shana Broussard, who remains in office. *See* Ellen L. Weintraub (@EllenLWeintraub), X (Feb. 6, 2025), https://x.com/EllenLWeintraub/status/1887648967300694270; Fed. Election Comm'n, Shana M. Broussard, https://www.fec.gov/about/leadership-and-structure/shana-m-broussard/.[6]

Plaintiff also notes that President Trump has removed the Librarian of Congress and the chairman of the Joint Chiefs of Staff, who are Black. Am. Compl. ¶ 42. Plaintiff ignores, however, that the President also has appointed Black officials, including a cabinet Secretary. This demonstrates that such anecdotal evidence "simply cannot support a plausible inference of intentional racial discrimination," even at the pleading stage. *Bellinger*, 2018 WL 4705808, at *7.

**3.**    Realizing the weakness of these statistical arguments, Plaintiff tries to supplement his statistical evidence with a constellation of discrete circumstantial facts, each attenuated from his case. Plaintiff notes the President and Trump Administration officials complained about "DEI" practices and that certain individuals—but not Plaintiff—were removed because they supported certain "DEI" practices. *Id.* ¶¶ 48-52. Plaintiff points to vintage-inspired Labor Department posters featuring white men—though Plaintiff alleges no connection with them or the Labor Department. *Id.* ¶ 54. Plaintiff generally references federal removal statistics for all government employees without alleging any direct or individual presidential involvement. *Id.* ¶ 55. Likewise, Plaintiff generally references presidential nomination statistics for all Senate-confirmed appointees— though Plaintiff was removed from his position rather than passed over for appointment. *Id.* ¶ 56. Ultimately, these facts are insufficient, even taken as true. To show discriminatory purpose, a

---

[6] The government addresses the racial discrimination claim of Alvin Brown, former member of the National Transportation Safety Board, in its motion to dismiss his complaint, also filed today. *See Brown v. Trump*, No. 1:25-cv-01764 (D.D.C.).

plaintiff must show that the decisionmaker, the President in this case, "selected or reaffirmed a particular course of action at least in part because of . . . its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (citation omitted).

Addressing each of Plaintiff's allegations in turn, none supports an inference that Plaintiff was removed because of race. Plaintiff does not allege that he is similarly situated to the Librarian of Congress or chairman of the Joint Chiefs of Staff, nor does he allege any facts that would plausibly demonstrate that they were removed because of race.

Plaintiff argues the President's statements on "DEI" demonstrate a discriminatory intent to remove Plaintiff. Am. Compl. ¶¶ 49, 51-52 ("We have to end the tyranny of so-called diversity, equity, and inclusion policies all across the entire federal government.") ("We will terminate every diversity, equity, and inclusion program across the entire federal government.") ("I ended all of the lawless so-called diversity, equity, and inclusion bullshit. All across the entire federal government and the private sector."). Importantly, none of those statements is about Plaintiff; they are about DEI, which is merely incidental to Plaintiff as DEI concerns topics including race, and Plaintiff is Black. Thus, none of the statements reflect an intent to discriminate based on race; rather, they merely reflect the President's criticism of DEI and DEI-adjacent programs. Plaintiff's claim seemingly assumes that the President's alleged criticism of DEI is necessarily motivated by racial animus, but that assumption is flawed. There are numerous good-faith bases to criticize DEI and DEI-adjacent programs. *See*, *e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.* (SFFA), 600 U.S. 181, 266 (2023) (Thomas, J., concurring) (expressing the view that paeans to "diversity" often conceal invidious racial discrimination). This Court need not weigh in on the wisdom of DEI programs or critiques of such programs. The mere recognition that criticism of DEI may be motivated by something other than discriminatory purpose sufficiently illustrates that the President's criticism of DEI and DEI-adjacent programs cannot be equated with an intent to discriminate based on race. *See Walls v. Sanders*, 760 F. Supp. 3d 766, 806 (E.D. Ark. 2024) (explaining that "allegations of animus toward Critical Race Theory are not synonymous with allegations of an intent to discriminate against African Americans"). Ultimately, Plaintiff may

13

disagree with the President's criticism of DEI, but that criticism does not demonstrate a discriminatory purpose.

Further, presidential proclamations show that in the President's view, DEI policies have often been used to discriminate on the basis of race, in a manner similar to what the Supreme Court found unlawful in *Students for Fair Admissions*. For example, President Trump issued an Executive Order stating that "illegal and immoral discrimination programs" have "go[ne] by the name 'diversity, equity, and inclusion' (DEI)," and that instead of "discrimination," "Americans deserve a government committed to serving every person with equal dignity and respect." Exec. Order No. 14151, Ending Radical And Wasteful Government DEI Programs And Preferencing, § 1. Another Executive Order stated that federal DEI programs "can violate the civil-rights laws of this Nation" and have resulted in "illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing." Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, § 1. Opposition to racial discrimination in government conduct is perfectly legitimate, as "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). To be clear, this case does not concern the legality of any particular DEI policy or DEI in general. But these statements underscore that in speaking out against DEI, the President is speaking out against what he believes to be racial discrimination, not evincing an intent to engage in racial discrimination.

As for Plaintiff's reference to vintage-inspired Labor Department graphics featuring white men, general removal statistics for the entire federal government, and nomination statistics for all Senate-confirmed appointees. Am. Compl. ¶¶ 54-56. These facts are atmospheric, disconnected between the President and Plaintiff, and do not address the President's alleged discriminatory intent. First, the President does not regularly review digital media and graphic design prior to its publication by the Labor Department, nor does Plaintiff allege otherwise. Thus, an unrelated executive department's media publications, barring evidence of the President's actual involvement, is insufficient to demonstrate his discriminatory intent in this case.

14

Plaintiff also does not allege the President personally oversaw or directed the individual removal of the Black federal employees referenced in the articles to which Plaintiff cites. Nor does Plaintiff allege the President directed his principal officers to specifically target Black federal employees for removal. Such allegations, if made, would be indicative of the President's intent, but that evidence is absent here. Further support can even be found in the articles to which Plaintiff cites. For example, Plaintiff cites a New York Times article discussing removals at the Department of Education, USAID, and the Internal Revenue Service. As the authors wrote:

> Black workers . . . have been hard hit by reductions in the federal work force overall . . . [because] agencies where racial minorities and women were a majority of the work force, such as the Education Department and the U.S. Agency for International Development, were targeted for the largest work force reductions or complete elimination. Black women made up nearly a quarter of the work force in agencies such as the Internal Revenue Service, which also saw deep reductions

Elisabeth Bumiller & Erica L. Green, *Trump Fires Black Officials from an Overwhelmingly White Administration*, N.Y. Times (Oct. 8, 2025), https://perma.cc/2DBG-3XFH. At most, that observation suggests that Black federal employees may have been disproportionately affected by removals at those agencies because they held a disproportionate share of positions at those federal agencies. But even so, disproportionate effect does not necessarily indicate discriminatory purpose. *Alston* directs us to "[c]onsider more closely the statistics present in *Gomillion* and *Yick Wo*. There, the statistics showed that minorities were disproportionately affected by the law. But the statistics showed more than disparate impact. They revealed that almost all minorities . . . were negatively affected by the law. The statistics also revealed that almost no whites . . . were negatively affected by the law." *Alston*, 853 F.3d at 908. Not only does this data fail to show "starkness" equivalent to *Gomillion* or *Yick Wo*, but it is disconnected from Plaintiff's case. The closure of unrelated federal agencies that have a disproportionately Black makeup is insufficient to establish the President's discriminatory intent in this case.

Lastly, statistics relating to the President's appointments are disconnected from Plaintiff's case because they do not demonstrate that Plaintiff was *removed* due to his race. Appointment data

may be instructive in ferreting out the intent of appointments, but it provides an incomplete picture into the President's decision making for removals. After all, it was President Trump who first appointed Plaintiff to the STB in 2020, William C. Vantuono, *Primus Nominated to STB*, Railway Age (July 21, 2020), https://www.railwayage.com/regulatory/primus-nominated-to-stb/, though Plaintiff now alleges the President removed him due to a newly manifested racial animus. Yet still, the President also appointed a Black Woman, Olivia Trusty, to another multimember commission Congress has described as "independent," *Olivia Trusty Biography*, FCC, https://perma.cc/728W-HVF7, as well a Black man, Scott Turner, to be Secretary of Housing and Urban Development, HUD's Secretary, HUD (last visited Jan. 21, 2026), https://perma.cc/V3BE-SRCS.

4.      Ultimately, Plaintiff's removal from the Surface Transportation Board is not "unexplainable on grounds other than race." *Vill. of Arlington Heights*, 429 U.S. at 266. Rather, there are multiple "obvious alternative explanation[s]," *Bellinger*, 2018 WL 4705808, at *6 (quoting *Iqbal*, 556 U.S. at 682). Plaintiff is a longtime political operative in an opposition party. For over twenty years, Plaintiff closely advised more than half-a-dozen Democratic senators and congresspersons. Am. Compl. ¶ 39; *Robert Primus Biography*, Surface Transportation Board, https://perma.cc/AT64-TWWH. Likewise, there are simpler explanations for the non-removal of Karen J. Hedlund: The President may have concluded that Karen Hedlund, a Democratic Board member who was not removed and who served in a variety of transportation-focused roles in and out of government, was less political than Plaintiff. *Board Member Biographies*, Surface Transportation Board (Last visited Jan. 27, 2026). It is common practice for an incoming President to remove certain individuals who he no longer believes are politically like-minded or will support his agenda. Ms. Hedlund's term was also expiring imminently on January 1, 2026.[7] Plaintiff's term, however, would not have expired until 2028. Thus, the President may not have seen a need

---

[7] Under 49 U.S.C. § 1301(b)(3), a member may continue to serve for up to one year after that member's term expires, or until a successor is appointed and qualified, whichever happens first. Ms. Hedlund is currently serving in such a capacity.

16

to remove Ms. Hedlund given her shorter term and potential near-term departure from the STB. Though Plaintiff and Ms. Hedlund appear to be similarly situated at first glance, they are not; Plaintiff's and Ms. Hedlund's situational differences their dissimilar treatment—not their identities. To borrow the diagnostician's old adage: when you hear hoofbeats, think of horses before zebras.  Accordingly, Plaintiff's reliance on inconclusive data and atmospheric facts, even taken as true, do not demonstrate the President's alleged discriminatory intent and are insufficient to show a violation of the Fifth Amendment.

## II.    Plaintiff's Claim Is Not Legally Cognizable

Even if Plaintiff had adequately alleged that President Trump was motivated by race when he removed Plaintiff, that would not give rise to a cognizable constitutional claim. "[T]he President's power to remove 'executive officers of the United States whom he has appointed'" is a "conclusive and preclusive" Presidential power that "may not be regulated by Congress or reviewed by the courts." *Trump v. United States*, 603 U.S. at 620-21 (quoting *Myers*, 272 U.S. at 106).

The President's removal of Plaintiff, a principal officer in the Executive Branch, falls within that conclusive and preclusive authority. As the Supreme Court has explained, "[b]ecause the Constitution vests the executive power in the President, he may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (citation omitted).

In arguing that STB members are not subject to at-will removal, Plaintiff relies on *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which "permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020). Although *Humphrey's Executor* remains good law for now, the Supreme Court in *Slaughter* is currently considering whether to overrule it. As the Chief Justice remarked at oral argument in *Slaughter*, for example, "*Seila Law* made pretty clear . . . that *Humphrey's Executor* is just a dried husk of whatever people

17

used to think it was." Oral Argument Tr. 109:11-13, *Trump v. Slaughter*, No. 25-332 (U.S. Dec. 8, 2025), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/25-332_7lhn.pdf. Whether or not the Supreme Court ultimately overrules *Humphrey's Executor*, because the STB exercises substantial executive power, STB members fall well outside of the domain of *Humphrey's Executor*'s "dried husk." Therefore, the President has "conclusive and preclusive" authority to remove STB members for any reason or no reason, and exercises of that authority cannot be "reviewed by the courts." *Trump v. United States*, 603 U.S. at 620-21.

No Court has ever held that when the President exercises his conclusive and preclusive Article II authority to remove a principal officer of the United States, the Fifth Amendment empowers a court to review whether such a removal was an act of racial discrimination. The implications of Plaintiff's legal theory are striking.

Although this case concerns an exercise of the President's Article II removal authority, the logic of Plaintiff's position is that more broadly, exercises of the President's core Article II powers are reviewable under the Fifth Amendment to determine whether the President discriminated on the basis of race. *See* Am. Compl. ¶ 8 ("Included within the ambit of these rights is a protection against discrimination in employment decisions. President Trump violated Mr. Primus's Fifth Amendment rights by removing him from his Board position, at least in part, because of Mr. Primus's race."). If Plaintiff's position is correct, then a Presidential *appointment* of a principal officer that considered race would support a Fifth Amendment legal claim just as much as a Presidential *removal* of a principal officer that considered race. Further, if any equal protection claim is cognizable based on alleged racial discrimination in removing a Black official or appointment of a white official, such a claim would be equally cognizable as applied to the removal of a white official or appointment of a Black official (or any other racial permutation). *See SFFA*, 600 U.S. at 206 ("[T]he Equal Protection Clause . . . applies without regard to any differences of race, of color, or of nationality—it is universal in its application. For the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color.") (cleaned up). Appointing or removing principal officers on the basis

18

of sex would likewise be constitutionally suspect. *See United States v. Virginia*, 518 U.S. 515, 531-34 (1996).

In sum, Plaintiff invites a legal regime in which federal district court judges would superintend the President's selections of the most important executive officials, the principal officers who lead the Executive Branch, to ensure that race and sex played no role in the President's decision making. Such a regime would come as a shock to the recent Presidents who have acknowledged that they considered race and sex in determining which principal officers would lead the Executive Branch under their administrations. For example, in recounting President Clinton's accomplishments at the end of his Presidency, the White House website boasted that he "[a]ppointed the most diverse cabinet in history," specifically pointing to President Clinton's consideration of race ("he has appointed seven African American Cabinet Secretaries" and "the first Asian American to serve in a Cabinet") and sex ("women make up 44 percent of Clinton Administration appointees, including the first woman to serve as Secretary of State, Madeline Albright, and the first to serve as Attorney General, Janet Reno"). The White House (archived), The Clinton Presidency: Building One America, Recore of Progress, https://clintonwhitehouse5.archives.gov/WH/Accomplishments/eightyears-11.html.

During his first Presidential campaign, President Obama reportedly "promise[d] to have the most diverse Cabinet in history" and "fulfilled his promise" by appointing many Black, Latino, and Asian-American cabinet members. The Associated Press, The Gainesville Sun, In Cabinet, Obama goes for experience, pragmatism, (Dec. 20, 2008), https://www.gainesville.com/story/news/nation-world/2008/12/20/in-cabinet-obama-goes-for-experience-pragmatism/31590871007/. And although President Obama was criticized when his first four Cabinet nominees for his second term were white men, he reassured supporters that he "intend[ed] to continue" having a cabinet that was "as diverse, if not more diverse . . . than any in history." Fox News, Obama: Attacks on Cabinet Diversity are Premature (updated Jan. 10, 2017), https://www.foxnews.com/politics/obama-attacks-on-cabinet-diversity-are-premature.

On the campaign trail, President Biden likewise "promised to nominate 'the most diverse Cabinet in history,' stressing that he wanted leaders that look like America." PBS News, Meet Joe Biden's Cabinet Picks (Jan. 20, 2021), https://www.pbs.org/newshour/politics/meet-joe-bidens-cabinet-picks; *see also id.* ("If all of Biden's nominees are confirmed, his Cabinet will contain more women and people of color than any other Cabinet in U.S. history.").

For his part, President George W. Bush selected a Cabinet that a commentator described as one that "looks like it was chosen by a casting director for a diversity commercial." CBS News, A Cabinet That Looks Like America (Jan. 5, 2001), https://www.cbsnews.com/news/a-cabinet-that-looks-like-america/. The commentator concluded that President Bush's apparent consideration of race and sex was "crafty" because "Democrats will have a tough time" opposing a set of nominees that, while ideologically conservative, exhibited racial and gender diversity. *Id.*

To state the obvious, none of these Presidents thought that by considering the race or sex of their principal officers, they were trampling the Bill of Rights in broad daylight. Yet under Plaintiff's theory, all of these Presidents violated the Fifth Amendment through the routine practice of considering the race or sex of principal officers.

Additional practical concerns counsel against recognizing Plaintiff's novel legal claim. If a claim like Plaintiff's is cognizable, then the success of such a claim will turn on the President's motivation, which would place federal district judges in the untenable position of trying to divine the President's intent when he exercises his conclusive and preclusive Article II authority to remove principal officers. This prospect is made all the more problematic by Plaintiff's apparent belief that the mere act of removing a Black principal officer but not removing an arguably similarly situated white principal officer somehow places the burden on the President to "offer[] a non-discriminatory reason" for the removal. Am. Compl. ¶ 66. If that were true, then to defeat a claim, the President would either need to offer his own testimony under oath or communications with his aides regarding his performance of his constitutional functions, which are presumptively subject to executive privilege. *See In re Sealed Case*, 121 F.3d 720, 742 (D.C. Cir. 1997).

20

Making matters worse, in Plaintiff's view, judges would then have to determine whether the President's proffered reasons for removing a principal officer were sincere or were "pretextual," Am. Compl. ¶¶ 11, 67, based in part on examining "statements by the President and his advisers," which a plaintiff can argue "cast[s] doubt" on the President's purported "objective" for his action, *Trump v. Hawaii*, 585 U.S. 667, 699 (2018); *see* Am. Compl. ¶¶ 48-53 (citing "several public statements" from "President Trump and high government officials" purportedly supporting the inference that the President's personnel decisions are racially motivated). But courts are rightly wary of giving weight to such statements "in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility." *Hawaii*, 585 U.S. at 702.

The Constitution instituted a political check, not a judicial check, on the President's selection of principal officers: the requirement of Senate confirmation. *See* U.S. Const. art. II, § 2, cl. 2. If the Senate objects to the President removing and replacing Plaintiff, then the Senate is free to reject whomever the President nominates or even insist that they will only confirm a Black nominee to the seat. More generally, the need for Senate confirmation politically constrains the President in making removals and appointments that, for whatever reason, are seen as unacceptable. *See* Federalist No. 77, at 459 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("Where a man in any station had given satisfactory evidence of his fitness for it, a new President would be restrained from attempting a change in favor of a person more agreeable to him, by the apprehension that a discountenance of the Senate might frustrate the attempt, and bring some degree of discredit upon himself."). The Framers entrusted the Senate, not the federal courts, with judging the President's selection of principal officers.

Few decisions are as important to a President as the selection of the principal officers who will lead the agencies and departments that comprise the Executive Branch. Article II of the Constitution entrusts the removal decision to the President alone and the appointment decision to the President, subject only to the Senate's advice and consent. This pragmatic boundary insulates the courts from the flood of presidential appointment and removal litigation this case invites. No

court has ever held that a district judge can try to peer into the President's mind and reject his exercise of conclusive and preclusive Article II removal authority if done for an improper reason. This Court should not be the first.

<strong>CONCLUSION</strong>

The Court should grant this Motion and dismiss the Amended Complaint for failure to state a claim.

Dated: January 28, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

/s/ *Jordan A. Hulseberg*
JORDAN A. HULSEBERG (DC Bar No. 90033542)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 598-3856
Email: Jordan.A.Hulseberg2@usdoj.gov

*Counsel for United States*

22