**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ROBERT E. PRIMUS, in his official capacity,

    *Plaintiff*,

            v.

DONALD J. TRUMP, in his official capacity, *et al.*,

    *Defendants*.

Civil Action No. 1:25-cv-03521-DLF

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' SECOND MOTION TO DISMISS AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 4

I.      Statutory Background................................................................................... 4

II.     Procedural Background ............................................................................... 4

III.    Plaintiff's Amended Complaint................................................................... 6

LEGAL STANDARD................................................................................................... 8

ARGUMENT................................................................................................................ 9

I.      Plaintiff Fails to Plausibly Allege that His Removal Was Motivated by Race .............. 9

II.     Plaintiff Cannot State a Claim by Invoking the *McDonnell Douglas* Framework ........ 19

III.    Plaintiff's Claim Is Not Legally Cognizable .................................................. 23

CONCLUSION............................................................................................................. 28

## TABLE OF AUTHORITIES

**CASES**

*Alston v. City of Madison*,
  853 F.3d 901 (7th Cir. 2017) ........................................................................ 10, 12, 17

*Ames v. Ohio Dep't of Youth Servs.*,
  605 U.S. 303 (2025) ..................................................................................................... 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 8, 12, 18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................... 8

*Bellinger v. Bowser*,
  No. 1:17-cv-02124-TJK, 2018 WL 4705808 (D.D.C. Sept. 30, 2018) ........................ 12, 13, 18

*Blackwell v. Strain*,
  496 F. App'x 836 (10th Cir. 2012) ............................................................................. 12

*Bolling v. Sharpe*,
  347 U.S. 497(1954).................................................................................................... 9

*California v. U.S. Dep't of Homeland Sec.*,
  476 F. Supp. 3d 994 (N.D. Cal. 2020) ....................................................................... 22

*Camreta v. Greene*,
  563 U.S. 692 (2011).................................................................................................... 20

*Carter v. Duncan-Huggins*, *Ltd.*,
  727 F.2d 1225 (D.C. Cir. 1984).................................................................................. 20

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
  551 U.S. 701 (2007).................................................................................................... 16

*Cones v. Shalala*,
  199 F.3d 512 (D.C. Cir. 2000)..................................................................................... 19

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  591 U.S. 1 (2020)........................................................................................................ 21

*Egbert v. Boule*,
  596 U.S. 482 (2022)..................................................................................................... 21

*Furnco Const. Corp. v. Waters*,
  438 U.S. 567 (1978)............................................................................................... 19, 21

ii

*Gomillion v. Lightfoot,*
  364 U.S. 339 (1960)................................................................................*passim*

*Gustave-Schmidt v. Chao,*
  226 F. Supp. 2d 191 (D.D.C. 2002), *aff'd*, 886 F.3d 122 (D.C. Cir. 2018)................................. 8

*Harrington v. DC Winery, LLC,*
  No. 22-689 (TSC), 2023 WL 5561604 (D.D.C. Aug. 29, 2023) ................................................. 8

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.,*
  608 U.S. ---, 146 S. Ct. 1391 (2026)...................................................................................... 8

*Holcomb v. Powell,*
  433 F.3d 889 (D.C. Cir. 2006)............................................................................................... 19

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935)...........................................................................................*passim*

*In re Navy Chaplaincy,*
  738 F.3d 425 (D.C. Cir. 2013)............................................................................................... 11

*In re Sealed Case,*
  121 F.3d 720 (D.C. Cir. 1997)............................................................................................... 27

*Irwin v. Dep't of Veterans Affairs,*
  498 U.S. 89 (1990)................................................................................................................ 22

*Jiggetts v. Cipullo,*
  774 F. Supp. 3d 168 (D.D.C. 2025)................................................................................. 19, 20

*Joyner v. Morrison & Foerster LLP,*
  140 F.4th 523 (D.C. Cir. 2025)....................................................................................... 19, 23

*LeBlanc v. U.S. Priv. & C.L. Oversight Bd.,*
  784 F. Supp. 3d 1 (D.D.C. 2025)........................................................................................... 13

*McCleskey v. Kemp,*
  481 U.S. 279 (1987).............................................................................................................. 14

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973).........................................................................................*passim*

*Mullin v. Doe,*
  609 U.S. ---, 146 S. Ct. 2121 (2026)..................................................................*passim*

*Myers v. United States,*
  272 U.S. 52 (1926)............................................................................................................ 3, 24

*Smith v. Clinton*,
    253 F. Supp. 3d 222 (D.C. Cir. 2017) ............................................................. 8

*Stella v. Mineta*,
    284 F.3d 135 (D.C. Cir. 2002) ...................................................................... 19

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
    600 U.S. 181 (2023) ............................................................................... 15, 24

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ..................................................................................... 27

*Trump v. Slaughter*,
    No. 25-332, 609 U.S. ---, 2026 WL 1855612 (U.S. June 29, 2026) .................................. *passim*

*Trump v. United States*,
    603 U.S. 593 (2024) ................................................................................. 3, 24

*United States v. Barrera-Vasquez*,
    617 F. Supp. 3d 400 (E.D. Va. 2022) .............................................................. 21

*United States v. Virginia*,
    518 U.S. 515 (1996) ............................................................................... 25, 26

*Vazquez–Rivera v. Figueroa*,
    759 F.3d 44 (1st Cir. 2014) ........................................................................... 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................................. *passim*

*Walls v. Sanders*,
    760 F. Supp. 3d 766 (E.D. Ark. 2024) ............................................................ 15

*Washington v. Davis*,
    426 U.S. 229 (1976) ................................................................................. 9, 10

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ................................................................................. *passim*

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ..................................................................................... 21

**CONSTITUTION**

U.S. Const. art. II, § 2, cl. 2 ............................................................................. 27

**STATUTES & RULES**

42 U.S.C. § 1981 ........................................................................................... 19

42 U.S.C. § 1983 .................................................................................................. 19, 20

42 U.S.C. § 2000e-16(c) ............................................................................................ 22

49 U.S.C. § 1301 ................................................................................................... 4, 18

49 U.S.C. § 1321(a) .................................................................................................... 4

49 U.S.C. § 10501 ....................................................................................................... 4

49 U.S.C. § 10704 ....................................................................................................... 4

49 U.S.C. § 10901 ....................................................................................................... 4

49 U.S.C. § 10903 ....................................................................................................... 4

49 U.S.C. § 11123 ....................................................................................................... 4

49 U.S.C. § 11124 ....................................................................................................... 4

49 U.S.C. § 11323 ....................................................................................................... 4

49 U.S.C. § 11702 ....................................................................................................... 4

49 U.S.C. § 13521 ....................................................................................................... 4

49 U.S.C. § 13701 ....................................................................................................... 4

49 U.S.C. § 14303 ....................................................................................................... 4

49 U.S.C. § 15301 ....................................................................................................... 4

49 U.S.C. § 24308 ....................................................................................................... 4

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 8

## OTHER AUTHORITIES

Amy Howe, *Biden reiterates promise to nominate a Black woman, lauds Breyer as "model public servant"*, SCOTUSblog (Jan. 27, 2022), https://www.scotusblog.com/2022/01/biden-reiterates-promise-to-nominate-a-black-woman-lauds-breyer-as-model-public-servant/ ........................................................................................... 26

The Associated Press, The Gainesville Sun, In Cabinet, Obama goes for experience, pragmatism, (Dec. 20, 2008), https://www.gainesville.com/story/news/nation-world/2008/12/20/in-cabinet-obama-goes-for-experience-pragmatism/31590871007/ .......... 25

*Board Member Biographies*, Surface Transportation Board, https://perma.cc/XD3A-P6NZ ...... 18

CBS News, A Cabinet That Looks Like America (Jan. 5, 2001),
https://www.cbsnews.com/news/a-cabinet-that-looks-like-america/ ...................................... 26

Ellen L. Weintraub (@EllenLWeintraub), X (Feb. 6, 2025),
https://x.com/EllenLWeintraub/status/1887648967300694270 ............................................. 13

Elisabeth Bumiller & Erica L. Green, *Trump Fires Black Officials from an Overwhelmingly White Administration*, N.Y. Times (Oct. 8, 2025), https://perma.cc/2DBG-3XFH .................. 17

Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing...................................................................................................................... 15

Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity .......................................................................................................................... 16

Fed. Election Comm'n, Shana M. Broussard,
https://www.fec.gov/about/leadership-and-structure/shana-m-broussard/ ............................. 13

Fed. Reserve, https://www.federalreserve.gov/aboutthefed/bios/board/jefferson.htm ................. 13

The Federalist No. 77 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ........................... 16, 27

Fox News, Obama: Attacks on Cabinet Diversity are Premature (updated Jan. 10, 2017),
https://www.foxnews.com/politics/obama-attacks-on-cabinet-diversity-are-premature ......... 26

https://myprivateballot.com/wp-content/uploads/2025/01/
Abruzzo-Wilcox-Firing-Letter.pdf...................................................................................... 13

HUD's Secretary, HUD (last visited Jan. 21, 2026), https://perma.cc/V3BE-SRCS ................... 18

ICC Termination Act of 1995, Pub. L. No. 104-88 ....................................................................... 4

Katz Banks Kumin, *Lisa Banks and Debra Katz to Represent Former EEOC Chair and Comm'r Charlotte A. Burrows* (Jan. 28, 2025),https://katzbanks.com/news/burrows/ ........... 13

*Olivia Trusty Biography*, FCC, https://perma.cc/728W-HVF7 .................................................... 17

PBS News, Meet Joe Biden's Cabinet Picks (Jan. 20, 2021),
https://www.pbs.org/newshour/politics/meet-joe-bidens-cabinet-picks. ................................ 26

PBS, *Trump Promises to Replace Ginsburg with a Woman – and Soon* (Sep. 20, 2020),
https://www.pbs.org/newshour/politics/trump-promises-to-replace-ginsburg-with-a-woman-and-soon ................................................................................................................ 26

President Donald Trump Fires Fed Governor Lisa Cook (Aug. 25, 2025),
https://www.documentcloud.org/documents/26074125-cook-letter/. ..................................... 13

*Robert Primus Biography*, Surface Transportation Board, https://perma.cc/AT64-TWWH ... 6, 18

vii

Supreme Court, *Sandra Day O'Connor: First Woman on the Supreme Court*,
 https://www.supremecourt.gov/visiting/exhibitions/SOCExhibit/Section3.aspx
 (last visited July 29, 2026) .................................................................................. 26

The White House (archived), The Clinton Presidency: Building One America,
 Record of Progress,
 https://clintonwhitehouse5.archives.gov/WH/Accomplishments/eightyears-11.html ............ 25
.
William C. Vantuono, *Primus Nominated to STB*, Railway Age (July 21, 2020),
 https://www.railwayage.com/regulatory/primus-nominated-to-stb/ ....................................... 17

**INTRODUCTION**

President Trump exercised his constitutional authority to remove Plaintiff Robert Primus, a principal officer of the United States who exercised substantial executive power as a member of the Surface Transportation Board (STB). During his first year of his second term in office, President Trump similarly exercised his constitutional authority to remove a number of Democratic principal officers, of every race, throughout the Executive Branch. Plaintiff filed this action as part of a series of lawsuits by removed principal officers, claiming that their removals violated statutory provisions that protected them from removal, except for cause, invoking *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).

The Supreme Court has since foreclosed those claims. In *Trump v. Slaughter*, No. 25-332, 609 U.S. ---, 2026 WL 1855612 (U.S. June 29, 2026), the Supreme Court concluded "all that is left of *Humphrey's* is its observation that an agency that 'exercises no part of the executive power' need not fall within the rule of Presidential removal." *Id.* at *14 (quoting *Humphrey's Executor*, 295 U.S. at 628). It accordingly "overrule[d]" what "[i]f anything more is left of" *Humphrey's Executor. Id.* at *15. Thus, agency officials that engage in investigatory, enforcement, or other executive powers, whether in whole or in part, are ultimately "accountable to" and "removable by" the President. *Id.* at *7. In light of *Slaughter*, Plaintiff "no longer intends to pursue" the ultra vires claim in Count I of his Amended Complaint. Jt. Status Rep. at 4, ECF No. 22.

But days before the Supreme Court heard arguments in *Slaughter*, and perhaps reading the writing on the wall, Plaintiff amended his complaint to add a claim that President Trump removed him on the basis of race in violation of the equal protection component of the Fifth Amendment's Due Process Clause. *See* Am. Compl. Count II, ECF No. 15. But Plaintiff fails to state a claim for two reasons:

1

*First*, he fails to plausibly allege that President Trump removed him on the basis of race. Lacking any direct allegations of discriminatory intent, Plaintiff tries to construct a claim out of an amalgam of circumstantial allegations. He argues that a statistical pattern of removing Black principal officers exists, but the Supreme Court has explained that statistical evidence of disparate outcomes does not make out a claim of intentional discrimination "[a]bsent a pattern as stark as that in *Gomillion*[ *v. Lightfoot*, 364 U.S. 339 (1960)] or *Yick Wo*[ *v. Hopkins*, 118 U.S. 356 (1886)]," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), two notorious cases in which cities targeted hundreds of minority residents for adverse treatment, to the total or near-total exclusion of similarly situated white residents. Plaintiff, however, suggested *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) controls and is the operative standard here, not *Arlington Heights*. The *McDonnell Douglas* framework is inapplicable because it applies to Title VII and certain other civil rights statutes, not to equal protection claims brought directly under the Fifth Amendment, which Plaintiff brings here. *See McDonnell Douglas* 411 U.S. at 793-94.

What Plaintiff proffers as statistical evidence comprises himself and a handful of other removed Black principal officers, when the President has also removed many officers of other races (as many other judges in this Court who have confronted challenges to such removals could attest). On the other hand, the President has appointed several prominent Black officials, including a cabinet member. Plaintiff gets no further by making atmospheric allegations with no connection to his removal, such as the fact that the President has generally opposed diversity, equity, and inclusion programs, and that the Department of Labor has issued vintage-inspired posters featuring white men. And although President Trump did not remove the remaining white Democrat member on the STB, that hardly supports an inference of discrimination where differences in that member's

2

professional experience and her shorter term and potential near-term departure from the STB supply obvious alternative explanations for her not having been removed. Indeed, the Supreme Court rejected similar claims of racial animus based on circumstantial facts just this past term in *Mullin v. Doe*, 609 U.S. ---, 146 S. Ct. 2121, 2133 (2026).

*Second*, no court has ever endorsed Plaintiff's novel legal theory that the Fifth Amendment constrains the President's selection of principal officers. "[T]he President's power to remove 'executive officers of the United States whom he has appointed'" is a "conclusive and preclusive" Presidential power that "may not be regulated by Congress or reviewed by the courts." *Trump v. United States*, 603 U.S. 593, 620-21 (2024) (quoting *Myers v. United States*, 272 U.S. 52, 106 (1926)). Indeed, the Supreme Court in *Slaughter* further recognized this "inherent" and "unitary" "executive power" to appoint, oversee, control, and remove subordinate officers "at will" under the Constitution's Vesting Clause. *See Slaughter*, 2026 WL 1855612 at *8-9 (citation modified). And if this executive power was "subject in whole or in part to the control and co-operation of others," including the judiciary, then "[t]he unity of the Executive Branch would be destroyed[.]" *Id.* (citation modified). The logic of Plaintiff's position, that the President's exercise of even plenary Article II authorities is constrained by the equal protection component of the Fifth Amendment, would extend equally to appointments of principal officers as to removals. Yet virtually all recent Presidents have proudly admitted that they considered race and sex when choosing the principal officers who led their administrations. The Court should not adopt a novel legal theory that would deem such conduct a constitutional violation while placing district court judges in the untenable position of having to peer into the President's mind to divine his intent when he makes his most sensitive and important personnel decisions.

3

**BACKGROUND**

## I.    Statutory Background

The Surface Transportation Board (STB) is a federal agency charged with the economic regulation of various modes of surface transportation, primarily freight rail. 49 U.S.C. § 10501. The agency has jurisdiction over railroad rate, practice, and service issues and rail mergers, line sales, line construction, and line abandonments. *See id.* §§ 10704, 10901, 10903 & 11323. The STB also has jurisdiction over certain matters pertaining to passenger rail, the intercity bus industry, non-energy pipelines, household goods carriers' tariffs, and marine freight shipping between the continental United States, Alaska, Hawaii, and U.S. territories and possessions. *See*, *e.g.*, *id.* §§ 13521, 13701, 14303, 15301 & 24308. The agency resolves surface transportation disputes through docketed proceedings, prescribes regulations, and may bring civil actions to enjoin violation of its orders. *E.g.*, *id*. §§ 1321(a), 10704(b), 11702. The Board also has authority to investigate certain freight and passenger rail matters, both upon complaint and on its own initiative. *Id.* §§ 11701, 24308(f). And it may direct the movement of rail traffic during emergencies and must direct that preference or priority be given to certain traffic upon notice by the President during times of war. *Id.* §§ 11123, 11124.

Created on January 1, 1996, by the ICC Termination Act of 1995, Pub. L. No. 104-88, the STB is the jurisdictional successor to the former Interstate Commerce Commission (1887-1995). For the first twenty years of its existence, the STB was "aligned" with the U.S. Department of Transportation for administrative purposes, although it retained a statutory removal provision. *See* 49 U.S.C. § 1301(b)(3). On December 18, 2015, Congress reauthorized the STB as a wholly "independent" agency and increased its membership from three to five persons. Of the STB's five Board Members, one serves as the Chairman. 49 U.S.C. § 1301(b)(1), (c)(1).

## II.    Procedural Background

Plaintiff filed his initial Complaint raising an ultra vires claim on October 1, 2025, ECF No. 1, and Defendants were properly served on October 28, 2025. On December 4, 2025, as a

4

matter of right, Plaintiff amended his Complaint to include a Fifth Amendment Due Process claim. ECF No. 15. Defendants intended to seek a stay of this case's proceedings pending the Supreme Court's resolution of *Trump v. Slaughter* in the U.S. Supreme Court. Plaintiff indicated he would consent to a stay of his ultra vires claim but not his Fifth Amendment Due Process claim. Recognizing that a similar removal case, *Brown v. Trump*, No. 25-1764 (DLF), was also before this Court with the same counsel, raising the same causes of action and with a motion to stay pending and fully briefed, the parties moved to stay this case until the Court ruled on the stay motion in *Brown* and subsequently move to adopt the Court's ruling there. On December 29, 2025, the Court stayed litigation as to the ultra vires claim in *Brown* but allowed the Fifth Amendment Due Process claim to proceed. The Court also ordered the parties in *Brown* to propose a briefing schedule for the Government's planned motion to dismiss. On January 7, 2025, the parties in this case filed a proposed scheduling order and partial motion to stay which would place this case on the same briefing schedule as *Brown*. Joint Proposed Briefing Schedule for Mot. to Dismiss on Count II of the Am. Compl., ECF No. 17. The Court approved the proposed briefing schedule in its January 8, 2026 Minute Order.

The Parties fully briefed the Government's Motion to Dismiss on March 4, 2026, but on June 29, 2026, before this Court could rule, the Supreme Court decided *Slaughter*. The Court determined it "cannot rule on the defendants' pending [ ] Motion to Dismiss Count II without considering the Supreme Court's recent opinion in *Trump v. Slaughter*." June 29 Minute Order. Accordingly, the Court ordered the parties to submit a joint status report, proposing a briefing schedule for Defendants' second Motion to Dismiss which would be inclusive of the Supreme Court's Opinion in *Slaughter*. The Parties submitted a Joint Status Report on July 2, 2026, in which Plaintiff stated he "no longer intends to pursue" the ultra vires claim in Count I of his Amended

Complaint. J. Status Rep. at 4, ECF No. 22.[1] Defendants now bring this second Motion to Dismiss against Count II of Plaintiffs' Amended Complaint.

### III.    Plaintiff's Amended Complaint

Plaintiff was a Democratic member of the STB who was first appointed by President Trump in 2020. *See* Am. Compl. ¶ 5, ECF No. 15. He was subsequently reappointed by President Biden to serve a term expiring on December 31, 2027. President Biden, during his administration, appointed Plaintiff as chairman of the STB. *Robert Primus Biography*, Surface Transportation Board, https://perma.cc/AT64-TWWH. Before he served on the STB, Plaintiff was a longtime political operative on Capitol Hill. For over twenty years, Plaintiff closely advised more than half-a-dozen Democratic senators and congresspersons. Am. Compl. ¶ 39; *Robert Primus Biography*, Surface Transportation Board, https://perma.cc/AT64-TWWH.

On August 27, 2025, President Trump removed Plaintiff from his position as a member of the STB, via email and without a stated reason. Plaintiff is Black. Am. Compl. ¶ 9. At the time of his removal, the remaining Democrat-appointee who was not removed was white. *Id.* ¶ 10. Plaintiff does not allege that the President or anyone else in the Trump Administration ever said anything mentioning his race.

Plaintiff asserts that his removal "fits within a pattern of Trump Administration removals of high-level Black officials in the federal government, including Senate-confirmed members of independent Commissions." *Id.* ¶ 12. Without specifying the data, he alleges that "available data" shows that "since the beginning of President Trump's second term in office, approximately 75 percent of Black federal officials leading multimember agencies have been removed from office. In contrast, only approximately 27 percent of white federal officials on multimember agencies have been removed." *Id.* ¶ 45. That 75 percent apparently equated to six out of eight. *See id.* ¶ 46 (listing six Black members of multi-member agencies that President Trump has removed). Plaintiff does not allege that President Trump or any member of his administration has referred to the race

---

[1] Based on this representation, the Government anticipates Plaintiff to voluntarily dismiss Count I of his Amended Complaint.

of any of the other Black members of multi-member agencies who have been removed or attributed their removal to race. Besides Plaintiff, only one of them has filed a lawsuit challenging his or her removal on the basis of alleged racial discrimination, Alvin Brown of the National Transportation Safety Board, who is represented by the same counsel as Plaintiff and whose case is also pending before this Court. *See Brown v. Trump*, No. 25-1764 (DLF).

Although Plaintiff argues that his removal "reflects a broader pattern across the government of President Trump removing high-level Black officials," he cites just two other examples: the Librarian of Congress and the Chairman of the Joint Chiefs of Staff. *See* Am. Compl. ¶ 47.

Plaintiff alleges that President Trump and White House representatives have made statements opposing "diversity, equity, and inclusion" ("DEI") policies in the federal government. *See id.* ¶¶ 48-52. Although Plaintiff asserts that these statements opposing DEI policies "indicat[e] that he and his administration are seeking to remove people of color throughout the federal government," *id.* ¶ 48, nothing in any of the quoted statements refers to removing people of color.

Plaintiff also asserts that "the Executive Branch has also at times made a clear and demonstrable emphasis on hiring white men," *id.* ¶ 54, but the sole factual allegation purportedly supporting this statement is that the Department of Labor issued "workforce posters featuring almost exclusively white men," *id.* Plaintiff argues that "[m]ore generally, Black officials and Black employees across the federal government have been removed from their jobs at disproportionate rates," *id.* ¶ 55, but not one of the articles cited in that paragraph compared the rates at which Black employees have been removed from federal government jobs to the rate at which employees of other races have been removed from federal government jobs. Finally, Plaintiff alleges that "in the Trump Administration's first 200 days, only two percent of all of President Trump's Senate-approved appointees have been Black individuals." *Id.* ¶ 56.

Plaintiff's Amended Complaint names President Trump, the STB, and STB Chairman Patrick Fuchs as Defendants. In Count II, Plaintiff claims that his removal constitutes racial discrimination in violation of the equal protection component of the Fifth Amendment Due Process

Clause. *See id.* ¶¶ 63-68. He alleges that he was removed and "was treated differently from similarly situated people, the other members of the Board, and particularly the white Democratic member." *Id.* ¶ 65. He alleges that "President Trump has not offered a non-discriminatory reason for his choice to remove Mr. Primus," *id.* ¶ 66, and that "[e]ven if the Defendants assert a non-discriminatory reason, any purported non-discriminatory reason is pretextual, and race was at least in part the reason for removing Mr. Primus," *id.* ¶ 67. He asks the Court to declare that his removal was unlawful and issue an injunction and a writ of mandamus against Chairman Fuchs and the STB that would de facto reinstate him in office by directing them to treat him as a member of the STB. *See id.*, Request for Relief.

## LEGAL STANDARD

"A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint." *Harrington v. DC Winery, LLC*, No. 22-689 (TSC), 2023 WL 5561604, at *2 (D.D.C. Aug. 29, 2023). "In order to proceed to discovery, a plaintiff must 'state a claim to relief that is plausible on its face.'" *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 608 U.S. ---, 146 S. Ct. 1391, 1399 (2026) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "If the complaint 'pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Instead, to nudge a claim 'across the line from conceivable to plausible,' a plaintiff must plead facts that, if true, 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' and to rule out 'obvious alternative explanation[s]' for the defendant's conduct[.]" *Id.* (quoting *Iqbal*, 556 U.S. at 678 and *Twombly*, 550 U.S. at 567 (citations modified)). On a Rule 12(b)(6) motion, the Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Smith v. Clinton*, 253 F. Supp. 3d 222, 234 (D.C. Cir. 2017) (quoting *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), *aff'd*, 886 F.3d 122 (D.C. Cir. 2018)).

8

## ARGUMENT

### I.    Plaintiff Fails to Plausibly Allege that His Removal Was Motivated by Race

Even if the Fifth Amendment constrains the President's authority to remove principal officers on the basis of race,[2] Plaintiff fails to state a Fifth Amendment claim because he fails to allege plausibly that the President removed him because of his race. "[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497(1954)). But while the Fifth Amendment, and the Fourteenth Amendment's Equal Protection Clause, address "invidious[ ]" discrimination, Supreme Court "cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional Solely [sic] because it has a racially disproportionate impact." *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Plaintiff makes no factual allegations that, if credited, would constitute direct evidence of discriminatory intent. The message removing him simply informed him of his removal and said, "[t]hank you for your service." Am. Compl. ¶ 40. And Plaintiff does not allege that the President or anyone in his administration made any other statement mentioning Plaintiff's race or tying his removal to his race.

Thus, Plaintiff's claim rests solely on circumstantial factual allegations of discriminatory intent. Plaintiff relies in part on alleged statistical data purportedly showing a pattern of removal of Black members of multi-member agencies, akin to a disparate impact argument. *See id.* ¶¶ 45-46. But the Supreme Court has set the bar extremely high for when evidence of disparate outcomes,

---

[2] *But see infra*, Part III.

without more, can demonstrate discriminatory intent, and Plaintiff's alleged statistical evidence comes nowhere close to that bar. Whether an action "bears more heavily on one race than another," *Davis*, 426 U.S. at 242, may provide a starting point, but "[a]bsent a pattern as stark as that in *Gomillion*[ *v. Lightfoot*, 364 U.S. 339 (1960)] or *Yick Wo*[ *v. Hopkins*, 118 U.S. 356 (1886)], impact alone is not determinative, and the Court must look to other evidence," *Vill. of Arlington Heights*, 429 U.S. at 266.

In both *Gomillion* and *Yick Wo*, referenced above, there were indisputable patterns of racial discrimination. In *Gomillion*, Tuskegee officials redrew city boundaries to exclude all but four or five Black residents out of 400, without removing a single white resident. 364 U.S. at 341. In *Yick Wo*, the City of San Francisco required the owners of all wooden laundry houses to seek permission to continue operating, and every Chinese owner's petition was denied while every non-Chinese person's petition was approved—with one exception. 118 U.S. at 362. As one court explained, for statistical evidence of disparate outcomes to meet the standard of *Gomillion* and *Yick Wo*, "[t]he statistics must be so stark that they are unexplainable on grounds other than race, leading to the inescapable conclusion, tantamount for all practical purposes to a mathematical demonstration, of discriminatory intent." *Alston v. City of Madison*, 853 F.3d 901, 908 (7th Cir. 2017) (citations omitted).

Here, Plaintiff attempts to suggest a similar statistical pattern: Plaintiff first argues his removal was based on race, not political affiliation, because a white Democratic member of the STB was not removed. Am. Compl. ¶ 43. Plaintiff also contends that 75 percent of Black officers leading independent multi-member boards and commissions[3] during the second Trump Administration have been removed while only 27 percent of the white officers on those same bodies have been removed. *Id.* ¶¶ 45-46.

---

[3] Plaintiff appears to be referencing five Black individuals, not including himself: Alvin Brown (National Transportation Safety Board), Gwynne Wilcox (National Labor Relations Board), Lisa Cook (Federal Reserve), Charlotte Burrows (Equal Employment Opportunity Commission), Travis LeBlanc (Privacy and Civil Liberties Oversight Board).

Plaintiff's statistical argument suffers from numerous flaws. First, these alleged statistics bear no resemblance to the stark facts of *Gomillion* or *Yick Wo*. Unlike in those cases, where the defendants excluded individuals outside the disfavored race from the allegedly discriminatory actions (completely in *Gomillion* and with one exception in *Yick Wo*), here Plaintiff admits that President Trump has removed a substantial percentage of white members of multi-member agencies. *See* Am. Compl. ¶ 47.[4] The alleged 75 percent of Black members of multi-member agencies who were removed is far less stark than the 100 percent of Chinese laundry owners who were disadvantaged in *Yick Wo* or the 99 percent of Black Tuskegee residents in *Gomillion*. These statistics do not "remotely approach" the starkness of *Gomillion* and *Yick Wo* and are insufficient to demonstrate disparate racial outcomes violative of the Fifth Amendment. *In re Navy*

---

[4] Indeed, one need only view the flood of recent litigation (mostly in this District) challenging the President's removal of executive officers, to see that he has removed many officers of all races. *See*, *e.g.*, *Wilcox v. Trump*, 1:25-cv-334 (D.D.C.) (lawsuit filed by removed Black member of National Labor Relations Board); *Harris v. Bessent*, 1:25-cv-412 (D.D.C.) (lawsuit filed by removed white member of Merit Systems Protection Board); *Grundmann v. Trump*, 1:25-cv-425 (D.D.C.) (lawsuit filed by removed Asian-American member of Federal Labor Relations Authority); *LeBlanc v. Trump*, 1:25-cv-542 (D.D.C.) (lawsuit filed by removed Black member and removed white member of Privacy and Civil Liberties Oversight Board; another removed white member did not join lawsuit); *Slaughter v. Trump*, 1:25-cv-909 (D.D.C.) (lawsuit originally filed by one removed white commissioner and one removed Latino commissioner of Federal Trade Commission); *Samuels v. Trump*, 1:25-cv-1069 (D.D.C.) (lawsuit filed by removed white commissioner of Equal Employment Opportunity Commission; a removed Black commissioner did not join lawsuit); *Harper v. Bessent*, 1:25-cv-1294 (D.D.C.) (lawsuit filed by removed white member and removed Asian-American member of National Credit Union Administration Board); *Corp. for Pub. Broad. v. Trump*, 1:25-cv-1305 (D.D.C.) (lawsuit filed by three removed white members of Board of Corporation for Public Broadcasting); *Brown v. Trump*, 1:25-cv-1764 (D.D.C.) (lawsuit filed by removed Black member of National Transportation Safety Board); *Cook v. Trump*, 1:25-cv-2903 (D.D.C.) (lawsuit filed by removed Black member of Board of Governors of the Federal Reserve); *Boyle v. Trump*, 8:25-cv-1628 (D. Md.) (lawsuit filed by two removed white commissioners and one removed Asian-American commissioner of Consumer Product Safety Commission); *Dellinger v. Bessent*, 1:25-cv-385 (D.D.C.) (lawsuit filed by removed white Special Counsel); *Storch v. Hegseth*, 1:25-cv-415 (D.D.C.) (lawsuit filed by eight of seventeen removed Inspectors General; removed officers were white, Black, and Asian-American); *Brehm v. Marocco*, 1:25-cv-660 (D.D.C.) (lawsuit filed by removed white President of United States African Development Foundation); *Aviel v. Gor*, 1:25-cv-778 (D.D.C.) (lawsuit filed by removed white President of Inter-American Foundation); *Perlmutter v. Blanche*, 1:25-cv-01659 (D.D.C.) (lawsuit filed by removed white Register of Copyrights).

*Chaplaincy*, 738 F.3d 425, 429 (D.C. Cir. 2013). Even a showing that "a substantial majority" of an affected population was Black is insufficient. *Alston*, 853 F.3d at 908.[5]

Second, Plaintiff chooses an invalid basis of comparison. Even though President Trump has removed only Democratic members of multi-member commissions with one recent exception at the National Transportation Safety Board, Plaintiff compares the percentages of all Black and white members of multimember agencies removed by President Trump, rather than the salient comparison of the percentage of Black and white *Democratic* members removed. *See* Am. Compl. ¶ 45. However, "[t]o be useful" in making out a claim for intentional discrimination, "a statistical comparison" must compare populations of "similarly situated individuals." *Blackwell v. Strain*, 496 F. App'x 836, 839-40 (10th Cir. 2012). There is thus an "obvious alternative explanation," *Bellinger v. Bowser*, No. 1:17-cv-02124-TJK, 2018 WL 4705808, at *6 (D.D.C. Sept. 30, 2018) (quoting *Iqbal*, 556 U.S. at 682), for why President Trump has removed a greater proportion of Black members of multimember agencies than white members: he has largely removed only Democrats, and Democrats had greater Black representation on multimember agencies at the time he took office.

Third, Plaintiff's evidence is anecdotal (unlike the hundreds of individuals adversely affected in *Gomillion* and *Yick Wo*), and those anecdotes do not paint a picture of intentional racial discrimination. The 75 percent of Black members removed apparently equates to six out of eight, or Plaintiff and five other individuals. *See* Am. Compl. ¶ 46. Regarding other Black members of multimember agencies, the Court can take judicial notice that:

- Travis LeBlanc, a Black Democratic member of the Privacy and Civil Liberties Oversight Board, was removed alongside two white Democratic members, Edward

---

[5] *See also Alston,* 853 F.3d at 908 ("Consider more closely the statistics present in *Gomillion* and *Yick Wo*. There, the statistics showed that minorities were disproportionately affected by the law. But the statistics showed more than disparate impact. They revealed that almost all minorities— every minority in *Yick Wo* and all but five minorities in *Gomillion*—were negatively affected by the law. The statistics also revealed that almost no whites—none in *Gomillion* and only one in *Yick Wo*—were negatively affected by the law. In both cases, it was clear that the statistical disparity at issue was caused by the defendants' actions, which allowed the Court to conclude that statistics alone were enough to prove unconstitutional disparate treatment.").

Felten and Sharon Bradford Franklin. *See LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, 784 F. Supp. 3d 1, 13-14 & n.8 (D.D.C. 2025).

- Charlotte Burrows, a Black Democratic commissioner of the Equal Employment Opportunity Commission, was removed alongside a white Democratic Commissioner, Jocelyn Samuels; an Asian-American Democratic commissioner, Kalpana Kotagal, was not removed. *See* Katz Banks Kumin*, Lisa Banks and Debra Katz to Represent Former EEOC Chair and Commissioner Charlotte A. Burrows (Jan. 28, 2025),* https://katzbanks.com/news/burrows/.

- Gwynne Wilcox, a Black member of the National Labor Relations Board, was removed alongside the white General Counsel, Jennifer Abruzzo. President Trump's message removing them raised specific policy disagreements he had with both Ms. Wilcox and Ms. Abruzzo. *See* https://myprivateballot.com/wp-content/uploads/2025/01/Abruzzo-Wilcox-Firing-Letter.pdf.

- President Trump invoked the Federal Reserve's for-cause removal provision in removing Governor Lisa Cook, based on apparent mortgage fraud. *See* President Donald Trump Fires Fed Governor Lisa Cook (Aug. 25, 2025), https://www.documentcloud.org/documents/26074125-cook-letter/. He did not remove another Black governor, Vice Chair Philip Jefferson, who has not been accused of wrongdoing. *See* Federal Reserve, https://www.federalreserve.gov/aboutthefed/bios/board/jefferson.htm.

- At the Federal Election Commission, President Trump removed a white Democratic member, Ellen Weintraub, but did not remove a Black Democratic member, Shana Broussard, who remains in office. *See* Ellen L. Weintraub (@EllenLWeintraub), X (Feb. 6, 2025), https://x.com/EllenLWeintraub/status/1887648967300694270; Fed. Election Comm'n, Shana M. Broussard, https://www.fec.gov/about/leadership-and-structure/shana-m-broussard/.

Plaintiff also notes that President Trump has removed the Librarian of Congress and the chairman of the Joint Chiefs of Staff, who are Black. Am. Compl. ¶ 42. Plaintiff ignores, however, that the President also has appointed Black officials, including a cabinet Secretary. This demonstrates that such anecdotal evidence "simply cannot support a plausible inference of intentional racial discrimination," even at the pleading stage. *Bellinger*, 2018 WL 4705808, at *7.

Realizing the weakness of these statistical arguments, Plaintiff tries to supplement his statistical evidence with a constellation of discrete circumstantial facts, each attenuated from his case. Plaintiff notes the President and Trump Administration officials complained about DEI

13

practices and that certain individuals—but not Plaintiff—were removed because they supported certain DEI practices. *Id.* ¶¶ 48-52. Plaintiff points to vintage-inspired Labor Department posters featuring white men—though Plaintiff alleges no connection with them or the Labor Department. *Id.* ¶ 54. Plaintiff generally references federal removal statistics for all government employees without alleging any direct or individual presidential involvement. *Id.* ¶ 55. Likewise, Plaintiff generally references presidential nomination statistics for all Senate-confirmed appointees—though Plaintiff was removed from his position rather than passed over for appointment. *Id.* ¶ 56. Ultimately, these facts are insufficient, even taken as true. To show discriminatory purpose, a plaintiff must show that the decisionmaker, the President in this case, "selected or reaffirmed a particular course of action at least in part because of . . . its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (citation omitted). Likewise, there is insufficient proof of discriminatory intent where statements or circumstantial evidence substantively "expresse[s] policy views that could rest on race-neutral justifications." *Mullin*, 146 S. Ct. at 2138.

Addressing each of Plaintiff's allegations in turn, none supports an inference that Plaintiff was removed because of race. Plaintiff does not allege that he is similarly situated to the Librarian of Congress or chairman of the Joint Chiefs of Staff, nor does he allege any facts that would plausibly demonstrate that they were removed because of race.

Plaintiff argues the President's statements on DEI demonstrate a discriminatory intent to remove Plaintiff. Am. Compl. ¶¶ 49, 51-52 ("We have to end the tyranny of so-called diversity, equity, and inclusion policies all across the entire federal government.") ("We will terminate every diversity, equity, and inclusion program across the entire federal government.") ("I ended all of the lawless so-called diversity, equity, and inclusion bullshit. All across the entire federal government and the private sector."). Importantly, none of those statements is about Plaintiff; they are about DEI, which is merely incidental to Plaintiff as DEI concerns topics including race, and Plaintiff is Black. None of the statements reflect an intent to discriminate based on race; rather, they merely reflect the President's criticism of DEI and DEI-adjacent programs. Plaintiff's claim

14

seemingly assumes that the President's alleged criticism of DEI is necessarily motivated by racial animus, but that assumption is flawed. There are numerous good-faith bases to criticize DEI and DEI-adjacent programs. *See*, *e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.* (SFFA), 600 U.S. 181, 266 (2023) (Thomas, J., concurring) (expressing the view that paeans to "diversity" often conceal invidious racial discrimination). This Court need not weigh in on the wisdom of DEI programs or critiques of such programs. The mere recognition that criticism of DEI may be motivated by something other than discriminatory purpose, such as a policy preference, sufficiently illustrates that the President's criticism of DEI and DEI-adjacent programs cannot be equated with an intent to discriminate based on race. *See Mullin*, 146 S. Ct. at 2137-39 (concluding statements calling immigrants criminals and broadly responsible for "social ills," maligning Haitians for immigrating to the United States, or criticizing asylum policy are insufficient to demonstrate discriminatory intent); *Walls v. Sanders*, 760 F. Supp. 3d 766, 806 (E.D. Ark. 2024) (explaining that "allegations of animus toward Critical Race Theory are not synonymous with allegations of an intent to discriminate against African Americans"). Ultimately, Plaintiff may disagree with the President's criticism of DEI, but that criticism does not demonstrate a discriminatory purpose.

Further, presidential proclamations show that in the President's view, DEI policies have often been used to discriminate on the basis of race, in a manner similar to what the Supreme Court found unlawful in *Students for Fair Admissions*. For example, President Trump issued an Executive Order stating that "illegal and immoral discrimination programs" have "go[ne] by the name 'diversity, equity, and inclusion' (DEI)," and that instead of "discrimination," "Americans deserve a government committed to serving every person with equal dignity and respect." Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs And Preferencing, § 1. Another Executive Order stated that federal DEI programs "can violate the civil-rights laws of this Nation" and have resulted in "illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing." Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, § 1. Opposition to racial

15

discrimination in government conduct is perfectly legitimate, as "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). To be clear, this case does not concern the legality of any particular DEI policy or DEI in general. But these statements underscore that in speaking out against DEI, the President is speaking out against what he believes to be racial discrimination, not evincing an intent to engage in racial discrimination. Indeed, this Court should not assume an intent to engage in racial discrimination where a statement expresses a race-neutral policy preference. *See Mullin*, 146 S. Ct. at 2138. Here, the President's stated goal is to create a meritocratic society free from any kind of racial discrimination.

As for Plaintiff's reference to vintage-inspired Labor Department graphics featuring white men, general removal statistics for the entire federal government, and nomination statistics for all Senate-confirmed appointees, Am. Compl. ¶¶ 54-56, these facts are atmospheric, disconnected between the President and Plaintiff, and do not address the President's alleged discriminatory intent. First, the President does not regularly review digital media and graphic design prior to its publication by the Labor Department, nor does Plaintiff allege otherwise. Thus, an unrelated executive department's media publications, barring evidence of the President's actual involvement, is insufficient to demonstrate his discriminatory intent in this case.

Plaintiff also does not allege the President personally oversaw or directed the individual removal of the Black federal employees referenced in the articles to which Plaintiff cites. Nor does Plaintiff allege the President directed his principal officers to specifically target Black federal employees for removal. Such allegations, if made, would be indicative of the President's intent, but that evidence is absent here. Further support can even be found in the articles to which Plaintiff cites. For example, Plaintiff cites a New York Times article discussing removals at the Department of Education, USAID, and the Internal Revenue Service. As the authors wrote:

> Black workers . . . have been hard hit by reductions in the federal work force overall
> . . . [because] agencies where racial minorities and women were a majority of the
> work force, such as the Education Department and the U.S. Agency for
> International Development, were targeted for the largest work force reductions or

>complete elimination. Black women made up nearly a quarter of the work force in agencies such as the Internal Revenue Service, which also saw deep reductions

Elisabeth Bumiller & Erica L. Green, *Trump Fires Black Officials from an Overwhelmingly White Administration*, N.Y. Times (Oct. 8, 2025), https://perma.cc/2DBG-3XFH. At most, that observation suggests that Black federal employees may have been disproportionately affected by removals at those agencies because they held a disproportionate share of positions at those federal agencies. But even so, disproportionate effects do not necessarily indicate discriminatory purpose. *Alston* directs us to "[c]onsider more closely the statistics present in *Gomillion* and *Yick Wo*. There, the statistics showed that minorities were disproportionately affected by the law. But the statistics showed more than disparate impact. They revealed that almost all minorities . . . were negatively affected by the law. The statistics also revealed that almost no whites . . . were negatively affected by the law." *Alston*, 853 F.3d at 908. Not only does this data fail to show "starkness" equivalent to *Gomillion* or *Yick Wo*, but it is disconnected from Plaintiff's case. The closure of unrelated federal agencies that have a disproportionately Black makeup is insufficient to establish the President's discriminatory intent in this case.

Lastly, statistics relating to the President's appointments are disconnected from Plaintiff's case because they do not demonstrate that Plaintiff was *removed* due to his race. Appointment data may be instructive in ferreting out the intent of appointments, but it provides an incomplete picture into the President's decision making for removals. After all, it was President Trump who first appointed Plaintiff to the STB in 2020, William C. Vantuono, *Primus Nominated to STB*, Railway Age (July 21, 2020), https://www.railwayage.com/regulatory/primus-nominated-to-stb/, though Plaintiff now alleges the President removed him due to a newly manifested racial animus. Yet still, the President also appointed a Black woman, Olivia Trusty, to another multimember commission Congress has described as "independent," *Olivia Trusty Biography*, FCC, https://perma.cc/728W-HVF7, as well a Black man, Scott Turner, to be Secretary of Housing and Urban Development, HUD's Secretary, HUD (last visited Jan. 21, 2026), https://perma.cc/V3BE-SRCS.

17

Ultimately, Plaintiff's removal from the Surface Transportation Board is not "unexplainable on grounds other than race." *Vill. of Arlington Heights*, 429 U.S. at 266. Rather, there are multiple "obvious alternative explanation[s]," *Bellinger*, 2018 WL 4705808, at *6 (quoting *Iqbal*, 556 U.S. at 682). And where a race-neutral justification exists, courts should not assume an intent to engage in racial discrimination. *See Mullin*, 146 S. Ct. at 2138. Here, Plaintiff is a longtime political operative in an opposition party. For over twenty years, Plaintiff closely advised more than half-a-dozen Democratic senators and congresspersons. Am. Compl. ¶ 39; *Robert Primus Biography*, Surface Transportation Board, https://perma.cc/AT64-TWWH. Likewise, there are simpler explanations for the non-removal of Karen J. Hedlund: The President may have concluded that Karen Hedlund, a Democratic Board member who was not removed and who served in a variety of transportation-focused roles in and out of government, was less political than Plaintiff. *Board Member Biographies*, Surface Transportation Board, https://perma.cc/XD3A-P6NZ. The President's recent decision to renominate Ms. Hedlund on May 11, 2026, is consistent with that explanation. It is also common practice for an incoming President to remove certain individuals who he no longer believes are politically like-minded or will support his agenda. Moreover, Ms. Hedlund's current term expired on January 1, 2026.[6] Plaintiff's term, however, would not have expired until 2028. Thus, at the time of Plaintiff's removal, the President may not have seen a need to remove Ms. Hedlund given her shorter remaining term and potential near-term departure from the STB. Though Plaintiff and Ms. Hedlund appear to be similarly situated at first glance, they are not; Plaintiff's and Ms. Hedlund's situational differences prompted their dissimilar treatment—not their identities. To borrow the diagnostician's old adage: when you hear hoofbeats, think of horses before zebras. Accordingly, Plaintiff's reliance on inconclusive data and atmospheric facts, even taken as true, do not

---

[6] Under 49 U.S.C. § 1301(b)(3), a member may continue to serve for up to one year after that member's term expires, or until a successor is appointed and qualified, whichever happens first. Ms. Hedlund is currently serving in such a capacity.

18

demonstrate the President's alleged discriminatory intent and are insufficient to show a violation of the Fifth Amendment.

**II.      Plaintiff Cannot State a Claim by Invoking the *McDonnell Douglas* Framework**

In earlier briefing, Plaintiff has signaled that he intends to invoke the burden-shifting framework of *McDonnell Douglas* to avoid the need to plead intentional discrimination under the *Arlington Heights* framework. Under this view, all Plaintiff would need to do to state a claim is to allege that a single white person who was similar to Plaintiff in at least some relevant respects was not removed. Plaintiff's gambit fails to proceed to discovery on such an extraordinary claim with such a minimal showing.

At the outset, the *McDonnell Douglas* framework applies to Title VII and certain other civil rights statutes but not to equal protection claims brought directly under the Fifth Amendment. In *McDonnell Douglas*, the Supreme Court considered "the proper order and nature of proof in actions under Title VII of the Civil Rights Act of 1964[.]" 411 U.S. at 793-94. The Court developed the burden-shifting framework to make it easier for a Title VII plaintiff to make out a prima facie case, given that "[t]he language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *Id.* at 800 (citation omitted); *see Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting."). Defendants have been unable to identify a case that does not apply the *McDonnell Douglas* framework to either Title VII or another federal statute that expressly confers a cause of action on individuals for violations of their civil rights. *See*, *e.g.*, *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025) (a Title VII case); *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523 (D.C. Cir. 2025) (a 42 U.S.C. § 1981 and Title VII case); *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) (a Title VII case); *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (a Title VII case); *Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000) (a Title VII case); *Jiggetts v.*

*Cipullo*, 774 F. Supp. 3d 168 (D.D.C. 2025) (a 42 U.S.C. § 1983 case). Overwhelming case law supports the proposition that the *McDonnell Douglas* framework is a doctrine of statutory interpretation that courts have developed to interpret certain civil rights statutes.

But Plaintiff does not sue under Title VII, Section 1981, or any other civil rights statute. Rather, he brings a claim directly under the equal protection component of the Fifth Amendment. Plaintiff has not cited to, and Defendants have been unable to locate, any case in which the *McDonnell Douglas* analysis was used for a Fifth Amendment claim. In his Opposition to Defendants' first Motion to Dismiss, Plaintiff oversimplified *Jiggetts* as a "case[ ] brought under the Fifth Amendment." Pl.'s Opp'n to Defs.' Mot. to Dismiss at 15 ("Opp'n"), ECF No. 20. . *Jiggetts* involved a Fifth Amendment claim brought under Section 1983, which the opinion acknowledges, 774 F. Supp. 3d at 185-86 ("To prevail on a Section 1983 claim, a plaintiff must first establish a predicate violation of her constitutional rights. "Jiggetts brings three constitutional claims [including] under the Fifth Amendment[.]" (internal citation omitted)). As a district court case, *Jiggetts* is nonbinding. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). But in any event, *Jiggetts* at most suggests that *McDonnell Douglas* applies to claims under Section 1983, a statute that provides for broad remedies for certain violations of civil rights by state and local officials acting "under color of . . . law." *See* 42 U.S.C. § 1983 (providing that an employee of a state or the District of Columbia who violates rights under federal law "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress"); *see also Jiggetts*, 774 F. Supp. 3d at 185-86 ("Where a Section 1983 plaintiff presents circumstantial evidence of racial discrimination, courts in this district apply the burden-shifting framework established in *McDonnell Douglas*[.]") (citations omitted).

The *McDonnell Douglas* framework is a pragmatic doctrine, meant to augment the remedial force of civil rights statutes. Indeed, the *McDonnell Douglas* analysis began in a Title VII case based on the broad remedial "purpose of Congress" in enacting Title VII. 411 U.S. at 800. *McDonnell Douglas Corp.* has been "borrowed" for other civil rights statutes that provide broad remedies for civil rights violations, *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1232 (D.C.

20

Cir. 1984) (application to Section 1981). The Supreme Court did not design it for routine application to any claim. "The method suggested in *McDonnell Douglas* for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic." *Furnco Const. Corp.*, 438 U.S. at 577 .

That pragmatic purpose finds no doctrinal basis in the Fifth Amendment's equal protection clause. Notably, while *McDonnell Douglas* and its progeny emphasize the broad remedial purposes of civil rights statutes, the Supreme Court has held that implying damages remedies against federal officers for constitutional violations "is 'a disfavored judicial activity.'" *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)). That suggests that courts should be hesitant to import evidentiary doctrines based on the broad remedial purposes of civil rights statutes into an implied cause of action for a violation of the constitution.

For equal protection claims, the Supreme Court provided the governing framework in *Arlington Heights*. "Proof of racially discriminatory intent or purpose is *required* to show a violation of the Equal Protection Clause[,]" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (emphasis added), and whether racially discriminatory intent or purpose is present "*demands a sensitive inquiry* into such circumstantial and direct evidence of intent as may be available." *Id.* at 266 (emphasis added). The Supreme Court carefully laid out the factors relevant to this "sensitive inquiry." *Id.* at 265-68. Plaintiff cannot now substitute his preferred test for a constitutionally required one articulated by the Supreme Court. The *Arlington Heights* framework has persisted since 1977, and courts continue to apply it to Fifth Amendment equal protection claims in criminal and civil cases alike. *See, e.g.*, *Mullin*, 146 S. Ct. at 2138 (applying *Arlington Heights* to the President's determination to end temporary protected status); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 34 (2020) (applying *Arlington Heights* framework to DACA recission); *United States v. Barrera-Vasquez*, 617 F. Supp. 3d 400, 407 (E.D. Va. 2022) (applying *Arlington Heights* framework to criminal immigration law). Plaintiff fails to justify why it must be uniquely discarded in cases alleging invidious (that is purposeful) employment discrimination.

21

*Arlington Heights*'s application does not depend on the object of a suit but the avenue for relief. If the claim raised is a constitutional challenge under the Fifth Amendment's equal protection component or the Fourteenth Amendment's Equal Protection Clause, *Arlington Heights*'s constitutionally required framework applies. But courts have applied *McDonnell Douglas* to claims brought under civil rights statutes like Section 1981, the Age Discrimination in Employment Act, or Title VII. Other courts have understood and applied this distinction. "*While not directly applicable to Equal Protection claims*, the Supreme Court and the Ninth Circuit have held that, for employment discrimination cases, the *McDonnell Douglas* evidentiary framework is a useful touchstone to evaluate whether a claim survives a motion to dismiss[.]" *California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1024 n.5 (N.D. Cal. 2020) (emphasis added); *see also id.* ("Similar to *McDonnell Douglas*, the *Arlington Heights* framework is an evidentiary burden-shifting regime" and "the Ninth Circuit has used [the *Arlington Heights*] factors in evaluating a district court's dismissal of a complaint pursuant to Rule 12(b)(6)" for an equal protection challenge.).

Plaintiff brought a Fifth Amendment claim, not a Title VII claim, but seeks the remedies regularly sought under Title VII. Title VII sets out its own requirements for challenging invidious employment discrimination in federal employment, including an exhaustion requirement, which would require a prospective plaintiff to file an equal employment opportunity complaint with the employing agency and wait until the final disposition of that complaint. 42 U.S.C. § 2000e-16(c). "This exhaustion requirement is no small matter; it 'is a condition to the waiver of sovereign immunity' and thus 'must be strictly construed.'" *Vazquez–Rivera v. Figueroa*, 759 F.3d 44, 47–48 (1st Cir. 2014) (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990)). Plaintiff seeks to bypass these jurisdictional requirements with his Fifth Amendment claim but nonetheless argues the *McDonnell Douglas* Title VII analysis should still apply. This would obviate the need for Title VII in disparate treatment federal employment cases, and it would create a back door to evade the jurisdictional and procedural requirements Title VII has long imposed. Plaintiff cannot have his cake and eat it, too.

Further problems abound. Even if it were possible to cordon off appointments from the ambit of Plaintiff's legal theory, the consequences as to removal are magnified by Plaintiff's position that to survive a motion to dismiss, a plaintiff need only allege a single comparator of a different race who is similarly positioned "in at least some relevant respects." *Joyner*, 140 F.4th at 531. If the mere fact that a person of a different race with a similar position (and perhaps of the same party) was not removed is sufficient, then many ordinary presidential removals could meet this standard. For example, each of the 93 U.S. Attorneys have similar positions leading one of the U.S. Attorney's Offices throughout the country. At any given time, there will likely be U.S. Attorneys of several different races. If Plaintiff is correct, the President could never remove a U.S. Attorney without giving rise to a race discrimination claim that would survive a motion to dismiss (unless he removed all U.S. Attorneys at once), because there would always be at least one other U.S. Attorney of a different race who was not removed. That would place impermissible burdens on the President's removal powers and decision making. This legal construction would offend a core tenet of the Supreme Court's reasoning in *Slaughter*: "officers [are] subject to the President's superintendence" and "ha[ve] to be removable by him at will." *Slaughter*, 2026 WL 1855612 at *9.

> The "unity" of the Executive Branch would be "destroyed," Hamilton wrote, if it were vested "ostensibly in one man, subject in whole or in part to the control and co-operation of others, in the capacity of counselors to him." But that is precisely what would occur if the President's so-called assistants could exercise *his* power against *his* wishes. Only if the President's deputies were removable at will would they truly be "subordinate" to "the sole executive magistrate."

*Id.* (citations omitted).

Thus, the *McDonnell Douglas* framework neither applies nor is reconcilable with the Supreme Court's Opinion in *Slaughter*, and Plaintiff is unable to state a claim under the *Arlington Heights* analysis.

## III.    Plaintiff's Claim Is Not Legally Cognizable

Even if Plaintiff had adequately alleged that President Trump was motivated by race when he removed Plaintiff, that would not give rise to a cognizable constitutional claim. "[T]he

23

President's power to remove 'executive officers of the United States whom he has appointed'" is a "conclusive and preclusive" Presidential power that "may not be regulated by Congress or reviewed by the courts." *Trump v. United States*, 603 U.S. at 620-21 (quoting *Myers*, 272 U.S. at 106).

The President's removal of Plaintiff, a principal officer in the Executive Branch, falls within that conclusive and preclusive authority. As the Supreme Court has explained, "[o]nly if the President's deputies were removable at will would they truly be subordinate to the sole executive magistrate." *Slaughter,* WL 1855612 at *9 (citation modified). "For another, the power to remove at will was a necessary corollary of the Constitution's design." *Id.*

No Court has ever held that when the President exercises his conclusive and preclusive Article II authority to remove a principal officer of the United States, the Fifth Amendment empowers a court to review whether such a removal was an act of racial discrimination. The implications of Plaintiff's legal theory are striking.

Although this case concerns an exercise of the President's Article II removal authority, the logic of Plaintiff's position is that more broadly, exercises of the President's core Article II powers are reviewable under the Fifth Amendment to determine whether the President discriminated on the basis of race. *See* Am. Compl. ¶ 8 ("Included within the ambit of these rights is a protection against discrimination in employment decisions. President Trump violated Mr. Primus's Fifth Amendment rights by removing him from his Board position, at least in part, because of Mr. Primus's race."). If Plaintiff's position is correct, then a Presidential *appointment* of a principal officer that considered race would support a Fifth Amendment legal claim just as much as a Presidential *removal* of a principal officer that considered race. Further, if any equal protection claim is cognizable based on alleged racial discrimination in removing a Black official or appointment of a white official, such a claim would be equally cognizable as applied to the removal of a white official or appointment of a Black official (or any other racial permutation). *See SFFA*, 600 U.S. at 206 ("[T]he Equal Protection Clause . . . applies without regard to any differences of race, of color, or of nationality—it is universal in its application. For the guarantee of equal

24

protection cannot mean one thing when applied to one individual and something else when applied to a person of another color.") (cleaned up). Appointing or removing principal officers on the basis of sex would likewise be constitutionally suspect. *See United States v. Virginia*, 518 U.S. 515, 531-34 (1996).

In sum, Plaintiff invites a legal regime in which federal district court judges would superintend the President's selections of the most important executive officials, the principal officers who lead the Executive Branch, to ensure that race and sex played no role in the President's decision making. Such a regime would come as a shock to the recent Presidents who have acknowledged that they considered race and sex in determining which principal officers would lead the Executive Branch under their administrations. For example, in recounting President Clinton's accomplishments at the end of his Presidency, the White House website boasted that he "[a]ppointed the most diverse cabinet in history," specifically pointing to President Clinton's consideration of race ("he has appointed seven African American Cabinet Secretaries" and "the first Asian American to serve in a Cabinet") and sex ("women make up 44 percent of Clinton Administration appointees, including the first woman to serve as Secretary of State, Madeline Albright, and the first to serve as Attorney General, Janet Reno"). The White House (archived), The Clinton Presidency: Building One America, Record of Progress, https://clintonwhitehouse5.archives.gov/WH/Accomplishments/eightyears-11.html.

During his first Presidential campaign, President Obama reportedly "promise[d] to have the most diverse Cabinet in history" and "fulfilled his promise" by appointing many Black, Latino, and Asian-American cabinet members. The Associated Press, The Gainesville Sun, In Cabinet, Obama goes for experience, pragmatism, (Dec. 20, 2008), https://www.gainesville.com/story/news/nation-world/2008/12/20/in-cabinet-obama-goes-for-experience-pragmatism/31590871007/. And although President Obama was criticized when his first four Cabinet nominees for his second term were white men, he reassured supporters that he "intend[ed] to continue" having a cabinet that was "as diverse, if not more diverse . . . than any in

history." Fox News, Obama: Attacks on Cabinet Diversity are Premature (updated Jan. 10, 2017), https://www.foxnews.com/politics/obama-attacks-on-cabinet-diversity-are-premature.

On the campaign trail, President Biden likewise "promised to nominate 'the most diverse Cabinet in history,' stressing that he wanted leaders that look like America." PBS News, Meet Joe Biden's Cabinet Picks (Jan. 20, 2021), https://www.pbs.org/newshour/politics/meet-joe-bidens-cabinet-picks; *see also id.* ("If all of Biden's nominees are confirmed, his Cabinet will contain more women and people of color than any other Cabinet in U.S. history.").

For his part, President George W. Bush selected a Cabinet that a commentator described as one that "looks like it was chosen by a casting director for a diversity commercial." CBS News, A Cabinet That Looks Like America (Jan. 5, 2001), https://www.cbsnews.com/news/a-cabinet-that-looks-like-america/. The commentator concluded that President Bush's apparent consideration of race and sex was "crafty" because "Democrats will have a tough time" opposing a set of nominees that, while ideologically conservative, exhibited racial and gender diversity. *Id.*

Several Presidents also publicly considered race or sex when making nominations to the Supreme Court.[7] To state the obvious, none of these Presidents thought that by considering the race or sex of their principal officers, they were trampling the Bill of Rights in broad daylight. Yet under Plaintiff's theory, all of these Presidents violated the Fifth Amendment through the routine practice of considering the race or sex of principal officers.

Additional practical concerns counsel against recognizing Plaintiff's novel legal claim. If a claim like Plaintiff's is cognizable, then the success of such a claim will turn on the President's motivation, which would place federal district judges in the untenable position of trying to divine the President's intent when he exercises his conclusive and preclusive Article II authority to

---

[7] *See* Supreme Court, *Sandra Day O'Connor: First Woman on the Supreme Court*, https://www.supremecourt.gov/visiting/exhibitions/SOCExhibit/Section3.aspx (last visited July 29, 2026); PBS, *Trump Promises to Replace Ginsburg with a Woman – and Soon* (Sep. 20, 2020), https://www.pbs.org/newshour/politics/trump-promises-to-replace-ginsburg-with-a-woman-and-soon; Amy Howe, *Biden reiterates promise to nominate a Black woman, lauds Breyer as "model public servant"*, SCOTUSblog (Jan. 27, 2022), https://www.scotusblog.com/2022/01/biden-reiterates-promise-to-nominate-a-black-woman-lauds-breyer-as-model-public-servant/.

26

remove principal officers. This prospect is made all the more problematic by Plaintiff's apparent belief that the mere act of removing a Black principal officer but not removing an arguably similarly situated white principal officer somehow places the burden on the President to "offer[] a non-discriminatory reason" for the removal. Am. Compl. ¶ 66. If that were true, then to defeat a claim, the President would either need to offer his own testimony under oath or communications with his aides regarding his performance of his constitutional functions, which are presumptively subject to executive privilege. *See In re Sealed Case*, 121 F.3d 720, 742 (D.C. Cir. 1997).

Making matters worse, in Plaintiff's view, judges would then have to determine whether the President's proffered reasons for removing a principal officer were sincere or were "pretextual," Am. Compl. ¶¶ 11, 67, based in part on examining "statements by the President and his advisers," which a plaintiff can argue "cast[s] doubt" on the President's purported "objective" for his action, *Trump v. Hawaii*, 585 U.S. 667, 699 (2018); *see* Am. Compl. ¶¶ 48-53 (citing "several public statements" from "President Trump and high government officials" purportedly supporting the inference that the President's personnel decisions are racially motivated). But courts are rightly wary of giving weight to such statements "in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility." *Hawaii*, 585 U.S. at 702; *see also Mullin*, 146 S. Ct. at 2138 (declining to find discriminatory intent where a race-neutral justification could exist).

The Constitution instituted a political check, not a judicial check, on the President's selection of principal officers: the requirement of Senate confirmation. *See* U.S. Const. art. II, § 2, cl. 2. If the Senate objects to the President removing and replacing Plaintiff, then the Senate is free to reject whomever the President nominates or even insist that they will only confirm a Black nominee to the seat. More generally, the need for Senate confirmation politically constrains the President in making removals and appointments that, for whatever reason, are seen as unacceptable. *See* Federalist No. 77, at 459 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("Where a man in any station had given satisfactory evidence of his fitness for it, a new President would be restrained from attempting a change in favor of a person more agreeable to him, by the

27

apprehension that a discountenance of the Senate might frustrate the attempt, and bring some degree of discredit upon himself."). The Framers entrusted the Senate, not the federal courts, with judging the President's selection of principal officers. And if courts could force the President to retain subordinate officers he did not trust, "the unity of the Executive Branch would be destroyed[.]" *Slaughter*, 2026 WL 1855612 at *9 (citation modified).

Few decisions are as important to a President as the selection of the principal officers who will lead the agencies and departments that comprise the Executive Branch. Article II of the Constitution entrusts the removal decision to the President alone and the appointment decision to the President, subject only to the Senate's advice and consent. This pragmatic boundary insulates the courts from the flood of presidential appointment and removal litigation this case invites. No court has ever held that a district judge can try to peer into the President's mind and reject his exercise of conclusive and preclusive Article II removal authority if done for an improper reason. This Court should not be the first.

## CONCLUSION

The Court should grant this Motion and dismiss the Amended Complaint for failure to state a claim.

Dated: July 29, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

/s/ *Jordan A. Hulseberg*
JORDAN A. HULSEBERG (DC Bar No. 90033542)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.

28

Washington, DC 20005
Tel: (202) 598-3856
Email: Jordan.A.Hulseberg2@usdoj.gov

*Counsel for United States*

29