**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROBERT PRIMUS, in his official capacity,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PATRICK J. FUCHS, in his official capacity as Chairman of the Surface Transportation Board; SURFACE TRANSPORTATION BOARD,<br><br>*Defendants*. | Case No. 1:25-cv-03521 |

**PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND AND PROCEDURAL HISTORY ..... 3

LEGAL STANDARD ..... 7

ARGUMENT ..... 7

I. Mr. Primus has plausibly alleged a claim of intentional racial discrimination. ..... 7

A. The FAC's allegations satisfy the standards for a disparate treatment comparator claim. ..... 8

B. Mr. Primus has stated a proper claim under the proper legal standard. ..... 11

1. *McDonnell Douglas* is the proper standard for Mr. Primus's claim. ..... 12

2. Defendants' efforts to discount Mr. Primus's evidence of discrimination are unavailing. ..... 17

3. Mr. Primus's claim would still succeed under the *Arlington Heights* framework. ..... 20

II. Mr. Primus's Fifth Amendment claim is legally cognizable ..... 21

A. The President's removal decisions can be reviewed by courts for compliance with the Constitution. ..... 21

B. Courts can reasonably assess a President's intent in removal decisions. ..... 25

C. Courts, not the Senate, are the proper forum for reviewing removal decisions. ..... 28

CONCLUSION ..... 28

# TABLE OF AUTHORITIES

## CASES

*Albright v. Oliver*,
510 U.S. 266 (1994) ........ 13

*Alston v. City of Madison*,
853 F.3d 901 (7th Cir. 2017) ........ 18

*Ames v. Ohio Department of Youth Services*,
605 U.S. 303 (2025) ........ passim

*Andrews v. Warden*,
958 F.3d 1072 (11th Cir. 2020) ........ 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 7, 9

*Baker v. McCollan*,
443 U.S. 137 (1979) ........ 13

*Ballou v. McElvain*,
29 F.4th 413 (9th Cir. 2022) ........ 12, 15

*Barber v. Dist. of Columbia*,
394 F. Supp. 3d 49 (D.D.C. 2019) ........ 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 7

*Brown v. Brody,*
199 F.3d 446 (D.C. Cir. 1999) ........ 16

*Brown v. Gen. Servs. Admin.*,
425 U.S. 820 (1976) ........ 14

*Brown v. Sessoms*,
774 F.3d 1016 (D.C. Cir. 2014) ........ 9, 10, 12

*Carey v. Fed. Express Corp.*,
519 F. App'x 772 (3d Cir. 2013) ........ 16

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ........ 12

*Clinton v. Jones*,
520 U.S. 681 (1997) ........ 21

*Conn v. Am. Red Cross*,
149 F. Supp. 3d 136 (D.D.C. 2016) ........ 19

*Davis v. Passman*,
442 U.S. 228 (1979)....................13, 20

*Delgado v. Chavez*,
140 U.S. 586 (1891)....................28

*DynaLantic Corp. v. U.S. Dep't of Def.*,
885 F. Supp. 2d 237 (D.D.C. 2012)....................14

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997)....................7

*Egbert v. Boule*,
596 U.S. 482 (2022)....................13

*Ex parte Milligan*,
71 U.S. (4 Wall.) 2 (1866)....................22

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)....................21

*Gen Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
458 U.S. 375 (1982)....................13

*Ginger v. Dist. of Columbia*,
527 F.3d 1340 (D.C. Cir. 2008)....................9

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960)....................18

*Gutzwiller v. Fenik*,
860 F.2d 1317 (6th Cir. 1988)....................12

*Hager v. Ark. Dep't of Health*,
735 F.3d 1009 (8th Cir. 2013)....................12, 14

*Holbrook v. Reno*,
196 F.3d 255 (D.C. Cir. 1999)....................8

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006)....................15

*Hornsby-Culpepper v. Ware*,
906 F.3d 1302 (11th Cir. 2018)....................12

*Hurd v. Hodge*,
334 U.S. 24 (1948)....................13

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977)....................8

*Jiggetts v. Cipullo*,
774 F. Supp. 3d 168 (D.D.C. 2025) ........ 12, 15

*Jo v. Dist. of Columbia*,
582 F. Supp. 2d 51 (D.D.C. 2008) ........ 12

*Johnson v. City of Shelby*,
574 U.S. 10 (2014) ........ 13

*Jones v. Trailways Corp.*,
477 F. Supp. 642 (D.D.C. 1979) ........ 15

*Joyner v. Morrison & Foerster LLP*,
140 F.4th 523 (D.C. Cir. 2025) ........ passim

*Joyner v. Morrison & Foerster LLP*,
No. 20-1440, 2023 WL 6313194 (D.D.C. Sep. 27, 2023) ........ 10

*Korematsu v. United States*,
323 U.S. 214 (1944) ........ 22

*Lewis v. City of Union City*,
918 F.3d 1213 (11th Cir. 2019) ........ 15

*Lyles v. Hughes*,
83 F. Supp. 3d 315 (D.D.C. 2015) ........ 14

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ........ 28

*McCreary County v. ACLU of Kentucky*,
545 U.S. 844 (2005) ........ 25

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ........ passim

*McNair v. Dist. of Columbia*,
213 F. Supp. 3d 81 (D.D.C. 2016) ........ 7

*Mitchell v. Mills*,
895 F.3d 365 (5th Cir. 2018) ........ 12

*Moore-Davis v. U.S. Dep't of the Navy*,
694 F. Supp. 3d 116 (D.D.C. 2023) ........ 9

*Moose Lodge No. 107 v. Irvis*,
407 U.S. 163 (1972) ........ 14

*Morris v. McCarthy*,
825 F.3d 658 (D.C. Cir. 2016) ........ 20

*Mullin v. Doe*,
146 S. Ct. 2121 (2026) ........ 26, 27

*Myers v. United States*,
272 U.S. 52 (1926) ........ 21, 27

*N. Am. Butterfly Ass'n v Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) ........ 7

*Nanko Shipping, USA v. Alcoa, Inc.*,
850 F.3d 461 (D.C. Cir. 2017) ........ 9, 18

*Oates v. Dist. of Columbia*,
824 F.2d 87 (D.C. Cir. 1987) ........ 12

*Omnipoint Corp. v. FCC*,
78 F.3d 620 (D.C. Cir. 1996) ........ 15

*Ponce v. Billington*,
679 F.3d 840 (D.C. Cir. 2012) ........ 9, 15

*Rosemond v. Hudgins*,
92 F.4th 518 (4th Cir. 2024) ........ 22

*Said v. Nat'l R.R. Passenger Corp.*,
317 F. Supp. 3d 304 (D.D.C. 2018) ........ 19

*Schick v. Reed*,
419 U.S. 256 (1974) ........ 22

*Severino v. Biden*,
71 F.4th 1038 (D.C. Cir. 2023) ........ 28

*Students for Fair Admissions v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ........ 24

*Swierkiewicz v. Sorema, N.A.*,
534 U.S. 506 (2002) ........ 9, 10, 16

*Tex. Dep't of Cmty. Affs. v. Burdine*,
450 U.S. 248 (1981) ........ 8, 12

*Trump v. Cook*,
146 S. Ct. 2234 (2026) ........ 23, 25, 28

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........ 2, 22, 25, 26

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ........ 2, 16, 22, 23

*Trump v. United States*,
603 U.S. 593 (2024)........................................................................................ 21, 22

*Trump v. Vance*,
591 U.S. 786 (2020)............................................................................................... 21

*U.S. Postal Serv. Bd. of Governors v. Aikens*,
460 U.S. 711 (1983)........................................................................................ 13, 25

*United States v. Burr*,
25 F. Cas. 30 (C.C.D. Va. 1807) (No. 14,692d) ..................................................... 21

*United States v. Nixon*,
418 U.S. 683 (1974).................................................................................. 23, 25, 26

*United States v. Virginia*,
518 U.S. 515 (1996)............................................................................................... 24

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977)....................................................................................... passim

*Washington v. Davis*,
426 U.S. 229 (1976)................................................................................................. 8

*Watson v. Fort Worth Bank & Tr.*,
487 U.S. 977 (1988)................................................................................................. 8

*Wright v. Eugene & Agnes E. Meyer Found.*,
68 F.4th 612 (D.C. Cir. 2023)................................................................................ 18

*Ya-Chen Chen v. City Univ. of N.Y.*,
805 F.3d 59 (2d Cir. 2015) .................................................................................... 12

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886)............................................................................................... 18

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952).................................................................................. 21, 22, 25

*Zigler v. Abbasi*,
582 U.S. 120 (2017)............................................................................................... 13

**CONSTITUTION**

U.S. Const. art. II, § 2, cl. 2 ......................................................................................... 27

**STATUTES**

3 U.S.C. § 411(c)(1)(A) ................................................................................................ 14

42 U.S.C. § 1981........................................................................................................ 12, 13

42 U.S.C. § 2000e-16(a) ................................................................................................ 14

49 U.S.C. § 1301(b) .......... 3, 10

49 U.S.C. § 1302 .......... 10

49 U.S.C. § 1321 .......... 10

**OTHER AUTHORITIES**

1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834) .......... 23

5 Wright & Miller, Federal Practice and Procedure § 1202 (2d ed. 1990) .......... 16

Board Members, STB, https://perma.cc/ST44-85P9 .......... 4

*Title VI Legal Manual (Updated): Section VI—Proving Discrimination—Intentional Discrimination*, DOJ, https://perma.cc/C8MK-34R8 .......... 16

## INTRODUCTION

Plaintiff Robert Primus alleges that Defendants violated the Fifth Amendment by removing him from the Surface Transportation Board ("STB") because he is Black. First Am. Compl. ("FAC"), Dkt. No. 15. Contrary to Defendants' contentions, *see* Mem. of Law in Support of Defs.' Second Mot. to Dismiss Am. Compl. ("Defs.' MTD"), Dkt. No. 23-1, the FAC plausibly alleges that Mr. Primus's removal was motivated by race, and his discriminatory removal is not immune from judicial review.

Under the Supreme Court's seminal decision regarding disparate-treatment employment claims like Mr. Primus's, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and subsequent cases applying it, Mr. Primus's burden is quite modest at the pleadings stage. He need only allege that at least one other person of a different race who was similarly positioned to him in at least some relevant aspects was not removed. The FAC here alleges there is such a comparator, fellow STB member Karen J. Hedlund, who is white and was not removed. Mr. Primus and his comparator were both appointed under the same statutory process, their duties as STB members were the same, and they are both Democrats. These allegations more than meet the governing requirement that an employee claiming discrimination must allege facts about comparators of different races that are "similarly positioned to the plaintiff in at least some relevant respects" and who were treated differently. *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 531 (D.C. Cir. 2025). Defendants devote almost their entire argument to disputing Mr. Primus's additional allegations of discriminatory conduct, but those arguments relate to whether Mr. Primus has proven discriminatory treatment under the third step of the *McDonnell Douglas* test, which is not required at the motion to dismiss stage.

Defendants' arguments that Mr. Primus's Fifth Amendment claim against the President is not legally cognizable are equally unavailing. It is well established that courts can review the President's actions to ensure they comply with the Constitution. And while Defendants argue that such review should not be available for the President's exercise of "conclusive and preclusive" powers, controlling precedent allows courts to review even core presidential powers when those

powers are exercised in unconstitutional ways. The implication of Defendants' contrary arguments would be a system where Presidents can freely violate constitutional rights without any accountability in court. Nothing in the Constitution supports that result.

The Supreme Court's decision in *Trump v. Slaughter*, 146 S. Ct. 2283 (2026), does not change this analysis. While *Slaughter* changed the distribution of power between Congress and the President, it did not change the principle that the President—like the other two branches of government—cannot trample on individual constitutional rights and that courts can review the President's actions to ensure they comply with the Constitution.

Allowing the Fifth Amendment claim to proceed would also not necessitate the intrusive inquiry into the President's motivations that Defendants forewarn. Defendants' practical concerns about the scope of potential testimony or disclosures are better reserved for disputes during discovery than a motion to dismiss, but in any event, the argument misstates what is required to prove race discrimination under the Fifth Amendment. A plaintiff can establish a race discrimination claim based on circumstantial evidence even if discovery of the President and his aides is limited. Courts routinely engage in similar analyses for Fifth Amendment claims against the President. And in the primary case Defendants cite in support of their argument, *Trump v. Hawaii*, 585 U.S. 667 (2018), the Supreme Court allowed for consideration of the President's public statements and actions, and the Court expressly affirmed that the constitutional right to equal protection under the law in fact constrains presidential action.

Defendants' policy arguments likewise fail. Defendants argue that allowing Mr. Primus's claim to proceed will open the floodgates for claims challenging presidential appointments as discriminatory in the future. But that ignores key differences between removals and appointments and conflates an adverse action taken against one person because of his race with nondiscriminatory efforts by past Presidents to seek cabinets that are representative of the country. And Defendants' remaining argument, unsupported by any legal citation—that the Constitution allows only a political check on removals via the Senate—ignores that courts can and do review the scope of constitutional rights and provide remedies for wrongly removed officials in a way the

Senate cannot. Such an opportunity to vindicate his constitutional rights is precisely what Mr. Primus here seeks.

## BACKGROUND AND PROCEDURAL HISTORY

The American economy relies on an effective freight railroad network that provides efficient and reliable service to shippers and consumers. FAC ¶ 34. The Surface Transportation Board ("STB" or "the Board") is an independent federal agency that helps spur economic growth by regulating America's surface transportation industries—most prominently the freight rail industry. FAC ¶ 33.

The STB's five members are designed to serve as a bipartisan group of experts, with no more than three members from the same political party. FAC ¶ 22. All five members are nominated by the President and confirmed by the Senate to staggered five-year terms. 49 U.S.C. § 1301(b).

Plaintiff Robert Primus was nominated to a vacancy on the STB by President Trump on July 29, 2020, and was confirmed to the post on November 18, 2020. FAC ¶ 38. His term started on January 7, 2021. FAC ¶ 38. In June 2022, President Biden nominated Mr. Primus to a full five-year term on the STB. Mr. Primus was confirmed by the Senate on December 20, 2022, and sworn in on January 12, 2023, to a term ending on December 31, 2027. FAC ¶ 38.

Mr. Primus came to the STB after a long career in transportation policy and public service. He served for more than two decades as a staff member in Congress, including 16 years as Chief of Staff for a member of the House Committee on Transportation and Infrastructure and ranking member of the Subcommittee on Railroads, Pipelines, and Hazardous Materials. FAC ¶ 39. When Mr. Primus briefly left his role as a congressional staffer to work as a consultant between 1995 and 1999, his policy consultations covered issues related to transportation, appropriations, and national security. FAC ¶ 39.

On August 27, 2025, Mr. Primus received a two-sentence email from Mary Sprowls, of the Presidential Personnel Office, informing him he had been terminated from his post on the STB. FAC ¶ 40. The entire body of the email reads as follows:

> Dear Mr. Primus,
>
> On behalf of President Donald J. Trump, I am writing to inform you that your position as a member of the Surface Transportation Board is terminated, effective immediately.
>
> Thank you for your service.
>
> Mary Sprowls
> Presidential Personnel Office
> The White House

FAC ¶ 40. Mr. Primus was given no further reasons for his removal. *Id.*

Defendants Fuchs and STB cut off Mr. Primus's access to STB systems, email, and offices on August 27, 2025, and Mr. Primus has not been able to perform his duties as a Board Member since that date. FAC ¶ 41.

Mr. Primus is a Black man. FAC ¶ 42. At the time of his removal, there were three other members of the Board: Chairman Patrick J. Fuchs and Members Michelle A. Schultz and Karen J. Hedlund. FAC ¶ 42. All three of these members are white. FAC ¶ 42. All three remain current members of the Board. FAC ¶ 42; *see* Board Members, STB, https://perma.cc/6ZTZ-8ZAD. Along with Member Hedlund, Mr. Primus is a Democrat, while Fuchs and Schultz are Republicans. FAC ¶ 42.

If President Trump had simply wanted to assert Republican control over the STB, he had two alternatives available to him over removing Mr. Primus. First, he could have removed the other Democrat on the Board, Member Karen J. Hedlund, who had been nominated for her position by President Biden and sworn in on January 03, 2022, for a term ending on December 31, 2025, a mere four months after Mr. Primus's removal. FAC ¶ 43. Second, President Trump could have filled the unoccupied fifth seat on the STB with a new Republican member. FAC ¶ 43.

Mr. Primus's removal was the first time that a sitting member of the STB has been removed prior to the expiration of their term in the history of the STB and its predecessor, the ICC. FAC ¶ 44.

Mr. Primus's firing fits within a pattern of the Trump Administration disproportionately removing Black government officials, and particularly presidentially appointed and Senate-confirmed Board members of independent multimember agencies. FAC ¶ 45. From the beginning of President Trump's second term in office to the date of filing of the First Amended Complaint, approximately 75 percent of Black federal officials leading multimember agencies were removed from office. FAC ¶ 45. In contrast, only approximately 27 percent of white federal officials on multimember agencies were removed during that period. FAC ¶ 45. President Trump has removed or attempted to remove six Black members of multi-member agencies during that period. FAC ¶ 46.

The removal of Mr. Primus and other Black independent agency board commissioners reflects a broader pattern across the government of President Trump removing high-level Black officials. FAC ¶ 47. On May 8, 2025, he removed Carla Hayden, a Black woman, as the Librarian of Congress. FAC ¶ 47. On February 21, 2025, he removed Gen. Charles Q. Brown, Jr., a Black man, as the Chairman of the Joint Chiefs of Staff. In General Brown's case, President Trump replaced him with Lieutenant General Dan Caine, a white man, who did not have the statutory requirement of status as a five-star general and could serve only because the President waived that requirement. FAC ¶ 47.

President Trump and high government officials have made several public statements indicating that he and his administration are seeking to dismantle efforts promoting diversity throughout the federal government. FAC ¶ 48–53. In some of the President's firings of Black officials, White House representatives have made statements explicitly linking the choice to remove the individual to their relationship to ideas of diversity and inclusion. FAC ¶ 53. After Mr. Trump terminated Ms. Hayden as Librarian of Congress, the White House Press Secretary referenced the "quite concerning things that she had done at the Library of Congress in pursuit of DEI" in explaining the decision on May 5, 2025. *Id.* Before his appointment, Secretary of Defense Pete Hegseth suggested that General Brown had obtained his appointment because of his race and

stated that General Brown needed to be fired because of his commitment to diversity, equity, and inclusion. *Id.*

Under President Trump, the Executive Branch has also at times put a clear and demonstrable emphasis on hiring white men, including in Department of Labor workforce posters featuring almost exclusively white men. FAC ¶ 54. More generally, Black officials and Black employees across the federal government have been removed from their jobs at disproportionate rates. FAC ¶ 55. And in the Trump Administration's first 200 days, only two percent of all of President Trump's Senate-approved appointees were Black individuals. FAC ¶ 56.

Mr. Primus filed this action on October 1, 2025, against President Trump, Mr. Fuchs, and the STB. Compl. for Declaratory & Injunctive Relief, Dkt. No. 1. The Complaint included one cause of action alleging that Defendants had violated 49 U.S.C. § 1301 by removing Mr. Primus without a showing of inefficiency, neglect of duty, or malfeasance in office.

On December 4, 2025, Mr. Primus filed the First Amended Complaint, adding a second cause of action alleging that Defendants had violated the Fifth Amendment of the United States Constitution by removing Mr. Primus because of his race. FAC ¶¶ 63–68.

On January 7, 2026, the parties filed a joint proposed briefing schedule for Mr. Primus's Fifth Amendment claim, adopting the briefing schedule set in *Brown v. Trump*, No. 25-cv-01764. Proposed Briefing Schedule, Dkt. No. 17. The Court granted this schedule and stayed Mr. Primus's first cause of action until the Supreme Court decided *Slaughter*. Minute Order (Jan. 8, 2026).

The Supreme Court decided *Slaughter* on June 29. 146 S. Ct. 2283. This Court then denied Defendants' motion to dismiss without prejudice and directed the parties to file a joint status report proposing a schedule for dispositive briefing. Minute Order (June 29, 2026). The parties filed their joint status report on July 2, 2026. Dkt. No. 22. In light of *Slaughter*, Mr. Primus no longer intends to pursue the first count of his amended complaint. Dkt. No. 22 at 4. He proceeds with his race discrimination claim. Defendants filed their Motion to Dismiss on July 29, 2026. Dkt. No. 23.

## LEGAL STANDARD

Defendants move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint "does not need detailed factual allegations" to survive but does need "more than labels and conclusions." *Twombly*, 550 U.S. at 555. While reviewing a motion to dismiss, courts act on the "assumption that all the allegations in the complaint are true." *Id.* All "reasonable inferences" from the allegations must be drawn "in the [plaintiff's] favor." *N. Am. Butterfly Ass'n v Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). And the Court cannot consider any information outside "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Courts in the D.C. Circuit have "'consistently recognized the ease with which a plaintiff claiming employment discrimination can survive . . . a motion to dismiss.'" *Barber v. Dist. of Columbia*, 394 F. Supp. 3d 49, 57 (D.D.C. 2019) (quoting *McNair v. Dist. of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016)).

## ARGUMENT

### I. Mr. Primus has plausibly alleged a claim of intentional racial discrimination.

Defendants' arguments for dismissing Mr. Primus's Fifth Amendment race discrimination claim are unavailing. *See* Defs.' MTD at 9–28. Mr. Primus pleads sufficient facts to survive a motion to dismiss under the governing *McDonnell Douglas* test by identifying a comparator who was treated differently. Defendants' efforts to shoehorn Mr. Primus's allegations into the *Arlington Heights* test fail both as a matter of law and as a matter of fact. *McDonnell Douglas* is the proper standard for employment discrimination claims. But even if it were not, Mr. Primus's allegations are sufficient to survive a motion to dismiss under any standard. Further, the Defendants' claim

that presidential removal decisions cannot be reviewed by courts portends a constitutional system where the President could violate individual rights without check or consequence. Our Constitution demands more.

### A. The FAC's allegations satisfy the standards for a disparate treatment comparator claim.

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). To establish an equal protection violation, a plaintiff must establish that the defendants had a discriminatory intent. *Id.* In the context of employment discrimination, intentional discrimination cases are known as "'disparate treatment'" cases where "an individual alleges that an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 985–86 (1988) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).

As the Supreme Court reaffirmed last year in *Ames v. Ohio Department of Youth Services*, 605 U.S. 303, 308 (2025), the "familiar" three-step burden-shifting framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is used to evaluate disparate treatment claims based on circumstantial evidence at trial and summary judgment. At step one, "the plaintiff bears the 'initial burden' of 'establishing a prima facie case' by producing enough evidence to support an inference of discriminatory motive." *Ames*, 605 U.S. at 308–09 (quoting *McDonnell Douglas*, 411 U.S. at 802). In a case where an employee claims that he was discriminated against compared to another employee (a comparator case), the elements of a prima facie case are: "(1) that [plaintiff] is a member of a protected class; (2) that [plaintiff] was similarly situated to an employee who was not a member of the protected class; and (3) that [plaintiff] and the similarly situated person were treated disparately." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). "For most plaintiffs, the first step of the *McDonnell Douglas* framework—the prima facie burden—is 'not

onerous.'" *Ames*, 605 U.S. at 309 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

"If the plaintiff clears [the first step], the burden then 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 308–09 (quoting *McDonnell Douglas*, 411 U.S. at 802). "Finally, if the employer articulates such a justification, the plaintiff must then have a 'fair opportunity' to show that the stated justification 'was in fact pretext' for discrimination." *Id.* at 309 (quoting *McDonnell Douglas*, 411 U.S. at 804). To ultimately prevail, the plaintiff has to show that "unlawful discrimination was 'a factor motivating the adverse action.'" *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012) (quoting *Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008)).

Importantly, the *McDonnell Douglas* test is an evidentiary test applicable at summary judgment or trial, not a pleading requirement. *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510–11 (2002); *Brown v. Sessoms*, 774 F.3d 1016, 1022–23 (D.C. Cir. 2014). To survive a motion to dismiss, a plaintiff proceeding on a "comparator" theory need only "plead enough facts about th[e] comparators and the relevant context to allow a plausible inference that he was treated differently because of his race." *Joyner*, 140 F.4th at 530. The D.C. Circuit's analysis in *Joyner* is particularly instructive because that case, like this one, was a "comparator" racial discrimination employment case. In *Joyner*, the plaintiff was hired by a legal staffing firm to fill a temporary role at a law firm. *Id.* at 527–28. He alleged that he was treated adversely compared to other temporary staffers because of his race. *Id.* at 528. The D.C. Circuit stated that "[i]n our cases addressing motions to dismiss . . . we have emphasized that the plaintiff's 'burden at the summary judgment stage and at trial is different and substantially more onerous than the pleading burden.'" *Id.* at 530 (quoting *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017)).

At the pleading stage, "[t]he complaint 'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Joyner*, 140 F.4th at 530 (quoting *Ashcroft*, 556 U.S. at 678). Complaints that the D.C. Circuit has "found sufficient to proceed on a comparator theory [have] contained allegations that a comparator was similarly positioned to the

plaintiff in at least some relevant respects, and included enough detail that we could plausibly infer that discrimination caused the defendant's differential treatment of the plaintiff." *Id.* at 531; *see Moore-Davis v. U.S. Dep't of the Navy*, 694 F. Supp. 3d 116, 123–24 (D.D.C. 2023) (a complaint alleging disparate treatment that "'detailed the events leading to'" the adverse action, "'provided relevant dates,'" and "'included the' race . . . 'of at least some . . . relevant persons'" who were treated differently, "'stated claims upon which relief could be granted'" (quoting *Swierkiewicz*, 534 U.S. at 510, 514)). Conversely, the D.C. Circuit has "never required a complaint to include factual allegations showing that the comparator's circumstances are 'nearly identical' to the plaintiff's in 'all relevant aspects.'" *Joyner*, 140 F.4th at 531 (quoting *Joyner v. Morrison & Foerster LLP*, No. 20-1440, 2023 WL 6313194, at *5 (D.D.C. Sep. 27, 2023) (*vacated in part* by *Joyner*, 140 F.4th 523)). The ultimate "question is always whether there are enough facts pleaded to make it 'plausible,' as opposed to just 'speculative,' to infer that a defendant was motivated by the plaintiff's race rather than the myriad other reasons that might affect an employment decision." *Id.* at 531 (quoting *Sessoms*, 774 F.3d at 1023).

Here, Mr. Primus's disparate-treatment claim is pleaded as a "comparator" claim and readily satisfies the pleading standard as articulated in *Joyner* and similar cases: "As a Black person, Mr. Primus is in a protected class. His removal is an adverse employment action, and he was treated differently from similarly situated people, the other members of the Board, and particularly the white Democratic member." FAC ¶ 65; *see also* FAC ¶ 8–10. The FAC alleges that Mr. Primus is Black, and his comparator, Ms. Hedlund, is white. FAC ¶ 42. And the FAC alleges that Mr. Primus and his comparator are similarly positioned in several relevant respects. Before his removal, Mr. Primus and his comparator were both members of the Surface Transportation Board. FAC ¶ 42. They both gained their seats on the STB through the Presidential appointment and Senate confirmation process as provided by statute. 49 U.S.C. § 1301(b). Their functions and powers as Board members are the same and provided by statute. *See id.* §§ 1302, 1321. Mr. Primus and his comparator are both Democrats. FAC ¶ 42. These allegations more than

meet the showing of alleging facts about comparators of different races that are "similarly positioned to the plaintiff in at least some relevant respects." *Joyner*, 140 F.4th at 531.

Indeed, while Mr. Primus was not required to go any further than that at the pleading stage, the FAC also includes allegations of actions and statements by President Trump and his administration that place Mr. Primus's removal in a broader context that goes beyond the STB. FAC ¶¶ 45–56. This includes allegations regarding: (1) the disproportionate removal of "presidentially appointed and Senate-confirmed Board members of independent multimember agencies" who are Black, FAC ¶ 45–46; (2) the removal of other high-level Black officials, FAC ¶ 47; (3) public statements from Mr. Trump and high government officials "indicating that he and his administration are seeking to remove people of color throughout the federal government," FAC ¶ 48, including several statements from President Trump about ending diversity, equity, and inclusion (DEI) programs that suggest a view that Black officials were likely to have been undesirable "DEI hires," FAC ¶¶ 49–52; (4) the disproportionate removal of Black officials and Black employees across the federal government FAC ¶ 55; (5) the low percentage of President Trump's Senate-approved appointees that are Black; FAC ¶ 56; and (6) the emphasis of the Trump Administration on hiring white men. FAC ¶ 54.

Although, at the pleading stage, Mr. Primus is not required to establish that any nondiscriminatory reasons Defendants might offer for Mr. Primus's removal are pretextual, these allegations support the inference that Mr. Primus was in fact removed instead of Ms. Hedlund because of his race.

**B. Mr. Primus has stated a proper claim under the proper legal standard.**

Defendants argue that the *McDonnell Douglas* test is not applicable and that Mr. Primus's race discrimination claim must instead by analyzed under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Defs.' MTD at 19, 21. But *McDonnell Douglas* is the standard framework for assessing constitutional employment discrimination claims. To the extent Defendants dispute the sufficiency of the FAC's allegations

under that framework, their arguments are either irrelevant or premature at the motion to dismiss stage. Finally, even if *Arlington Heights* were the controlling framework, Defendants fail to apply it faithfully. The allegations in the FAC state a claim for race discrimination even under that standard.

**1. *McDonnell Douglas* is the proper standard for Mr. Primus's claim.**

Defendants begin by arguing that the *McDonnell Douglas* test applies only to statutory contexts like Title VII and 42 U.S.C. § 1981 claims, but "not to equal protection claims brought directly under the Fifth Amendment." Defs.' MTD at 19. Even overlooking that Defendants do not cite a single case directly affirming this proposition, the logic of this argument does not hold up.

Courts, including in the D.C. Circuit, have routinely applied the *McDonnell Douglas* framework to assess the validity of equal protection claims. *See, e.g.*, *Jiggetts v. Cipullo*, 774 F. Supp. 3d 168, 186 (D.D.C. 2025); *Jo v. Dist. of Columbia*, 582 F. Supp. 2d 51, 60 (D.D.C. 2008); *see also Oates v. Dist. of Columbia*, 824 F.2d 87, 90 (D.C. Cir. 1987).[1] That makes sense. Equal protection claims assess whether someone was intentionally treated differently from those similarly situated because of a protected characteristic. *See City of Cleburne v. Cleburne Living*

[1] *See, e.g.*, *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 73–74 (2d Cir. 2015) ("[W]e evaluate . . . Title VII and Equal Protection claims under the *McDonnell Douglas* framework."); *Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018) ("In order to establish a violation of the Equal Protection Clause in the employment context, a plaintiff must prove a racially discriminatory purpose or motive . . . . In the absence of direct evidence of intentional discrimination, under the Title VII framework, we apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas*."); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) ("[T]he showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983 . . . [that a plaintiff] was the victim of intentional or purposeful discrimination"); *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1014 (8th Cir. 2013) ("[C]ourts apply the *McDonnell Douglas* burden-shifting analysis to claims of employment discrimination under the Equal Protection Clause."); *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022) (while the *McDonnell Douglas* framework "originated in cases interpreting Title VII . . . its use has since expanded to other discrimination statutes and to constitutional equal protection"); *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.6 (11th Cir. 2018) ("Employment discrimination claims against state actors for violation of the Equal Protection Clause . . . are subject to the same standards of proof and use the same analytical framework as discrimination claims brought under Title VII.").

*Ctr.*, 473 U.S. 432, 439 (1985). The *McDonnell Douglas* comparator test assesses the same thing. *Sessoms*, 774 F.3d at 1022. And it uses a framework that enables courts to "progressively . . . sharpen the inquiry into the elusive factual question of intentional discrimination." *Burdine*, 450 U.S. at 255 n.8.

Defendants stress that the constitutional claims addressed in those cases relied on statutory causes of action, like § 1983 or § 1981, arguing that these statutes "provide[] for broad remedies for certain violations of civil rights." Defs.' MTD at 20. But the substantive constitutional protection is the same whether a plaintiff proceeds under one of those statutes or under the Constitution directly, and there is accordingly no reason why the framework for analyzing an alleged violation should differ. The Supreme Court has been clear that § 1983 is not itself "a source of substantive rights," but instead "a method for vindicating" existing rights, like equal protection. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).[2] Section 1981, meanwhile, closely parallels the Fourteenth Amendment and requires proof of intentional discrimination—unsurprisingly, since the law originated from the same Congress as the Amendment, and members saw "the statute and the Amendment [as] expressions of the same general congressional policy" and "directed against the same evils." *Gen Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 384–85, 389–91 (1982) (quoting, in part, *Hurd v. Hodge*, 334 U.S. 24, 32–33 (1948)). What's more, Defendants' argument confuses the difference between an evidentiary test, like *McDonnell Douglas*, which courts use to help determine discriminatory intent, and the remedies available for such a claim if proven. Evidentiary tests like *McDonnell Douglas* are not about identifying a remedy but are merely tools—"sensible, orderly way[s] to evaluate the evidence"—that judges can use to help assess the "critical question of discrimination." *Ames*, 605 U.S. at 308 n.2 (quoting *U.S. Postal Serv. Bd. of Governors v.*

[2] Indeed, plaintiffs raising constitutional race discrimination claims are not even required to invoke § 1983 to survive a motion to dismiss on their complaint. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014); *Sessoms*, 774 F.3d at 1022. Neither is Mr. Primus.

*Aikens*, 460 U.S. 711, 715 (1983)).[3] And there is no reason why a test that is appropriate to prove discriminatory intent under a statute would suddenly become inappropriate when used to make the same determination under the Constitution. No cases Defendants cite support that proposition, and for good reason.

Defendants note that they have been unable to identify other cases where courts applied *McDonnell Douglas* to assess a constitutional claim alone, as opposed to constitutional and statutory claims brought together. Defs.' MTD at 19. But that reflects a doctrinal quirk concerning the claims available to different categories of plaintiffs, not a limitation on when *McDonnell Douglas* applies. Employees suing private employers for intentional discrimination bring statutory claims because private conduct is not regulated by the Equal Protection Clause. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 171–72 (1972). State employees can, and do, bring both statutory and constitutional employment discrimination claims together. *See, e.g.*, *Hager*, 735 F.3d at 1012. For most federal employees, Title VII is the exclusive judicial remedy for employment discrimination claims. *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976). But this limitation does not extend to Senate-confirmed appointees, like Mr. Primus, who are part of a narrow class of federal officials not covered by Title VII at all. *See* 42 U.S.C. § 2000e-16(a); 3 U.S.C. § 411(c)(1)(A). Meanwhile, federal employees have access to neither § 1983, which by its terms applies only to state law, *see Lyles v. Hughes*, 83 F. Supp. 3d 315, 324 (D.D.C. 2015), nor § 1981, which similarly does not reach actions taken under color of federal law, *see DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 291 (D.D.C. 2012) (collecting cases). Plaintiffs like Mr. Primus are thus in the rare class of plaintiffs who can bring only constitutional employment-

[3] Limits on implied damages remedies against federal officers for constitutional violations are thus irrelevant here, where the dispute concerns the framework for determining whether a violation occurred in the first place. *Cf.* Defs.' MTD at 21 (citing *Zigler v. Abbasi*, 582 U.S. 120 (2017), and *Egbert v. Boule*, 596 U.S. 482, 491 (2022)). In any event, federal employees proceeding outside of Title VII can seek damages under a stand-alone constitutional claim. *Davis v. Passman*, 442 U.S. 228, 242–43, 248 (1979).

discrimination claims, not Title VII or other statutory claims.[4] The reason why so few cases apply *McDonnell Douglas* to stand-alone constitutional claims is thus simply that few plaintiffs bring stand-alone constitutional claims without a corresponding statutory claim.

Contrary to Defendants' contention, Defs.' MTD at 21, the fact that all race discrimination claims brought under the Constitution require proof of discriminatory intent does not mean that all such claims must be evaluated under the *Arlington Heights* test. *McDonnell Douglas* and *Arlington Heights* both require an ultimate finding that invidious discriminatory purpose was a motivating factor. *See Arlington Heights*, 429 U.S. at 266; *Ponce*, 679 F.3d at 844. Both are approaches courts can take to identifying discriminatory intent where direct evidence is missing. *See Ballou*, 29 F.4th at 424–25; *Lewis v. City of Union City*, 918 F.3d 1213, 1217, 1220 n.6 (11th Cir. 2019) (noting the *McDonnell Douglas* comparator test is "one" of a "variety of ways" a plaintiff can survive a motion to dismiss); *Jones v. Trailways Corp.*, 477 F. Supp. 642, 646 (D.D.C. 1979). The major difference is that *Arlington Heights* was a case dealing with a discriminatory policy, 429 U.S. at 257–60, and the test it articulated is generally applied to assess whether a facially neutral law or policy was enacted or applied with a discriminatory intent, *see, e.g.*, *Omnipoint Corp. v. FCC*, 78 F.3d 620, 634 (D.C. Cir. 1996). Indeed, the cases Defendants cite that applied the *Arlington Heights* test exclusively deal with policy decisions that affect wider populations. Defs.' MTD at 21. *McDonnell Douglas*, in contrast, is an employment discrimination case brought by an individual, and the test it articulated is tailored to that context, 411 U.S. at 800–07. Accordingly, as recently reiterated in *Ames*, the Supreme Court has applied *McDonnell Douglas* consistently in comparator employment discrimination cases rather than the *Arlington Heights* factors. Lower federal courts have likewise looked to *McDonnell Douglas* in comparator employment discrimination cases, including cases brought under the Fifth Amendment, *see, e.g.*, *Jiggetts*, 774

[4] This limitation makes Defendants' argument that Mr. Primus's Fifth Amendment claim threatens to "create a back door to evade the jurisdictional and procedural requirements Title VII has long imposed" all the more unpersuasive. Defs.' MTD at 22. Mr. Primus cannot evade a statutory requirement that does not apply to him.

F. Supp. 3d at 186, and cases brought by federal employees, *see, e.g.*, *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Indeed, DOJ's own legal manual on Title VI claims, which adopts "the constitutional analysis of intentional discrimination," lists the *Arlington Heights* and *McDonnell Douglas* test as interchangeable methods of circumstantial proof of discriminatory intent, while noting that the *Arlington Heights* test is "most commonly applied in cases alleging discrimination against a group," and the *McDonnell Douglas* test is "most commonly applied in cases alleging discrimination in individual instances." *Title VI Legal Manual (Updated): Section VI—Proving Discrimination—Intentional Discrimination*, DOJ, https://perma.cc/C8MK-34R8 (last accessed Aug. 1, 2026).

Finally, as a last resort, Defendants argue that the *McDonnell Douglas* test is at odds with *Slaughter* because it "impermissibl[y] burdens" the President's "removal powers and decision making." Defs.' MTD at 23. As explained below, however, the President has no such power to remove officials on discriminatory grounds that violate the Constitution. *See infra* Part II.A. And there is little reason to believe that the *McDonnell Douglas* test will not sufficiently filter out unmeritorious claims. Plaintiffs bringing race discrimination claims still must plead enough facts to allow for a "plausible inference that [they were] treated differently because of their race." *Joyner*, 140 F.4th at 530. Further, as the Supreme Court articulated in *Swierkiewicz*, courts can "very easily" remove unwarranted discrimination claims in later stages of litigation, because "[t]he provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective." 534 U.S. at 512-13 (quoting 5 Wright & Miller, Federal Practice and Procedure § 1202 (2d ed. 1990)). Finally, courts have been relying on the *McDonnell Douglas* standard to effectively filter employment discrimination claims for decades, without grave consequence, including in federal employee cases. *See Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999), *overruled on other grounds* by *Chambers v. D.C.*, 35 F.4th 870 (D.C. Cir. 2022) (listing

cases). Concern about the *McDonnell Douglas* standard opening the floodgates for litigation have been frequently voiced and yet rarely borne out.[5]

**2. Defendants' efforts to discount Mr. Primus's evidence of discrimination are unavailing.**

Because Defendants do not apply the *McDonnell Douglas* framework, very little of their motion bears on what a plaintiff must allege to plead a plausible comparator claim under that framework. They devote only one paragraph to addressing the adequacy of Mr. Primus's allegations comparing his removal to a similarly situated member of the STB, focusing on Mr. Primus's pre-STB career, improperly introducing allegations outside the FAC, in suggesting that Ms. Hedlund is not a comparator for Mr. Primus because Mr. Primus is more political. Defs.' MTD at 18. They also suggest that the President may have removed Mr. Primus because his term is a year longer than Ms. Hedlund, whose term expired on January 1, 2026. Defs.' MTD at 18. These arguments go to the second step of *McDonnell Douglas*—the employer's burden to identify "legitimate, nondiscriminatory reason[s] for the employee's rejection," *Ames*, 605 U.S. at 308–09 (quoting *McDonnell Douglas*, 411 U.S. at 802)—which does not come into play at the motion to dismiss stage. Defendants' only other response to the FAC's STB-specific allegations is that President Trump could not have discriminated against Mr. Primus because he appointed Mr. Primus in the first place. Defs.' MTD at 17. This clearly cannot preclude a discrimination claim outright because it would essentially immunize employers from race discrimination termination claims brought by any employees they hired; and whether it has any relevance as part of a defense is a question for a later stage in the case. Thus, Defendants' limited arguments relating to Mr.

[5] Defendants' hypothetical about U.S. Attorneys does little to advance their argument, not only because U.S. Attorneys from different districts are likely not viable comparators, *see Carey v. Fed. Express Corp.*, 519 F. App'x 772, 776 (3d Cir. 2013) (noting an employee working at a different regional office was likely an insufficient comparator), but also because Defendants provide no justification in law or logic for why the President would have to remove "*all* U.S. Attorneys at once" to avoid such claims. Defs.' MTD at 23 (emphasis added). The comparator test for employment discrimination claims requires no such approach.

Primus's comparator do nothing to diminish Mr. Primus's showing that Ms. Hedlund is similarly situated to him for the purposes of overcoming a motion to dismiss.

Defendants devote several pages, Defs.' MTD at 9–13, to addressing the FAC's allegations regarding the Trump Administration's disproportionate removal of Black independent agency board members compared to white independent agency board members. Defendants critique these allegations because they claim that "evidence of disparate outcomes, without more" rarely demonstrates discriminatory intent. *Id.* at 9–10. These allegations, however, provide substantial support to the inference that Mr. Primus was removed because of his race—they point to an administration consistently and disproportionately targeting people of color and vestiges of diversity. But Mr. Primus also does not rely on these allegations "without more." As discussed above, the FAC plausibly alleges that Mr. Primus was treated differently from other members of the STB based on his race and includes allegations specific to the STB and similarly situated STB members who were not removed—i.e., precisely the allegations required under *Joyner*. No more is required at this stage. The FAC's allegations regarding the disproportionate removal of Black members of independent agencies provide context to the STB-specific allegations and support the inference of intentional racial discrimination. In so far as additional evidence points to a "general culture of racial inequity," it serves only to push Mr. Primus's claim "farther over the plausibility threshold." *Joyner*, 140 F.4th at 532 (internal citation omitted). While additional evidence that goes beyond a prima facie showing is helpful for "strengthen[ing a] discrimination complaint," it is also "not required at the pleading stage." *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 622–23 (D.C. Cir. 2023) (quoting *Nanko Shipping*, 850 F.3d at 467).

Similarly, because Mr. Primus's claim relies on a comparator theory under the *McDonnell Douglas* disparate-treatment framework—not on a showing of statistical disparities—Defendants'

discussion of the statistical showings made in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), *see* Defs.' MTD at 10–12, 17, are irrelevant.[6]

Defendants also introduce allegations that President Trump has removed white independent agency commissioners and has appointed some Black officials in agencies other than the STB. Defs.' MTD at 12–13. These allegations are not germane in determining whether Mr. Primus has adequately pled a comparator employment discrimination claim. To the extent they are relevant, it would be at a later stage of the case in a potential effort to counter Plaintiffs' evidence regarding the disproportionate removal of Black officials outside of the STB.

The same holds true with respect to the FAC's other non-STB specific allegations, which Defendants characterize as a "constellation of discrete circumstantial facts." Defs.' MTD at 13. These include allegations regarding President Trump's hostility to diversity, equity, and inclusion initiatives; his firing of Black officials associated with DEI; the Trump Administration's emphasis on hiring white men, as reflected in materials produced by the Department of Labor; the Trump Administration's disproportionate firing of Black employees; and the miniscule percentage of Trump appointees that are Black. Defs.' MTD at 13–14. Defendants contend that these allegations should be disregarded because, "[u]ltimately, these facts are insufficient, even taken as true," to establish an intentional discrimination claim. Defs.' MTD at 14. But again, the FAC does not rely on those allegations alone. Mr. Primus plausibly alleges that he is Black and was treated differently from his similarly situated white colleagues on the STB, and those allegations are sufficient to survive a motion to dismiss.

---

[6] Even taken at face value, the Defendants' arguments about statistical proofs miss the mark. The *Gomillion* and *Yick Wo* tests are meant to assess racial discrimination claims that rely solely on statistical evidence for proof of intent, *see Arlington Heights*, 429 U.S. at 266 (noting the *Yick Wo/Gomillion* standard applies only where "impact alone" can prove discriminatory intent)—something Defendants' own case citations affirm, *see* Defs.' MTD at 12 n.5 (quoting *Alston v. City of Madison*, 853 F.3d 901, 908 (7th Cir. 2017), affirming that *Yick Wo* and *Gomillion* apply when "statistics alone" are "enough to prove" disparate treatment). But, again, Mr. Primus's claim does not rest on the disparities he highlights, which serve instead as one factor among many that push his already sufficient comparator claim "farther over the plausibility threshold." *See Joyner*, 140 F.4th at 532.

Defendants spend several pages arguing that President Trump's comments about removing diversity policies and programs across the federal government are immaterial since there are racially neutral explanations for the comments. Defs.' MTD at 14-16. But whether there is a racially neutral explanation for the President's comments misses the point—not only because it is an argument tailored to a later stage of litigation, not a motion to dismiss, but also because it misconstrues the way courts assess potentially discriminatory comments and circumstantial evidence. To "constitute indirect evidence" of racial discrimination, a "statement need not 'express bias on its face.'" *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 322 (D.D.C. 2018) (cleaned up) (quoting *Conn v. Am. Red Cross*, 149 F. Supp. 3d 136, 146-47 (D.D.C. 2016)). Instead, intent can be "*inferred* from the statement based on what was said and the surrounding circumstances." *Conn*, 149 F. Supp. 3d at 147. Thus, statements that could have a non-discriminatory meaning should still be considered by courts, in context and along with other relevant statements, as well as "all other evidence," to help "determine whether a plaintiff has met [their] burden." *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016). Mr. Primus does not lean the weight of his entire claim against President Trump's statements, as Defendants imply. But context here matters, and the cumulative impact of those statements, combined with all the other evidence of racial animus and targeted firings, once again, push his claim further over the plausibility threshold.

**3. Mr. Primus's claim would still succeed under the *Arlington Heights* framework.**

Finally, even if the *Arlington Heights* framework applied, the FAC would survive at the pleading stage. The non-exhaustive *Arlington Heights* factors include (1) "whether" the "impact of the official action . . . 'bears more heavily on one race than another,'" which "may provide an important starting point"; (2) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) the sequence of events leading to the decision; (4) procedural and substantive departures from the norm; and (5) the legislative and administrative history. *Arlington Heights*, 429 U.S. at 266–68 (quoting *Davis*, 426 U.S. at

242). Defendants make little attempt to apply the *Arlington Heights* factors to the allegations in this case—perhaps because, even under their preferred standard, Mr. Primus's claims are sufficient to survive a Motion to Dismiss.

Indeed, the allegations of the FAC in fact address several of the *Arlington Heights* factors, beginning with the important starting point that the President's decision had a racial impact. FAC ¶¶ 42–43. Additionally, the FAC alleges that Mr. Primus's removal was made in the context of the President having removed other Black officials and the administration having taken actions and made statements that could be viewed as disadvantageous to Black employees. FAC ¶¶ 45–56. Moreover, the FAC alleges that Mr. Primus's removal was both a substantive and procedural departure from the norm: Mr. Primus was the first STB member removed from the Board in its history and his removal contravened the STB statute. FAC ¶¶ 40, 44. These allegations are sufficient to state a claim for intentional discrimination at this stage under any applicable standard.

## II. Mr. Primus's Fifth Amendment claim is legally cognizable

Defendants' alternative argument, that Mr. Primus lacks a cognizable Fifth Amendment claim, asks this Court to declare that a President can violate the Constitution without any judicial review or accountability when that violation occurs in the exercise of the President's core constitutional powers. Such a rule cannot be, is not, and has never been, this country's law.

### A. The President's removal decisions can be reviewed by courts for compliance with the Constitution.

Defendants begin by arguing that removal decisions fall within the President's "conclusive and preclusive" authority and thus cannot be "reviewed by the courts" even to ensure compliance with the Constitution. Defs.' MTD at 24 (citing *Trump v. United States*, 603 U.S. 593, 620–21 (2024) (quoting *Myers v. United States*, 272 U.S. 52, 106 (1926))). Under this theory, any removal decision, no matter how discriminatory or otherwise unconstitutional, could never be the basis for a cognizable claim. This argument fails across multiple fronts.

The Supreme Court has repeatedly underscored that "[t]he President . . . does not 'stand exempt from the general provisions of the [C]onstitution,'" including those preserving individual

rights. *Trump v. Vance*, 591 U.S. 786, 795 (2020) (quoting *United States v. Burr*, 25 F. Cas. 30, 33–34 (C.C.D. Va. 1807) (No. 14,692d)). And the Court has long held that "when the President takes official action, [courts] ha[ve] the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *see Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("[T]he President's actions may . . . be reviewed for constitutionality."). This precept was reaffirmed by the Supreme Court's ruling in *Trump v. United States*, with the Court concluding that when a President exercises authority beyond the law, "courts may say so." 603 U.S. at 608.

This principle does not change when the President exercises a "conclusive and preclusive" power. "Conclusive and preclusive" powers, as Justice Jackson originally described them, are those that preclude "*Congress* from acting upon the subject." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring) (emphasis added). They mark a point on the constitutional equilibrium between Congress and the President, *id.*; *see Trump v. United States*, 603 U.S. at 607—not a sphere in which the President can exercise "authority without law," *id.* at 608 (quoting *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring). Courts thus can and do review exercises of core executive powers for compliance with the Constitution. In *Trump v. Hawaii*, the Supreme Court considered a constitutional challenge to a presidential proclamation imposing nationality-based entry restrictions—a policy that fell "well within executive authority"—that the plaintiffs claimed was motivated by invidious discrimination. 585 U.S. at 710. Although the Court concluded that the plaintiffs were not likely to succeed on the merits of their claim, it made clear that a President engaging in disparate treatment based on race violates the Constitution, even when exercising a core executive power. *Id.* (overruling *Korematsu v. United States*, 323 U.S. 214 (1944)). The Court stated for example that "the forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority," and "'has no place in law under the Constitution.'" *Id.* at 710 (quoting *Korematsu*, 323 U.S. at 248 (Jackson, J., dissenting)). Courts have similarly reviewed other exercises of "plenary" presidential powers, like the pardon power, and consistently

find that such acts are exempt from judicial review only insofar as their use "does not otherwise offend the Constitution." *See Schick v. Reed*, 419 U.S. 256, 266 (1974); *Rosemond v. Hudgins*, 92 F.4th 518, 525, 526 (4th Cir. 2024); *Andrews v. Warden*, 958 F.3d 1072, 1076 (11th Cir. 2020). Defendants cite no decision holding that the removal power stands alone and apart in this regard, and they offer no reason why it should.

*Slaughter* does nothing to change this foundational principle. In holding that "Congress [cannot] place any limits on the President's power to remove" officers exercising executive power, 146 S. Ct. at 2307, the Court readjusted the balance of powers between Congress and the President but did nothing to imply the President's removal power is exempt from limits imposed by the Constitution itself. To the contrary, citing seminal decisions enforcing limits on presidential power, the Court reaffirmed in *Slaughter* that "[the] President is not all powerful—not by any means," *id.* at 2310 (citing *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866); *Youngstown*, 343 U.S. 579; and *United States v. Nixon*, 418 U.S. 683 (1974)). And on the very same day as it decided *Slaughter*, the Court held in *Trump v. Cook* that where legally valid limits constrain the President's removal power, courts can review and remedy unlawful firings. *See* 146 S. Ct. 2234, 2250–51 (2026).

It is undeniable that the Constitution imposes one such enforceable limit. The Court in *Slaughter* relied heavily on the first Congress's debates on executive authority, when James Madison's view that removal is an exclusive presidential power won the day. 146 S. Ct. at 2296 (citing 1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834) (statement of Rep. Madison)). But as the Court explained, that debate and its resolution focused entirely on whether Congress should have any role in or control over the removal power. *Id.* at 2295-96. None of the competing camps suggested the removal power was unlimited by the Constitution itself. *Id.* To the contrary, even while pressing the strongest version of exclusive presidential control, Madison simultaneously urged Congress to pass the Bill of Rights because it was necessary not only to "circumscribe[]" the federal government's power but also to protect against "abuse" of the "discretionary powers" left to each branch. 1 Annals of Cong. 455 (1789) (Joseph Gales ed., 1834) (statement of Rep. Madison). "[T]he great object in view [in passing the Bill of Rights] is to limit and qualify the

powers of Government, by excepting out of the grant of power those cases in which the Government ought not to act, or to act only in a particular mode." *Id.* at 454 (statement of Rep. Madison). The *Slaughter* Court adopted Madison's view of the removal power as exclusive to the President. It did not, in doing so, reject Madison's equally foundational view that even exclusive powers are not unlimited ones. Defendants respond that because *Slaughter* found the removal power to be a "corollary of the Constitution's design," its exercise must lie beyond court review. *See* Defs.' MTD at 24 (quoting *Slaughter*, 146 S. Ct. at 2295). But a power that flows from the constitutional design is also bound by it. A Constitution that explicitly safeguards the free exercise of religion, for example, cannot be read at the same time, as Defendants would have it, to impliedly empower the President to remove all executive officers who practice Catholicism. The same is true of the Constitution's guarantee of equal protection.

Contrary to Defendants' suggestion, allowing judicial review of the President's exercise of core Article II powers for compliance with the Constitution would not lead to intolerable consequences in the context of the appointments power. Defs.' MTD at 24–26. According to Defendants, allowing courts to review a President's appointment of principal officers for race- and sex-based discrimination would mean that past Presidents' efforts to create diverse and representative cabinets would be subject to claims that they were "trampling the Bill of Rights in broad daylight." Defs.' MTD at 26. But the process of appointing officers is different from removing officers, and exercising the appointment power is far less likely to transgress constitutional limits. When the President removes an officer, he unilaterally takes adverse action against a specific person; and if that action is based on the removed officer's race, that would give rise to a constitutional violation. In contrast, the process of assembling a cabinet is fundamentally different. Even assuming that publicly promoting the goal of a diverse and representative executive branch could be relevant context for supporting a discrimination claim as Defendants suggest, Defs.' MTD at 26, those statements by themselves would not constitute unconstitutional discrimination in the absence of an adverse action being taken against a particular person or persons because of race. And the appointment context does not clearly lend itself to such

constitutional concerns unless (at a minimum) particular candidates could show that they would have instead been selected over other potential nominees but for their race. Defendants cite the uncontroversial propositions that people of all races and sexes are protected from intentional discrimination, *see* Defs.' MTD at 24–25 (citing *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023); *United States v. Virginia*, 518 U.S. 515, 531–34 (1996)), but those cases do not suggest that efforts to create diverse presidential cabinets, absent direct discrimination against particular individuals, violate the Fifth Amendment. And they certainly do not suggest that subjecting the exercise of the appointments power to constitutional review in the event unconstitutional discrimination did occur would be particularly problematic.

To the contrary, the implications of Defendants' argument are far more unsettling than Mr. Primus's. Defendants' view, if accepted, would imply that the President is immune from judicial review or accountability for any violation of constitutional rights committed through the exercise of any Article II power—a precept that not only contradicts the Supreme Court's own holdings that courts can intervene when the President violates individual rights, see *Hawaii*, 585 U.S. at 710, but also flouts the foundational ideal that no President is "above the law," *Nixon*, 418 U.S. at 715; *see Youngstown*, 343 U.S. at 646 (Jackson, J., concurring) ("No penance would ever expiate the sin against free government of holding that a President can escape control of executive powers by law through assuming his military role.").

**B. Courts can reasonably assess a President's intent in removal decisions.**

Defendants' concern that courts should be "wary" of inquiring into the President's intent when making a removal decision does not warrant the conclusion that the Constitution simply should not apply. Defs.' MTD at 27. In *Cook*, the Supreme Court expressly affirmed that courts have a role to play in assessing the validity of Presidential removals—even when that inquiry extends into the reasons or cause for the removal. *See Cook*, 146 S. Ct. at 2246–48. Defendants' argument seeks to give the President the very same "free hand" that *Cook* rejected. *Id.* at 2248.

Defendants' speculation about testimony being required from the President is premature. Defs.' MTD at 27. A plaintiff can prove motive through a range of circumstantial and direct evidence and is not required to show direct statements by the decisionmaker. *See Ames*, 605 U.S. at 306 (writing that *McDonnell Douglas* claims "rest on circumstantial evidence"); *Aikens*, 460 U.S. at 714 n.3 ("As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence. The trier of fact should consider all the evidence, giving it whatever weight and credence it deserves."). In *McCreary County v. ACLU of Kentucky*, for example, the Supreme Court, in reviewing a county's efforts to display the ten commandments in their courthouse, found that courts are capable of looking to "readily discoverable fact" and available context to discern why the government acted the way it did, without engaging in any "psychoanalysis of [the actor's] heart of hearts." 545 U.S. 844, 862, 866 (2005). Here, if permitted to proceed, Mr. Primus would initially seek only limited discovery, narrowly cabined to information relevant to his claims, such as interrogatories directed to the STB defendants seeking the reason for Mr. Primus's removal and any evidence of purported insufficiencies in his performance or misalignment with the President's policy goals.

What's more, Defendants themselves point to the very legal structure that would prevent discovery from improperly invading the interests and duties of the President: privilege. Defs.' MTD at 27. If discovery proceeds to the point where Mr. Primus's requests are met with assertions of privilege, this Court can assess executive privilege, as other courts have done, to ensure that discovery is properly limited. *Nixon*, 418 U.S. at 707 (concluding that while the "the legitimate needs of the judicial process may outweigh Presidential privilege," courts must "resolve those competing interests in a manner that preserves the essential functions of each branch"). Questions about the scope and details of specific discovery requests are better reserved for a later stage of litigation.

Defendants argue that judicial inquiries into the President's motives are improper, citing *Hawaii* and *Mullin v. Doe*, 146 S. Ct. 2121 (2026). Defs.' MTD at 27. But the Court was clear in its ruling in *Hawaii*, which assessed the propriety of relying on President Trump's public

statements to determine if he acted with animus in passing his "Muslim Ban," that even in the sensitive context of foreign affairs and national security, the Court could review the President's public statements—along with other circumstantial and extrinsic evidence—to determine if he had acted with impermissible animus. 585 U.S. at 704–05.

*Mullin* likewise does not foreclose inquiry into the President's intent. That case simply held that the plaintiffs were unlikely to succeed on their claim, on grounds that are readily distinguishable from this case. There, the plaintiffs brought an equal protection claim challenging the revocation of Temporary Protected Status (TPS) for Haitian nationals. The claim relied heavily on public statements by the President and the Secretary of Homeland Security denigrating Haiti and its people. *Mullin*, 146 S. Ct. at 2137–40. At the outset, in reversing a preliminary injunction, the Court emphasized the "important factor" that the case arose in "the immigration context." *Id.* at 2138. In that context, in which race, ethnicity, and policy are sometimes inextricably linked, the Court concluded that the President's and Secretary's public statements "in substance all expressed policy views that could rest on race-neutral justifications." *Id.* No such context is present here. Moreover, in *Mullin*'s procedural posture, it was appropriate for the Court, in assessing whether the plaintiffs had established a substantial likelihood of success on the merits warranting interim relief, to consider whether the termination of TPS status could be justified by race-neutral explanations. Indeed, the Court's decision rested largely on its finding that the defendants had "identif[ied] a strong, race-neutral explanation" and the plaintiffs were therefore unlikely to prove that race was a motivating factor. *Id.* at 2138–40. Here, in contrast, such an inquiry is improper at the motion-to-dismiss stage. *See supra* Part I.B.2. Moreover, in *Mullin*, there were no similarly situated comparators—*i.e.*, there was no predominantly white European nation with TPS designations that could be compared against the treatment of other TPS-designated nationalities, like Haitians. *Id.* at 2139–40. Here, in contrast, not only are there clear comparators to Mr. Primus, but the comparisons are damning: Mr. Primus was removed while his white counterparts were kept in place. Meanwhile, the majority of independent commission heads are white individuals while Black independent commission heads have been removed at a disproportionate rate. *See supra* at

4–5. Nothing in *Mullin* or *Hawaii* precludes judicial consideration of those circumstances as indicia of invidious discrimination.

**C. Courts, not the Senate, are the proper forum for reviewing removal decisions.**

Finally, Defendants cite no support for their assertion that the Senate provides the only proper forum for checking unconstitutional presidential removals. Defs.' MTD at 27–28. But their argument highlights the very difference between appointments and removals that makes court review essential. For while there is an explicit constitutional provision balancing the power of appointment between the President (who nominates) and the Senate (which confirms), U.S. Const. art. II, § 2, cl. 2, there is no constitutional provision regarding the removal power. The Senate cannot block removals the same way it can block appointments. *See Myers*, 272 U.S. at 107, 176 (finding law requiring Senate advice and consent prior to presidential removals unconstitutional). Instead, courts are the only body that can ensure the President exercises his removal powers within the bounds of constitutional limits. Courts are empowered, in a way that the Senate is not, to return improperly removed officials to their office through mandamus, injunctive relief, or the writ of quo warranto. *See Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023); *see also Delgado v. Chavez*, 140 U.S. 586, 590 (1891). "The law does not require" that "a court . . . [simply] wait, and perhaps award backpay later . . . if the court holds that [the President] broke the law" in removing someone. *Cook*, 146 S. Ct. at 2250. And it remains the sole province of the courts to authoritatively say "what the law is." *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The tool that Defendants claim the Senate does have—the ability to refuse to appoint a replacement for an improperly removed officer, Defs.' MTD at 27—does nothing to prevent an illegal removal. Our Constitution allows, and requires, more.

## CONCLUSION

For these reasons, Mr. Primus respectfully requests that the Court deny Defendants' Motion to Dismiss.

Dated: August 12, 2026

Respectfully submitted,

/s/ Ross Snyder
Catherine M.A. Carroll (D.C. Bar No. 497890)
Cynthia Liao (D.C. Bar No. 90036947)
Elena Goldstein (D.C. Bar No. 90034087)
Ross Snyder (D.C. Bar No. 90037922)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
rsnyder@democracyforward.org

Jon M. Greenbaum (D.C. Bar No. 489887)
**JUSTICE LEGAL STRATEGIES PLLC**
P.O. Box 27015
Washington, D.C. 20038
(202) 601-8678
jgreenbaum@justicels.com

*Counsel for Plaintiff*