**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROBERT E. PRIMUS, in his official capacity,<br><br>*Plaintiff*,<br><br>vs.<br><br>DONALD J. TRUMP, in his official capacity, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:25-cv-03521-DLF |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' SECOND MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ........................................................................................................ 2

I. Plaintiff fails to plausibly allege that he was removed because of race............................ 2

A. Plaintiff fails to engage with *Arlington Heights*, the governing analytical framework for Fifth Amendment equal protection claims. .................................. 3

B. The McDonnell Douglas framework does not apply to Fifth Amendment equal protection claims. .......................................................................... 4

C. Plaintiff Has Failed to Identify a Comparator...................................................... 9

II. Plaintiff's claim is not legally cognizable......................................................................... 10

A. Plaintiff's novel legal theory contravenes Supreme Court precedent.................. 10

B. Plaintiff's Contrary Arguments Are Unpersuasive.............................................. 11

CONCLUSION ........................................................................................................ 18

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Ames v. Ohio Dep't of Youth Servs.*,
605 U.S. 303 (2025) .......... 5, 14

*Andrews v. Warden*,
958 F.3d 1072 (11th Cir. 2020) .......... 12

*Ashcroft v. Iqbal*,
556 U.S. 662 .......... 3, 4

*Brown v. Sessoms*,
774 F.3d 1016 (D.C. Cir. 2014) .......... 9

*Camreta v. Greene*,
563 U.S. 692 (2011) .......... 7

*Carter v. Duncan-Huggins, Ltd.*,
727 F.2d 1225 (D.C. Cir. 1984) .......... 7-8

*Clinton v. Jones*,
520 U.S. 681 (1997) .......... 11

*Cones v. Shalala*,
199 F.3d 512 (D.C. Cir. 2000) .......... 5, 7

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) .......... 8

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 11

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
608 U.S. ----, 146 S. Ct. 1391 (2026) .......... 4

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006) .......... 5

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) .......... 17

*Jiggetts v. Cipullo*,
774 F. Supp. 3d 168 (D.D.C. 2025) .......... 5, 6-7

*Jo v District of Columbia*,
582 F. Supp. 2d 51 (D.D.C. 2008) .......... 7

*Joyner v. Morrison & Foerster LLP*,
140 F.4th 523 (D.C. Cir. 2025) .......... 5, 9, 14

*Kobell v. Suburban Lines, Inc.*,
731 F.2d 1076 (3d Cir. 1984) .......... 14

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ........................................................................................ *passim*

*Nanko Shipping, USA v. Alcoa, Inc.*,
850 F.3d 461 (D.C. Cir. 2017) ............................................................................. 9

*Rosemond v. Hudgins*,
92 F.4th 518 (4th Cir. 2024) ............................................................................... 12

*Schick v. Reed*,
419 U.S. 256 (1974) ........................................................................................... 12

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993) ............................................................................................. 7

*Stella v. Mineta*,
284 F.3d 135 (D.C. Cir. 2002) ............................................................................. 5

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........................................................................................... 12

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ......................................................................................... 6

*Trump v. Slaughter*,
No. 25-332, 609 U.S. ----, 2026 WL 1855612 (June 29, 2026) ........................................ 2, 10

*Trump v. United States*,
603 U.S. 593 (2024) ........................................................................................ *passim*

*Trump v. Vance*,
591 U.S. 786 (2020) ........................................................................................... 12

*United States v. Barrera-Vasquez*,
617 F. Supp. 3d 400 (E.D. Va. 2022) .................................................................... 8

*Vazquez–Rivera v. Figueroa*,
759 F.3d 44 (1st Cir. 2014) ............................................................................... 8-9

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ...................................................................................... 1, 3, 8

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................................................... 11

**CONSTITUTIONS**

U.S. Const. art. I, § 8, cl. 4 ................................................................................ 12

**STATUTES**

42 U.S.C. § 2000e-2(a)(1) ................................................................................... 14

42 U.S.C. § 2000e-16(c) ....................................................................................... 8

**OTHER AUTHORITIES**

Andrew Jackson & the Bank War, Andrew Jackson's Hermitage,
https://perma.cc/2EXK-TGT9 .......... 6

Roger B. Taney (1833-34), U.S. Dep't of the Treasury,
https://perma.cc/7FWL-E66P .......... 6

## INTRODUCTION

Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiff's Fifth Amendment race discrimination claim confirms the alarming contours of Plaintiff's novel legal theory that district courts can review and enjoin the President's removal of principal officers based on the President's subjective motivations. Plaintiff argues that to state a claim, he need only identify a single non-Black person who was not removed and who was similar to him in some respects. At that point, the burden would shift to the President to prove why he removed Plaintiff, presumably by testifying or producing sensitive and privileged evidence of his deliberations with his closest aides. Yet Plaintiff misconceives the relevant law. His claim is inadequately alleged as a matter of fact and fails as a matter of law.

Plaintiff has no real response to Defendants' showing that his constellation of weak statistical patterns and inapposite atmospheric allegations of the President's attitudes on race-related issues do not plausibly support the claim that the President removed Plaintiff because of his race. Instead, Plaintiff argues that the Court should borrow a burden-shifting framework adopted by the Supreme Court to interpret certain civil rights statutes in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and that under that standard, it is sufficient that he identifies one white person who was not removed and who is purportedly similar to him in some respects. But Plaintiff cites no case law applying *McDonnell Douglas* to a claim not brought under a civil rights statute that expressly confers a cause of action and broad remedies, but directly under the Constitution. Under the standard governing constitutional equal protection claims, a Plaintiff must prove (and plausibly allege at the pleading stage) that "invidious discriminatory purpose was a motivating factor" for the challenged action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Even if *McDonnell Douglas* applied, STB Member Karen Hedlund is

not an adequate comparator because she had significantly different qualifications and experience from Plaintiff.

Plaintiff's Opposition also underscores why the Court should not recognize Plaintiff's claim as legally cognizable. Plaintiff does not dispute that no Court has ever entertained an equal protection claim based on the President's removal of a principal officer nor does he dispute that the Supreme Court recently held that the President's removal of officers he appoints is a "conclusive and preclusive Presidential authority," which "may not be . . . reviewed by the courts." *Trump v. United States*, 603 U.S. 593, 620-21 (2024). Indeed, the Supreme Court in *Trump v. Slaughter,* No. 25-332, 609 U.S. ----, 2026 WL 1855612, at *8-*9 (U.S. June 29, 2026) further recognized this "inherent" and "unitary" "executive power" to appoint, oversee, control, and remove subordinate officers "at will" under the Constitution's Vesting Clause. Particularly given how little Plaintiff contends is required to state such a claim and shift the burden to the President, allowing claims such as Plaintiff's would give rise to extensive litigation over presidential removals, and perhaps even appointments, in which the President would be placed in the intolerable position of having either to produce privileged evidence of his own motivations or concede the merits of the claim. To be sure, Plaintiff can eventually ask the Supreme Court to hear his case and try to convince the Justices that they did not really mean it when they said that presidential removals of officers cannot be reviewed by the courts. But this Court should not open the floodgates to such litigation.

## ARGUMENT

### I. Plaintiff fails to plausibly allege that he was removed because of race.

Plaintiff all but ignores Defendants' arguments under *Arlington Heights*, the appropriate analytical framework for Fifth Amendment equal protection claims. Plaintiff instead asserts that his Fifth Amendment equal protection claim is governed under the burden-shifting analysis

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Not so. The *McDonnell Douglas* standard is a doctrine of statutory interpretation used to interpret statutes that provide a cause of action for employment discrimination challenges, such as Title VII, Section 1981, and the Age Discrimination in Employment Act. Plaintiff cites no cases applying *McDonnell Douglas* to a claim brought directly under the Fifth Amendment, let alone a claim against the President for removal of a principal officer.

Even if *McDonnell Douglas* did apply here, Defendants have shown that Plaintiff's "comparator," STB Member Karen Hedlund, is differently situated from Plaintiff. Moreover, Plaintiff's theory of Fifth Amendment equal protection vindication would be practically unworkable and would enable chaos throughout the government.

Accordingly, Plaintiff fails to state a claim under either framework.

**A. Plaintiff fails to engage with *Arlington Heights*, the governing analytical framework for Fifth Amendment equal protection claims.**

Under *Arlington Heights*, a plaintiff bringing an equal protection claim must prove (and plausibly allege at the pleading stage) that "invidious discriminatory purpose was a motivating factor" for the challenged action. *Vill. of Arlington Heights*, 429 U.S. at 266 (1977); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Where the claim is invidious discrimination in contravention of the . . . Fifth Amendment[], our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose."). In Defendants' Second Motion to Dismiss, Defendants showed that Plaintiff failed to meet this standard. Defs.' Second Mot. to Dismiss 9-19, ECF No. 23 ("MTD."). Plaintiff alleged no direct evidence, only tenuous atmospheric and circumstantial evidence that did not raise a plausible inference of intentional racial discrimination. *Id.* Because these allegations are patently insufficient to create a plausible inference of intentional discrimination, Plaintiff barely even attempts to respond. Rather, across

two paragraphs, he simply summarizes his allegations, and asserts without citation to any authority that they "are sufficient to state a claim for intentional discrimination at this stage under any applicable standard." Pl.'s Opp'n. to Defs.' Second Mot. to Dismiss, ECF No. 25 at 21 ("Opp'n"). That blithe dismissal of Plaintiff's pleading burden cannot be squared with well established federal pleading standards. "If the complaint 'pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 608 U.S. ----, 146 S. Ct. 1391, 1399 (2026) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Instead, to nudge a claim 'across the line from conceivable to plausible,' a plaintiff must plead facts that, if true, 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' and to rule out 'obvious alternative explanation[s]' for the defendant's conduct[.]" *Id.* (quoting *Iqbal*, 556 U.S. at 678 and *Twombly*, 550 U.S. at 567 (citations modified)).

As Plaintiff's argument that he plausibly pleads intentional discrimination is so weak, he instead focuses most of his argument on a novel legal theory that would let him bypass the constitutionally required *Arlington Heights* framework, needing only to allege the existence of a single comparator under *McDonnell Douglas*, a doctrine developed in a Title VII case and applied in cases involving other civil rights statutes. As shown below, Plaintiff is wrong.

**B. The McDonnell Douglas framework does not apply to Fifth Amendment equal protection claims.**

The *McDonnell Douglas* framework applies to Title VII and certain other civil rights statutes, but not to equal protection claims brought directly under the Fifth Amendment. In *McDonnell Douglas*, the Supreme Court considered "the proper order and nature of proof in actions under Title VII of the Civil Rights Act of 1964." 411 U.S. at 793-94. The Court developed the burden-shifting framework to make it easier for a Title VII plaintiff to make out a prima facie

case, given that "[t]he language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *Id.* at 800. Each of the other cases cited by Plaintiff that applies the *McDonnell Douglas* framework likewise involves either Title VII or another federal statute that expressly confers a cause of action on individuals for violations of their civil rights. *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025) (a Title VII case); *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523 (D.C. Cir. 2025) (a 42 U.S.C. § 1981 and Title VII case); *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) (a Title VII case); *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (a Title VII case); *Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000) (a Title VII case); and *Jiggetts v. Cipullo*, 774 F. Supp. 3d 168 (D.D.C. 2025) (a 42 U.S.C. § 1983 case). In sum, Plaintiff's cases merely support the proposition that the *McDonnell Douglas* framework is a doctrine of statutory interpretation that courts have developed to interpret certain civil rights statutes.

But Plaintiff does not sue under Title VII, Section 1981, or any other civil rights statute. Rather, he brings a claim directly under the equal protection component of the Fifth Amendment. Plaintiff has not cited to, and Defendants have been unable to locate, any case in which the *McDonnell Douglas* analysis was used for a naked Fifth Amendment claim. Plaintiff acknowledges as much, agreeing that he is not protected by any federal employment statute or Title VII and so must bring an employment discrimination suit under the Fifth Amendment given his unique status as a Senate-confirmed presidential appointee. Opp'n at 14. But the fact that Congress chose not to enact a statute giving principal officers the rights and remedies to challenge employment discrimination that many employees enjoy does not suggest that the Court should import doctrines from federal employment statutes into the Fifth Amendment and apply them to principal officers.

Rather, the relationship between a President and a principal officer is fundamentally different from a typical employment relationship. Principal officers are chosen by the President "to assist [him] in discharging the duties of his trust." *Trump v. Slaughter*, 146 S. Ct. 2283, 2294 (2026) (30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)). When a President removes a principal officer, he is implementing the Constitution's "hierarchy," under which "the buck stops" with the President, and "[t]o remain accountable to the President, those officers must be removable by the President." *Id.* at 2293.

Consider, for example, President Andrew Jackson who wished to dissolve the nation's second national bank in favor of state banks. Andrew Jackson & the Bank War, Andrew Jackson's Hermitage, https://perma.cc/2EXK-TGT9. It became a main issue of Jackson's 1832 reelection campaign, which he won. *Id.* Jackson ordered Secretary of the Treasury William J. Duane to drain funds from the bank, which Duane refused to do. Roger B. Taney (1833-34), U.S. Dep't of the Treasury, https://perma.cc/7FWL-E66P. Jackson removed Duane when Attorney General Roger Taney agreed to be appointed as treasury secretary to carry out the policy. *Id.* Jackson's conduct was tantamount to policy direction not employment termination. While not all appointments and removals coincide with high-profile policy goals, determining who shares in the President's executive power—with the authority to implement wide-reaching policies often affecting millions of Americans—is ultimately a policy judgment made by the President; thus, *Arlington Heights* would be the appropriate analytical framework under which to examine such an appointment or removal, if justiciable at all.

Plaintiff likewise oversimplifies *Jiggetts* as a "case[ ] brought under the Fifth Amendment." Opp'n. at 15. *Jiggetts* involved a Fifth Amendment claim brought under Section 1983, which the opinion acknowledges. *Jiggetts*, 774 F. Supp. 3d 185-86 ("To prevail on a Section 1983 claim, a

plaintiff must first establish a predicate violation of her constitutional rights . . . . Jiggetts brings three constitutional claims. . . [including] under the Fifth Amendment. . . ."). Moreover, *Jiggetts*, which is not binding as a district court case, *see Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011), was also likely wrongly decided. The *Jiggetts* court does not analyze whether *McDonnell Douglas* is the correct framework for a Section 1983 claim based on equal protection; instead, it relies on a series of cases, apparently originating from *Jo v. District of Columbia*, 582 F. Supp. 2d 51, 60-61 (D.D.C. 2008), in which each subsequent court presumed *McDonnell Douglas* applied to Section 1983 claims. Yet the *Jo* court fails to articulate reasoning for *McDonnell Douglas*'s application to Section 1983. Instead, it relies on a Title VII case, *Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000), as justification for *McDonnell Douglas*'s application to Section 1983 claims.[1] Even still, *Jiggetts* applied *McDonnell Douglas* to claims involving the removal of low-level municipal District of Columbia employees, a context that more closely resembles an ordinary Title VII case. *Jiggetts* provides no support for applying *McDonnell Douglas* to the President's removal of a principal officer.

The *McDonnell Douglas* framework is a pragmatic doctrine, meant to augment the remedial force of civil rights statutes. Indeed, the *McDonnell Douglas* analysis began in a Title VII case based on the broad remedial "purpose of Congress" in enacting Title VII, *McDonnell Douglas Corp.*, 411 U.S. at 800, and has been "borrowed" for other civil rights statutes that provide broad remedies for civil rights violations, *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1232 (D.C.

[1] The Supreme Court has previously "assume[d]" that *McDonnell Douglas* could apply to Section 1983 when the issue was not disputed in a Title VII case, but it did not address that question on the merits as there was no briefing on the subject. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993). Also, *St. Mary's* involved a Section 1983 claim based on a state's alleged violation of Title VII, *see id.* at 505, so it provides no support for applying *McDonnell Douglas* to a Section 1983 claim based on the Fifth Amendment.

Cir. 1984) (application to Section 1981). That pragmatic interpretation of civil rights statutes finds no doctrinal basis in the Fifth Amendment's equal protection clause.

As explained above, for equal protection claims, the Supreme Court provided the governing framework in *Arlington Heights*. "Proof of racially discriminatory intent or purpose is *required* to show a violation of the Equal Protection Clause," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (emphasis added), and whether racially discriminatory intent or purpose is present "*demands a sensitive inquiry* into such circumstantial and direct evidence of intent as may be available." *Id.* (emphasis added). The Supreme Court carefully laid out the factors relevant to this "sensitive inquiry." *Id.* at 265-68. Plaintiff cannot now substitute his preferred test for a constitutionally required one articulated by the Supreme Court. The *Arlington Heights* framework has persisted since 1977, and courts continue to apply it to Fifth Amendment equal protection claims in criminal and civil cases alike. *See*, *e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 34 (2020) (applying *Arlington Heights* framework to DACA recission); *United States v. Barrera-Vasquez*, 617 F. Supp. 3d 400, 407 (E.D. Va. 2022) (applying *Arlington Heights* framework to criminal immigration law). Plaintiff fails to justify why it must be uniquely discarded in cases alleging invidious employment discrimination.

Plaintiff brought a Fifth Amendment claim, not a Title VII claim, but seeks remedies regularly sought under Title VII. Title VII sets out its own requirements for challenging invidious employment discrimination in federal employment, including an exhaustion requirement, which would require a prospective plaintiff to file an equal employment opportunity complaint with the employing agency and wait until the final disposition of that complaint. 42 U.S.C. § 2000e-16(c). "This exhaustion requirement is no small matter; it 'is a condition to the waiver of sovereign immunity' and thus 'must be strictly construed.'" *Vazquez–Rivera v. Figueroa*, 759 F.3d 44, 47–

48 (1st Cir. 2014) (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990)). Plaintiff seeks to bypass these jurisdictional requirements with his naked Fifth Amendment claim but nonetheless argues the *McDonnell Douglas* Title VII analysis should still apply. This would obviate the need for Title VII in disparate treatment federal employment cases and would create a back door to evade the jurisdictional and procedural requirements Title VII has long imposed. Plaintiff cannot have his cake and eat it, too.

**C. Plaintiff Has Failed to Identify a Comparator**

Even if *McDonnell Douglas* and *Joyner* applied, Plaintiff has not produced a sufficient "comparator" for the analysis. *Joyner* states that "courts must draw on their 'judicial experience and common sense' in determining whether" a plaintiff has identified an adequate "comparator." *Joyner*, 140 F.4th at 530. While a comparator's circumstances need not be "'nearly identical' to the plaintiff's in 'all relevant aspects,' they must be "'similarly situated' in some meaningful respect." *Id.* at 531. Courts have required a comparator to do more than merely occupy the same role. For example, in *Brown v. Sessoms*, 774 F.3d 1016 (D.C. Cir. 2014), a professor sued her employer for discrimination after she was denied tenure for failing to satisfy a requirement to publish three articles. *Sessoms*, 774 F.3d at 1019. She successfully identified a tenured comparator who had written no articles and showed "equivalent qualifications" to that professor "with regard to teaching and service." *Id.* at 1023. Notably, in *Sessoms*, the plaintiff and her comparator had a similar position and similar relevant qualifications.

Here, Plaintiff and Ms. Hedlund, Plaintiff's alleged comparator, shared the same role, but their qualifications greatly diverge. *See* MTD at 18. Plaintiff attempts to bridge this gap by arguing they are both Democrats, but *Joyner* requires more. Indeed, courts have repeatedly looked to similar or identical qualifications before identifying a comparator. *See*, *e.g.*, *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461 (D.C. Cir. 2017). Accordingly, even if *McDonnell Douglas* applied,

Plaintiff's qualifications and role are sufficiently different from Ms. Hedlund's at this stage of the *McDonnell Douglas* and *Joyner* analyses. Thus, Plaintiff has failed to demonstrate that Ms. Hedlund is a comparator.

**II. Plaintiff's claim is not legally cognizable.**

**A. Plaintiff's novel legal theory contravenes Supreme Court precedent.**

Even if Plaintiff had adequately alleged his Fifth Amendment claim as a factual matter, that claim would not be legally cognizable. *See* MTD at 23-28. Plaintiff cannot dispute two key points from Defendants' Second Motion to Dismiss. First, no court has ever held that the President's removal of a principal officer violated the equal protection component of the Fifth Amendment or even entertained such a claim. MTD at 24. Second, the Supreme Court recently held that "the President's power to remove executive officers of the United States whom he has appointed" is a "conclusive and preclusive Presidential authority," which "may not be regulated by Congress *or reviewed by the courts*." *Trump v. United States*, 603 U.S. 593, 620-21 (2024) (quoting *Myers v. United States*, 272 U.S. 52, 106 (1926)) (emphasis added). *Id.* Indeed, "[o]nly if the President's deputies were removable at will would they truly be subordinate to the sole executive magistrate." *Slaughter,* WL 1855612 at *9 (citation modified). "For another, the power to remove at will was a necessary corollary of the Constitution's design." *Id.*

Plaintiff, of course, seeks to have the President's removal of a presidentially appointed principal officer reviewed by a court. That Plaintiff's legal theory lacks precedent and contravenes guidance is alone reason enough to reject it. The Framers entrusted the Senate, not the federal courts, with judging the President's selection of principal officers. And if courts could force the President to retain subordinate officers he did not trust, "the unity of the Executive Branch would be destroyed[.]" *Id.* (citation modified).

**B. Plaintiff's Contrary Arguments Are Unpersuasive**

**1.** None of Plaintiff's contrary arguments would justify this Court taking the extraordinary step of defying clear and recent Supreme Court precedent to recognize a novel legal claim. Plaintiff resorts to mischaracterizing Defendants' position as stating "that the President is immune from judicial review or accountability for any violation of constitutional rights committed through the exercise of any Article II power." Opp'n at 25. Not so. Defendants' position is far more modest, that this Court should adhere to the Supreme Court's holding that the President's exercise of this particular "conclusive and preclusive Presidential authority . . . may not be . . . reviewed by the courts." *Trump v. United States*, 603 U.S. at 620-21. Whether other Presidential actions not before the Court would give rise to reviewable constitutional claims would present distinct questions and are not at issue here.

For similar reasons, Plaintiff's citation of cases that stand for the general proposition that some presidential actions give rise to viable legal or constitutional claims does not establish that this action is reviewable under the Fifth Amendment. For example, *Clinton v. Jones*, 520 U.S. 681, 703 (1997), and *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992), cite *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), for the proposition that courts can review presidential actions for lawfulness or constitutionality. Yet in *Youngstown*, Justice Robert Jackson famously explained in concurrence that the President's seizure of steel mills could be enjoined as unlawful because it violated federal statutes and was not within the President's conclusive and preclusive authority. *See Youngstown*, 343 U.S. at 637-47 (Jackson, J., concurring). *Youngstown* and its progeny provide no support for the proposition that a court can review the President's removal of a principal officer for race discrimination. To the contrary, *Trump v. United States* relied on Justice Jackson's *Youngstown* concurrence for its framework regarding "conclusive and preclusive" presidential authority, *see Trump v. United States*, 603 U.S. at 607 (quoting *Youngstown*, 343 U.S.

at 585 (Jackson, J., concurring)), which it applied in holding that the President's removal of officers "may not be . . . reviewed by the courts," *id.* at 621.

Other cases cited by Plaintiff are also far afield. *Trump v. Vance*, 591 U.S. 786 (2020), did not involve judicial review of a presidential action. Rather, it concerned requests for the President to produce documents or testify when the President has evidence that is relevant to a criminal investigation or case. *Id.* at 795. *Trump v. Hawaii*, 585 U.S. 667, 710 (2018), involved a presidential proclamation limiting entry of certain classes of immigrants. Plaintiff claims that *Hawaii* involved "the President exercis[ing] a 'conclusive and preclusive' power," Opp'n 19, but that is wrong. Immigration is an area within Congress's authority to legislate. *See*, *e.g.*, U.S. Const. art. I, § 8, cl. 4. In *Hawaii*, President Trump invoked a specific statutory delegation from Congress to the President, rather than relying on conclusive and preclusive presidential authority. *See Hawaii*, 585 U.S. at 674-75.

Plaintiff also cites a case concluding that when a presidential pardon or commutation includes "the attachment of [a] condition," a court can review whether that condition "otherwise offend[s] the Constitution." *Schick v. Reed*, 419 U.S. 256, 266 (1974); *see also id.* at 267 (concluding that the condition at issue did not offend the Constitution).[2] Yet that hardly suggests that a pardon would be reviewable for racial discrimination under the Fifth Amendment. If that were true, then a convict whose pardon application was denied could bring a lawsuit claiming that the pardon was denied because of race, citing (much like Plaintiff does here) alleged comparators who received a pardon and statistical data about alleged racial patterns in the President's pardons

---

[2] Two other cases cited by Plaintiff briefly cite *Schick* and suggest in dicta that acts of clemency may transgress some other constitutional limitation, before rejecting any such claim in those particular cases. *See Andrews v. Warden*, 958 F.3d 1072, 1076 (11th Cir. 2020); *Rosemond v. Hudgins*, 92 F.4th 518, 525-26 (4th Cir. 2024).

to try to get past a motion to dismiss and open the doors to discovery about the President's pardon decisions. That has never been the law.

In sum, Plaintiff's cases establish the unremarkable proposition that some constitutional claims can be brought to challenge some presidential actions. But even if this Court had the authority to disregard Supreme Court precedent, Plaintiff's inapposite cases cast no doubt on the Supreme Court's holding that the President's removal of principal officers "may not be . . . reviewed by the courts." *Trump v. United States*, 603 U.S. at 621.

**2.** As Defendants explained, allowing courts to review removals of principal officers to determine whether the President considered race would have alarming consequences. MTD at 24. Plaintiff's efforts to minimize those consequences are unpersuasive. Instead, his arguments validate and exacerbate those consequences.

Defendants explained that the logic of Plaintiff's position that removals of principal officers are reviewable for racial discrimination would extend equally to appointments of principal officers, yet most recent Presidents have proudly acknowledged considering race and sex when choosing principal officers. MTD at 25-26. Plaintiff essentially agrees that Presidents have considered race and sex in appointments, *see* Opp'n at 24 (citing "past Presidents' efforts to create diverse and representative cabinets"), yet they argue that "exercising the appointment power is far less likely to transgress constitutional limits" than the removal power, because removal involves "tak[ing] adverse action against a specific person" rather than "choosing one nominee from a pool of potential candidates," *id.* at 24.

Plaintiff's purported distinction between removals and appointments cannot be squared with his argument that courts handling equal protection claims involving principal officers should apply principles drawn from case law applying Title VII and other employment discrimination

statutes. *See* Opp'n at 12-17 (arguing that the Court should apply standards from *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) (Title VII), *Ames v. Department of Ohio Youth Services*, 605 U.S. 303 (2025) (Title VII), and *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523 (D.C. Cir. 2025) (Title VII and 42 U.S.C. § 1981)). Those employment discrimination statutes make discrimination on the basis of race (or other protected grounds) just as unlawful in the context of hiring as in the context of firing. *See*, *e.g.*, 42 U.S.C. § 2000e-2(a)(1) (making it unlawful to "refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin"); *cf. Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1086 (3d Cir. 1984) (explaining, in an unfair labor practice case, that "[p]osting a sign . . . that reads 'No Blacks Need Apply'" would constitute racial discrimination).

Even if it were possible to cordon off appointments from the ambit of Plaintiff's legal theory, the consequences as to removal are magnified by Plaintiff's position that to survive a motion to dismiss, a plaintiff need only allege a single comparator of a different race who is similarly positioned "in at least some relevant respects." Opp'n at 1 (quoting *Joyner*, 140 F.4th at 531). And in Plaintiff's view, the mere fact that a person of a different race with a similar position (and perhaps of the same party) was not removed is sufficient.[3] Many ordinary presidential removals could meet this standard. For example, each of the 93 U.S. Attorneys have similar positions leading one of the U.S. Attorney's Offices throughout the country. At any given time, there will likely be U.S. Attorneys of several different races. If Plaintiff is correct, the President could never remove a U.S. Attorney without giving rise to a race discrimination claim that would

[3] *See id.* ("The FAC here alleges there is such a comparator, fellow STB member Karen J. Hedlund, who is white and was not removed. Mr. Primus and his comparator were appointed under the same statutory process, their duties as STB members were the same, and they are both Democrats.").

survive a motion to dismiss (unless he removed all U.S. Attorneys at once), because there would always be at least one other U.S. Attorney of a different race who was not removed.

Likewise, Plaintiff's theory could even hinder a President's ability to remove Cabinet members. Because each Cabinet member leads a department of the Executive Branch, Cabinet members could arguably be considered similarly positioned to each other in at least some relevant respects, if that standard is not construed strictly. If so, then a President with a multiracial Cabinet (such as President Trump and every other recent President) could not remove a single Cabinet member without giving rise to a claim of race discrimination that would survive a motion to dismiss, unless the President removed the entire Cabinet.

Plaintiff might respond that even if these hypothetical claims could survive a motion to dismiss, the government can defeat them if they lack merit. But even allowing such cases to advance to discovery would create immense difficulties both for judges and for the Executive Branch, and Plaintiff's efforts to minimize these consequences are unpersuasive.

Under Plaintiff's legal theory, race discrimination claims by principal officers will turn on the President's subjective motivations when making his most important personnel decisions, specifically whether the President had a "nondiscriminatory reason" for removing a principal officer, and whether that reason was "pretext." Opp'n at 10 (citations and quotations omitted). Such claims would place intrusive discovery demands on the Executive Branch and place district courts in the untenable position of trying to divine the contents of the President's mind. It is easy to see how such claims would encourage plaintiffs to seek discovery of the President or his closest aides, who are generally the only people who might have knowledge of the President's motivations when deciding who should run Executive Branch agencies. Not to worry, says Plaintiff, because he "*would initially* seek only limited discovery." Opp'n at 26 (emphasis added). In other words,

the most aggressive requests would not be in the first tranche of discovery but could be in the second tranche. That is cold comfort.

Plaintiff also states that if and when he seeks discovery of the President's internal deliberations, this Court can address it by resolving claims of executive privilege. Notably, he does not acknowledge that such evidence would be privileged. Rather, he envisions that he would make "requests" for information regarding the President's deliberations, those requests would be "met with assertions of privilege," and then he would oppose the President's assertion of privilege, leaving it to "this Court" to resolve such disputes. Opp'n at 26. Yet the fact that this category of claim, challenging the President's removal of principal officers based on his subjective motivations, would inevitably ensnare courts in thorny executive privilege disputes underscores why this Court should not be the first to recognize such a novel claim.

Furthermore, Plaintiff's legal theory would place Presidents in the intolerable position of needing to produce evidence subject to executive privilege to mount a defense. In Plaintiff's view, he must only meet a "prima facie burden" that "is not onerous," by showing that at least one white person who was similarly positioned in some respects was not removed. Opp'n at 8-9. At that point, "the burden then shifts" to the President "to articulate some legitimate, nondiscriminatory reason" for removing Plaintiffs. *Id.* at 9. That is, in Plaintiff's view, the President will have a burden to produce evidence showing why he removed Plaintiff, and if the President does not meet that burden, Plaintiff's claim will necessarily succeed. But where a claim turns on the President's removal of a principal officer, it is difficult to imagine what other evidence of the President's reasons would exist besides the President's own testimony or evidence of the President's communications with his aides. For the President to provide testimony would be an enormous burden (even if he did so by declaration), especially since a plaintiff would undoubtedly argue that

he should be allowed to depose or cross-examine the President regarding his testimony. And evidence of the President's communications with aides about important personnel decisions would surely be covered by executive privilege.[4] The Court should not endorse a novel legal theory that would place Presidents in the untenable position of needing to testify or waive executive privilege over their most sensitive personnel deliberations to defend against equal protection claims.

**3.** As Defendants argued, the Framers designed the Constitution to place the political check of Senate confirmation, rather than a judicial check, on the President's selection of principal officers. MTD at 27. Plaintiff counters by arguing that because Senate confirmation applies only to appointments, "courts are the only body that can ensure the President exercises his removal powers within the bounds of constitutional limits." Opp'n at 28. Yet this argument again runs afoul of the Supreme Court's holding that "the President's power to remove 'executive officers of the United States whom he has appointed' may not be regulated by Congress or reviewed by the courts." *Trump v. United States*, 603 U.S. at 621 (quoting *Myers*, 272 U.S. at 106). But the Supreme Court's recognition that neither Congress nor the courts *directly* check presidential removals is tempered by the fact that a President's need to obtain Senate confirmation of a replacement for a removed officer *indirectly* serves as a political check on the President's removals of executive officers. Although Plaintiff is correct that the Senate's "ability to refuse to appoint a replacement" does not "prevent" a President's removal, Opp'n at 28, as Alexander Hamilton recognized, the Senate confirmation requirement nonetheless "restrain[s]" the President in removing officers based on "the apprehension that a discountenance of the Senate might frustrate the attempt [to

[4] *See, e.g.*, *In re Sealed Case*, 121 F.3d 729, 743 (D.C. Cir. 1997) (explaining that there is "a presumptive privilege for Presidential communications," which is "necessary to guarantee the candor of presidential advisers and to provide a President and those who assist him . . . with freedom to explore alternatives in the process of shaping policies and making decisions") (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)).

appoint a replacement], and bring some degree of discredit upon himself." The Federalist No. 77, at 459 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

## CONCLUSION

The Court should grant Defendants' Motion and dismiss Count II of the Amended Complaint for failure to state a claim.

Dated: August 26, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

/s/ *Jordan A. Hulseberg*
JORDAN A. HULSEBERG (DC Bar No. 90033542)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 598-3856
Email: Jordan.A.Hulseberg2@usdoj.gov

*Counsel for United States*